**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

| | |
|---|---|
| _____ )  | |
| CENTER FOR BIOLOGICAL DIVERSITY; ) | |
| MANASOTA-88, INC; PEOPLE FOR ) | |
| PROTECTING PEACE RIVER; and ) | |
| SUNCOAST WATERKEEPER, ) | |
| ) | |
| *Plaintiffs,* ) | Civil No: 8:17-cv-00618-SDM-MAP |
| ) | |
| v. ) | |
| ) | |
| U.S. ARMY CORPS OF ENGINEERS; ) | |
| LT. GEN. TODD T. SEMONITE, in his ) | |
| official capacity as Commanding General and ) | |
| Chief of Engineers of the U.S. Army Corps of ) | |
| Engineers; COL. JASON A. KIRK, in his ) | |
| official capacity as District Commander of the ) | |
| U.S. Army Corps of Engineers; U.S. ) | |
| DEPARTMENT OF THE INTERIOR; ) | |
| RYAN ZINKE, in his official capacity as ) | |
| Secretary of the U.S. Department of Interior; ) | |
| U.S. FISH AND WILDLIFE SERVICE; and ) | |
| JIM KURTH, in his official capacity as ) | |
| Acting Director of U.S. Fish and Wildlife ) | |
| Service, ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

**I. INTRODUCTION**

1.     The Center for Biological Diversity; ManaSota-88, Inc.; People for Protecting

Peace River; and Suncoast Waterkeeper (collectively, Plaintiffs) challenge two related

actions by the U.S. Army Corps of Engineers (Corps) and the U.S. Fish & Wildlife Service (Service): (1) the decision to grant a 20-year Clean Water Act Section 404 permit for the South Pasture Extension Mine, permit number SAJ-1993-01395,[1] which would strip mine 7,513 acres in the Peace River watershed for phosphate; and (2) the decision to rely on an incomplete and unlawfully insufficient National Environmental Policy Act (NEPA) analysis to support the South Pasture Extension Mine permit as well as three other proposed phosphate strip mining permits, which together cover more than 50,000 total acres of vital ecosystems and watersheds in an area of central Florida known as Bone Valley.  Plaintiffs contend the above referenced actions and decisions are in violation of the Clean Water Act, Endangered Species Act (ESA), NEPA, and the Administrative Procedure Act (APA).

2.      Florida's rich natural heritage is steeped in rural locales, grassy prairies, lush wetlands, abundant forests, and diverse wildlife.  Generations of panthers have prowled the lands of central Florida.  Wood storks nest and fish in the area's rich, ephemeral wetlands.  Eastern indigo snakes travel hundreds of miles over the sandy soils of the pine uplands to find their mates, resting periodically in protective gopher tortoise burrows.  And people have witnessed it all, living in relative harmony with the land and seeking comfort in the bounty of central Florida's clean water, rich soil, and fresh air.

---

1 This permit, including its application, is or has also been known as SAJ-1993-01395, SAJ-1993-01395 (SP-JPF), and SAJ-1993-01395 (IP-JPF), *hereinafter* SAJ-1993-01395.

3.      Industrial phosphate mining practices squander this heritage by degrading and destroying huge swaths of life-giving watersheds, uprooting precious habitat, and displacing species.  These practices rely on technologies that strip away and disfigure the land and its water systems only to replace them many years later with an artificial veneer that, while perhaps superficially convincing, is functionally deficient.  Once destroyed, the complex natural functions of these lands and waters are forever lost, and the communities and wildlife that define this region may never return.

4.      Indeed, as the phosphate industry's record in Florida lays bare, phosphate mining comes at a heavy cost to local communities, imperiled species, and the ecosystems on which they rely.

5.      Environmental statutes such as the Clean Water Act, NEPA, and the ESA are designed to support early, comprehensive planning and environmental review of federal actions.  These laws are intended to guarantee thoughtful consideration by the government, private applicants, and the public of all federal activities *prior to approval* so those actions will not irretrievably harm the environment for this or future generations.

6.      The Corps and Service have a solemn obligation to uphold and give meaning to these laws.  When deciding whether to approve phosphate mining activities in jurisdictional waterways, Congress and the public trust demand that the Corps and Service meaningfully comply with the law by observing statutory and regulatory conditions and rigorously analyzing environmental impacts.  These efforts are not only legally mandatory but are also indispensable to protecting Florida's dwindling natural heritage and environment.

7.     Yet the Corps and Service have failed to fulfill these key directives in approving strip-mining for phosphate across more than 7,000 acres in the Peace River watershed, and by conveying their intention to continue relying on a substantively and procedurally inadequate area-wide NEPA review to approve the strip-mining of more than 40,000 additional acres of vital ecosystems and watersheds in Bone Valley.

8.     As a result of the Corps' and Service's unlawful actions, Bone Valley and its residents, wildlife, and downstream neighbors risk permanent injury, including endangerment to the public's health, safety, and welfare; imperilment of endangered and threatened species; and forfeiture of long-term, productive use of these lands and the continued vitality of the environment and communities.

9.     For the reasons described below, Plaintiffs request that the Court: declare that the Corps' issuance of Clean Water Act permit number SAJ-1993-01395is in violation of the Clean Water Act, NEPA, the ESA, and the APA; order the Corps to rescind Clean Water Act permit number SAJ-1993-01395; order the Service to withdraw the biological opinion and rescind its incidental take statement; and enjoin the Corps from authorizing any further action under the permit until the Corps lawfully complies with the statutory and regulatory demands of the Clean Water Act, NEPA, the ESA, and the APA.

## II. PARTIES

10.    Plaintiff Center for Biological Diversity (Center) is a non-profit 501(c)(3) organization with more than 52,000 active members across the country, including in Bone Valley.  The Center's Florida office is in St. Petersburg, Florida.  The Center's mission is to protect and conserve endangered species and their habitats.  Pursuant to that

mission, the Center advocates against unsustainable mining practices and for sustainable agricultural solutions.

11.     The Center has members who live in or visit counties impacted by phosphate mining and fertilizer production in Florida, including Charlotte, DeSoto, Hardee, Hillsborough, Manatee, Polk, and Sarasota counties.  The Center and its members are concerned with the conservation of imperiled species impacted by phosphate mining, including the wood stork, Audubon's crested caracara, and eastern indigo snake, and the effective implementation of the ESA.

12.     The Center has members who have visited areas where these species are known to occur.  The Center's members use these areas for observation of these species and other wildlife, research, nature photography, aesthetic enjoyment, recreation, education, and other activities.  The Center's members derive professional, aesthetic, spiritual, recreational, economic, informational, and educational benefits from these species and their habitat.  These members have concrete plans to continue visiting and recreating in areas where they can observe these species and their habitat.

13.     The Center and its members' interests are adversely affected by the Corps' and Service's failure to comply with the ESA and other relevant federal environmental laws like the Clean Water Act and NEPA.  The agency's inactions are likely harming the prospects of recovery for these imperiled species and may be jeopardizing their ability to survive.

14.     The Center and its members also have a procedural interest in seeing the Corps and Service comply with their legal obligations, and they suffer procedural injury from

the agencies' failure to do so.

15.     Unless the requested relief is granted, the Center's interests and the interests of its members will continue to be adversely affected and injured by the agencies' failure to protect these species from jeopardy.  The injuries described above are actual, concrete injuries presently suffered by the Center and its members, and the injuries will continue to occur unless this Court grants the requested relief.

16.     Plaintiff ManaSota-88, Inc. (ManaSota-88) is a public-interest conservation and environmental protection organization, a Florida not-for-profit corporation.  The corporate purposes of ManaSota-88 include the protection and preservation of water quality and wildlife habitat in Manatee and Sarasota counties, both of which will be adversely affected by the challenged mining activities in Bone Valley.

17.     ManaSota-88 and its members will be substantially and adversely affected by the conditions and activities that will result if the proposed phosphate mining actions move forward, including water pollution, degradation of the quality of surface and ground waters, and long-term degradation and destruction of natural habitat for wildlife, which members of ManaSota-88 enjoy and value observing.  These impacts will have a substantial and adverse effect on the quality of life of ManaSota-88's members.

18.     Phosphate mining is likely to impair, pollute, and otherwise injure Florida's natural resources, directly and cumulatively, which will significantly injure ManaSota-88 and its members.

19.     ManaSota-88's members will be negatively impacted, in-part, because the removal of native vegetation and wetland species through phosphate mining practices will harm their aesthetic enjoyment of the native plant and animal life.

20.     This loss of flora and fauna will negatively affect ManaSota-88's members' enjoyment of birding and general wildlife observation.  In fact, the loss of flora and fauna from phosphate mining has already negatively affected ManaSota-88 members' enjoyment of birding and general wildlife observation.  The further impairment of native ecosystems will fundamentally diminish its members' continued and future use and enjoyment of the mined lands and nearby areas.

21.     ManaSota-88's members share the organization's goal of ensuring that native areas of Florida—which are areas of national importance—are preserved and protected.

22.     ManaSota-88 and its members also have a procedural interest in seeing the Corps and Service comply with their obligations, and they suffer procedural injury from the agencies' failure to do so.

23.     Plaintiff People for Protecting Peace River (3PR) is a non-profit 501(c)(3) organization incorporated in the State of Florida and committed to educating the public on the extraordinary value of the natural and agricultural lands of the Peace and Myakka River watersheds.  Two of 3PR's primary goals are to end the damage caused by phosphate strip mining and promote a superior quality of life in the heartland of the Peace River.

24.     In furtherance of its mission, 3PR seeks to maintain the rural quality of life characteristic to the region; keep clay waste disposal areas out of Charlotte, DeSoto,

Hardee, and Manatee counties; keep soils intact and aquifers functioning; be free of the danger of harmful pollutants left in the ground and aquifer after phosphate mining; and see the beauty of Florida's unique natural world left for future generations to experience and appreciate.

25.     Many of 3PR's members live within the rural areas adjacent to or near proposed phosphate mines.

26.     Appreciation of rural Hardee County, including its natural peacefulness and unique biodiversity, is one of the main reasons many of 3PR's members live in the area. In the region, 3PR's members have observed eastern indigo snakes, deer, bobwhite quail, barred owls, hawks, bald eagles, Audubon's crested caracaras, rattlesnakes, gopher tortoises, swallowtail kites, alligators, and hundreds of plant species.  Some of these plants and animals are imperiled species.  3PR's members have educated themselves regarding these species, as well as the natural systems and their functioning.  This knowledge and involvement has greatly enhanced 3PR's members' lives intellectually, emotionally, and spiritually.

27.     3PR's members have seen the impacts of phosphate strip mining in the region and understand that the complexity of natural systems cannot be readily restored.  Phosphate mining permanently disrupts natural hydrology and habitat for populations of animal and plant species, and this harms 3PR's members.

28.     Many of 3PR's members obtain their drinking water from local wells and are concerned about impacts to water quality and quantity from phosphate mining in Bone Valley.

29.     Many of 3PR's members recreate on Horse Creek and the Peace River and are concerned about impacts to these waterways from phosphate mines in Bone Valley which would injure their recreational, aesthetic, and health interests.  3PR's members also hike, canoe, and photograph the wild areas of Hardee and DeSoto counties.  All of these interests are harmed by phosphate mining.

30.     Some of 3PR's members are concerned that they will suffer economic injuries, including depreciation in the value of real property, as mining operations expand south.

31.     Many of 3PR's members are further concerned about effects from the expansion of mining operations to the quiet use and enjoyment of their nearby properties, as well as the security of the community.  3PR's members value their homes and community by many measures beyond just monetary standards.

32.     3PR and its members also have a procedural interest in seeing the Corps and Service comply with their legal obligations, and they suffer procedural injury from the agencies' failure to do so.  The injuries 3PR and its members suffer can only be remedied through the relief requested herein.

33.     Plaintiff Suncoast Waterkeeper is a non-profit 501(c)(3) organization incorporated in Florida and dedicated to protecting and restoring Florida's west-coast waterways through enforcement, fieldwork, advocacy, and environmental education for the benefit of communities that rely on these precious coastal resources.

34.     Suncoast Waterkeeper has more than 600 members in Bone Valley and adjacent coastal areas.  Its members are active hikers, birders, boaters, travelers, kayakers, and park enthusiasts.  They have a deep appreciation of the intrinsic value of nature and

particularly treasure Florida's pristine native habitat and the many species that thrive in

that habitat.  A number of Suncoast Waterkeeper's members live adjacent to or near one

or more of the proposed phosphate mines.

35.     Suncoast Waterkeeper's members are concerned about the destructive character

and effects of phosphate strip mining in Florida.  Suncoast Waterkeeper and its members

have significant concerns about the future use and safety of mined lands in Bone Valley

and the applicant's ability to create reclaimed mined lands that function naturally and

provide habitat for imperiled species.

36.     Suncoast Waterkeeper and its members are specifically concerned about the

individual and cumulative effects of permitting thousands of additional acres of Florida

habitat and agricultural lands for phosphate mining and fertilizer production, including

effects to water quality and species that depend on those lands for survival.

37.     Suncoast Waterkeeper and its members deeply appreciate and find value in the

diversity of the plant and animal species that thrive in and around Bone Valley, and they

are concerned about the effects of phosphate mining on those interests.  They are

specifically concerned about the viability and practicality of the proposed reclamation

practices that will be used in this region as well as the direct link between those practices

and continuing harm to the interests of Suncoast Waterkeeper and its members.

38.     Suncoast Waterkeeper and its members derive satisfaction from living in and

exploring the natural environments in the heartland of Florida and are concerned about

the effects of increased phosphate mining on those interests.  For example, Suncoast

Waterkeeper's members have enjoyed sightings of bald eagles, Audubon's crested

caracaras, scrub jays, wood storks, gopher tortoises, eastern indigo snakes, red-cockaded woodpeckers, and Florida panthers.  They are concerned about how the expansion of mining operations in the area will affect these species and their enjoyment of them.

39.     Suncoast Waterkeeper and its members are also concerned about the use of pesticides and herbicides prior to and during the reclamation process, and the effect of those chemicals on human health, the natural environment, water quality, and species.

40.     Suncoast Waterkeeper and its members are also concerned about the impact phosphate mining, ore processing, and waste disposal have on surface and groundwater quality and quantity, which are essential to the region's drinking water supply.  In addition to these concerns, they are worried the proposed phosphate mines will degrade and impair perennial and headwater streams.  All of these effects will harm their environmental, aesthetic, and recreational interests.

41.     Suncoast Waterkeeper and its members are particularly concerned about harm to the water quality and function of the Manatee, Myakka, and Peace rivers, and the Horse Creek tributary.  The Myakka River, for example, becomes a state-designated Wild and Scenic River when it enters Sarasota County from Manatee County.  The Manatee and Peace rivers are both significant drinking water sources.

42.     Suncoast Waterkeeper and its members are further concerned about the production, storage, and disposal of hazardous waste produced during the phosphate manufacturing process, and the effect of this process on public health and their individual interests.

43.     The members of Suncoast Waterkeeper share a belief in the principles and values

of the organization's mission statement and, along with Suncoast Waterkeeper itself, will sustain injury from the actions alleged.  The relief sought will redress these injuries.

44.     Suncoast Waterkeeper and its members further have a procedural interest in seeing the Corps and Service comply with their obligations, and they suffer procedural injury from the agencies' failure to do so.

45.     Defendant U.S. Army Corps of Engineers is an agency of the United States and a subdivision of the U.S. Department of the Army, which is in the U.S. Department of Defense.  The Corps is responsible for, among other things, regulating the placement of dredged and fill material into navigable waters and, in doing so, must meet all environmental standards and requirements. *See* 33 U.S.C. § 1344(a).

46.     Defendant Lieutenant General Todd T. Semonite is Commanding General and Chief of Engineers for the U.S. Army Corps of Engineers, and is responsible for ensuring that the Corps complies with the requirements of the Clean Water Act, NEPA, the ESA, and the APA.  Defendant Colonel Jason A. Kirk is the District Commander for the Jacksonville District of the U.S. Army Corps of Engineers and is also responsible for ensuring that the Corps complies with the requirements of the Clean Water Act, NEPA, the ESA, and the APA.  Defendants U.S. Army Corps of Engineers; Lt. Gen. Todd T. Semonite, in his official capacity as Commander and Chief of Engineers; and Col. Jason A. Kirk, in his official capacity as District Commander, have waived sovereign immunity pursuant to 5 U.S.C. § 702, 33 U.S.C. § 1365, and 16 U.S.C. § 1540(g).

47.     Defendant Department of Interior is an agency of the United States charged with administering the ESA for non-marine species.

48.     Defendant Ryan Zinke is the Secretary of the Interior.  As Secretary of the Interior, he has the ultimate responsibility to enforce and implement the provisions of the ESA.  Defendant Zinke is sued in his official capacity.

49.     Defendant U.S. Fish and Wildlife Service is a federal agency within the Department of the Interior charged with implementing and ensuring compliance with the ESA through the APA and other federal laws.

50.     Defendant Jim Kurth is the Acting Director of the U.S. Fish and Wildlife Service.  As Acting Director, Defendant Kurth is the federal official vested with responsibility for enforcing the ESA and its joint regulations.  Defendant Kurth is sued in his official capacity.

51.     Defendants U.S. Fish and Wildlife Service; Department of the Interior; Ryan Zinke, in his official as Secretary of the Interior; and Jim Kurth, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service, have waived sovereign immunity pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

52.     Defendants Corps and Service are agencies of the federal government, which may be named as defendants and against which a writ in the nature of mandamus, a declaratory judgment, and injunctive relief may be entered pursuant to 28 U.S.C. §§ 1361, 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65(a).  The Corps is the action agency for purposes of environmental review under the Clean Water Act, NEPA, and the ESA.  Likewise, the Service is an action agency under the ESA.

### III. JURISDICTION AND VENUE

53.     Plaintiffs bring this action under the Clean Water Act, 33 U.S.C. § 1251, *et. seq*.;

NEPA, 42 U.S.C. §§ 4321-4370e; the ESA, 16 U.S.C. §§ 1536, 1540(g); and the APA, 5 U.S.C. § 706.

54.     This Court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 701-706 (APA judicial review provisions); 28 U.S.C. § 2201 (Declaratory Judgment Act); 28 U.S.C. § 1361 (action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiffs); and 16 U.S.C. § 1540(g) (ESA citizen suit provision).  The relief requested is authorized by 28 U.S.C. § 2201 (declaratory relief); 28 U.S.C. § 2202 (injunctive relief); 5 U.S.C. §§ 701-706; and 16 U.S.C. § 1540(g).

55.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants federal district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

56.     Plaintiffs provided legally sufficient notice to Defendants of their intent to file suit under the ESA more than 60 days prior to filing this complaint, consistent with the Act's statutory requirements. 16 U.S.C. § 1540(g)(2).  Defendants have not remedied the issues raised in that notice.  Plaintiffs have exhausted all administrative remedies, the agency's actions are final and ripe for review, and Plaintiffs have standing to bring these claims.

57.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) because the Corps and Service, agencies of the United States, have committed and will commit the unlawful conduct alleged herein in Jacksonville and Vero Beach, Florida, respectively. The affected areas are in Charlotte, DeSoto, Hardee, Hillsborough, Manatee, Polk, and Sarasota counties, Florida.

58.     The federal government has waived sovereign immunity in this action pursuant to

5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

## IV. STATUTORY AND REGULATORY FRAMEWORKS

## A. CLEAN WATER ACT

59.     Congress created the Clean Water Act to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters" and to prohibit the discharge of

pollutants into waters of the United States unless expressly authorized. 33 U.S.C.

§§ 1251(a), 1311(a), 1344.

60.     Section 404 authorizes the Corps to issue permits for the discharge of "dredged or

fill materials" after providing "notice and opportunity for public hearings." *Id.* § 1344(a).

61.     Two sets of implementing regulations govern the Section 404 permit program:

Corps regulations, 33 C.F.R. Parts 320-330; and Environmental Protection Agency (EPA)

regulations, called the "404(b)(1) Guidelines," 40 C.F.R. §§ 230.1-230.98.

62.     Under the Corps' regulations, a Section 404 permit application must include all

activities the applicant plans to undertake that are "reasonably related to the same

project," along with a complete description of such activities "sufficient for public

notice." 33 C.F.R. § 325.1(d)(1), (2).  When the Corps receives a complete application, it

must issue a public notice soliciting comments from interested persons as to the

advisability of granting the permit. 33 U.S.C. § 1344(a); 33 C.F.R. §§ 325.2(a)(2), 325.3.

63.     When performing its substantive review of permit applications, the Corps is

required to give wetlands, such as those in this matter and those connected and adjacent

thereto, the highest possible level of protection.

64.     The Corps has found that "wetlands constitute a productive and valuable public resource, the unnecessary alteration and destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1).

65.     The Corps' regulations list wetland functions that are "important to the public interest." *Id*. § 320.4(b)(2).  These include:

> (i) Wetlands which serve significant natural biological functions, including food chain production, general habitat and nesting, spawning, rearing and resting sites for aquatic or land species;
>
> . . .
>
> (iii) Wetlands the destruction or alteration of which would affect detrimentally natural drainage characteristics, sedimentation patterns, salinity distribution, flushing characteristics, current patterns, or other environmental characteristics;
>
> . . .
>
> (v) Wetlands which serve as valuable storage areas for storm and flood waters;
>
> (vi) Wetlands which are ground water discharge areas that maintain minimum baseflows important to aquatic resources and those which are prime natural recharge areas;
>
> (vii) Wetlands which serve significant water purification functions; and
>
> (viii) Wetlands which are unique in nature or scarce in quantity to the region or local area.

*Id*.

66.     The regulations further provide that "[n]o permit will be granted which involves the alteration of wetlands identified as important" unless the Corps finds under its "public interest review" that "the benefits of the proposed alteration outweigh the damage to the wetlands resource." *Id*. § 320.4(b)(4).

67.     In making these determinations, the Corps must consider "[a]ll factors which may be relevant to the proposal . . . including the cumulative effects thereof." *Id.* § 320.4(a).

68.     The Corps must also consult with the Service "with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application," and it must give "full consideration" to the views of the Service "in deciding on the issuance, denial, or conditioning of individual or general permits." *Id*. § 320.4(c).

69.     The EPA's "guidelines" for the issuance of dredge and fill permits are also binding on the Corps. 40 C.F.R. Part 230; 33 C.F.R. § 320.4(b)(4).  These guidelines articulate a strong presumption against allowing any damage to wetlands: "From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts . . . ." 40 C.F.R. § 230.1(d).  "The guiding principle should be that degradation or destruction of [wetlands] may represent an irreversible loss of valuable aquatic resources." *Id.*

70.     Thus, the guidelines provide that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." *Id.* § 230.1(c).

71.     EPA's guidelines further provide that the Corps may not issue a dredge and fill permit "which will cause or contribute to significant degradation of the waters of the

United States," *Id.* § 230.10(c).  Effects "contributing to significant degradation

considered individually or collectively, include . . . loss of fish and wildlife habitat . . . ."

*Id.* § 230.10(c)(3).

72.     EPA's guidelines also strictly prohibit the Corps from issuing any permit "if there

is a practicable alternative . . . [that] would have less adverse impact on the aquatic

ecosystem." *Id.* § 230.10(a).  An alternative is considered "practicable" if it is "available

and capable of being done after taking into consideration cost, existing technology, and

logistics in light of overall project purposes." *Id.* § 230.10 (a)(2).  Practicable alternatives

are "presumed to be available, unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3).

**B. NATIONAL ENVIRONMENTAL POLICY ACT**

73.     NEPA is the Nation's charter for protection of the environment. 40 C.F.R.

§ 1500.1(a).  Its central goals are "[t]o declare a national policy which will encourage

productive and enjoyable harmony between man and his environment; to promote efforts

which will prevent or eliminate damage to the environment and biosphere and stimulate

the health and welfare of man; [and] to enrich the understanding of the ecological

systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.  The

president, federal agencies, and courts share responsibility for enforcing NEPA and

guaranteeing that high quality information is available to the public and analyzed by the

federal agencies before the agencies make decisions and take actions. 40 C.F.R.

§ 1500.1(a).

74.     Congress designed NEPA to "insure that environmental information is available

to public officials and citizens *before* decisions are made and actions are taken" and to

"help public officials make decisions that are based on understanding of environmental consequences." *Id.* § 1500.1(b)-(c) (emphasis added).

75.     Pursuant to 42 U.S.C. § 4342, Congress created the Council on Environmental Quality (CEQ) to promulgate regulations applicable to all federal agencies consistent with the intent and purposes of NEPA. *See* 40 C.F.R. § 1500 *et seq.*  In addition, the Corps promulgated a set of regulations to guide the application of NEPA to its actions; these regulations incorporate and expand upon the regulations promulgated by the CEQ. 33 C.F.R. pt. 325, app. B (NEPA Implementation Procedures for the Regulatory Program).

76.     Federal agencies must engage in NEPA review for any major federal agency action.  "Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18 (internal quotation marks omitted).

77.     NEPA reviews may be on a site- or project-specific level, or on a broader programmatic or regional level.  A programmatic analysis is one that considers the aggregate effects of a broad federal policy.  A regional analysis assesses the environmental impact of individual projects within a discrete area.  Agencies that engage in a programmatic or regional analysis often subsequently tier narrower or site-specific analyses to the broader programmatic or regional analyses. *Id.* § 1508.28.

78.     To start the NEPA process, federal agencies are required to either prepare an Environmental Impact Statement (EIS) if it is already known that the action will significantly affect the human environment or an Environmental Assessment (EA) if the

extent of effects is unclear or unknown.  EAs are meant to assess the impacts of the

action on the environment, determine if those actions will significantly affect the human

environment, and establish if a more in-depth EIS analysis is required.  Thus, while the

purpose of an EA is generally to determine whether the agency must prepare an EIS, the

preparation of EA is not a necessary predicate to the preparation of an EIS. *Id.* §§ 1501.4;

1508.9.

79.     If after completing an EA the agency concludes that an EIS is unnecessary, it

must make a finding of no significant impact (FONSI) on the human environment from

the proposed agency action. *Id*. §§ 1501.4(e); 1508.9(a)(1); 1508.13; 33 C.F.R. pt. 325,

app. B, § 7.  If the EA results in a finding that an action will likely significantly affect the

human environment, the agency is required to prepare an EIS. 40 C.F.R. § 1501.4.

80.     The "human environment" is defined "comprehensively to include the natural and

physical environment and the relationship of people with that environment." *Id.*

§ 1508.14.  "Significantly," as used in NEPA, "requires considerations of both context

and intensity." *Id*. § 1508.27.  In the case of a site-specific action, "context" means "the

effects in the locale rather than in the world as a whole.  Both short- and long-term effects

are relevant." *Id.* § 1508.27(a) "Intensity" refers to "the severity of impact." *Id.*

§ 1508.27(b).

81.     Public controversy or uncertainty surrounding the potential impacts of a federal

agency action on the human environment strongly suggests that an action is significant

and requires the preparation of an EIS. *Id.* § 1508.27(b)(4), (5).

82.     Other factors an agency must consider in determining whether a project will have

significant effects include the degree to which the proposed action affects public health or safety; the unique characteristics of the geographic area such as proximity to park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; whether the action is related to other actions with individually insignificant but cumulatively significant impacts (significance cannot be avoided by terming an action temporary or by breaking it down into small component parts); and the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the ESA. *Id.*

83.     An EIS must describe:

>       (i) the environmental impact of the proposed action,

>       (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

>       (iii) alternatives to the proposed action,

>       (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

>       (v) any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C)(i)-(v).

84.     The EIS must additionally "specify the underlying purpose and need to which the agency is responding." 40 C.F.R. § 1502.13.  The purpose and need statement is intended to explain why the agency is proposing an action and what the agency expects to achieve in taking that action.  Similarly, within an EA the agency "shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E) [of NEPA], [and] of the environmental impacts of the proposed action and alternatives." *Id.*

§ 1508.9(b).

85.     Each federal agency must "study, develop, and describe appropriate alternatives

to recommended courses of action in any proposal which involves unresolved conflicts

concerning alternative uses of available resources." 42 U.S.C. § 4332(E).  An agency

must "[r]igorously explore and objectively evaluate all reasonable alternatives," including

alternatives that are "not within the jurisdiction of the . . . agency." 40 C.F.R.

§ 1502.14(a), (c).  In addition, an agency "shall state how alternatives … will or will not

achieve the requirements of section 101 and 102(1) of the Act," which requires agencies

to "use all practicable means" to "assure for all Americans safe, healthful, productive,

and esthetically and culturally pleasing surroundings" and to "preserve important historic,

cultural, and natural aspects of national heritage." 42 U.S.C. § 1502.2(d); 42 U.S.C.

§ 4331(b).  An agency must also determine how alternatives "will or will not achieve the

requirements of . . . other environmental laws and policies." 40 C.F.R. § 1502.2(d).

86.     Although the Corps' primary function in issuing Clean Water Act Section 404

permits is to protect the integrity of the waters of the United States, 33 U.S.C. § 1251(a),

NEPA demands a broader analysis that must include consideration of reasonably

foreseeable, direct, indirect, and cumulative impacts to the natural and physical

environment, not just impacts to wetlands. 40 C.F.R. § 1508.14.

87.     Likewise, agencies must include discussions of "[i]ndirect effects and their

significance" in the EIS. *Id.* § 1502.16(b).

88.     Indirect effects are

        caused by the action and are later in time or farther removed in distance,
        but are still reasonably foreseeable. Indirect effects may include growth

> inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

*Id.* § 1508.8(b).

89.     Effects are further defined to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts. *Id.* § 1508.8.

90.     According to the Corps' regulations, NEPA analyses should "address the impacts of the specific activity requiring a . . . permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. Pt. 325, App. B, § 7(b)(1).

91.     Further, "[t]he district engineer is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action." *Id.* § 7(b)(2).

92.     One factor to consider in evaluating whether the district engineer has sufficient control and responsibility to warrant federal review is "[w]hether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity." *Id.* § 7(b)(2)(ii).

93.     Cumulative impacts are impacts on the environment that result from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person

undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.  Cumulative impact analyses include private, state, and federal actions. *Id.* §§ 1708.7; 1508.25(a), (c).

94.     The Corps defines "independent utility" as:

> [a] test to determine what constitutes *a single and complete project* in the Corps regulatory program. A project is considered to have independent utility if it would be constructed absent the construction of other projects in the project area. Portions of a multi-phase project that depend upon other phases of the project do not have independent utility. Phases of a project that would be constructed even if the other phases were not built can be considered as separate single and complete projects with independent utility. Issuance of Nationwide Permits, 67 Fed. Reg. 2020, 2094 (Jan. 15, 2002) (emphasis added).

95.     A "[s]ingle and complete project" is the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers. 33 C.F.R. § 330.2(i).

96.     Neither NEPA nor implementing regulations allow federal agencies to analyze effects of their actions in isolation.  Rather, the entire body of law under NEPA directs federal agencies to analyze the effects of proposed actions to the extent they are reasonably foreseeable consequences of the proposed action, regardless of where those impacts might occur.  Agencies must analyze indirect effects, "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

97.     After completing and considering an EIS, the agency shall prepare a concise public record of decision (ROD) stating the agency's decision, identifying all alternatives

considered, and stating whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted. *Id.* § 1505.2.  Corps regulations additionally provide that "in those cases involving an EIS, the statement of findings will be called the record of decision and shall incorporate the requirements of 40 C.F.R. § 1505.2." 33 C.F.R. pt. 325, app. B, § 18.

98.     Until an agency issues an ROD pursuant to NEPA, no action concerning a proposal may be taken that would have an adverse environmental impact or limit the choice of reasonable alternatives. 40 C.F.R. § 1506.1(a).

99.     It is expected that a public hearing will be held for a permit application that requires an EIS. 33 C.F.R. pt. 325, app. B, § 11.  When a member of the public requests a public hearing, the Corps shall grant that request unless the Corps determines in writing that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing." 33 C.F.R. § 327.4(b).  "In case of doubt," the Corps should hold a public hearing. *Id.* § 327.4(c).

100.    NEPA requires agencies to take a "hard look" at the environmental consequences of their actions.  To meet NEPA's "hard look" requirement, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  This includes requiring that environmental effects are "discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 352 (1989).

101.    The agency must also "[i]nclude appropriate mitigation measures not already

included in the proposed action or alternatives." 40 C.F.R. § 1502.14(f); *see also id.*

§ 1502.16(h).

102.    Finally, an agency "[s]hall prepare supplements to either draft or final

environmental impact statements if . . . [t]here are significant new circumstances or

information relevant to environmental concerns and bearing on the proposed action or its

impacts," and it "[m]ay also prepare supplements when the agency determines that the

purposes of the Act will be furthered by doing so." *Id.* § 1502.9(c)(1)-(2).

103.    In sum, the purpose of the NEPA process is to lead to better outcomes; include

meaningful public engagement; provide transparent, accountable, and informed

government decisionmaking; allow for consideration of reasonable alternatives that may

not otherwise be identified; identify mitigation alternatives and measures; and encourage

collaboration with interested parties.

## C. ENDANGERED SPECIES ACT

104.    The Supreme Court has found through examination of the language, history, and

structure of the ESA that "Congress intended endangered species to be afforded the

highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).  The ESA

"represent[s] the most comprehensive legislation for the preservation of endangered

species ever enacted by any nation." *Id.* at 180.  To that end, the ESA's purpose is to

"provide a program for the conservation of . . . endangered species and threatened

species" and "to provide a means whereby the ecosystems upon which endangered

species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).  The

ESA requires that "all Federal departments and agencies . . . seek to conserve endangered

species and threatened species and . . . utilize their authorities in furtherance of the

purposes" of the ESA. *Id*. §1531(c)(1).

105.    The Secretaries of the Departments of the Interior and Commerce have delegated

their ESA duties to the U.S. Fish and Wildlife Service and the National Marine Fisheries

Service, respectively. 50 C.F.R. § 402.01(b).

106.    Listed species are entitled to significant protections under the ESA, including a

number of congressionally mandated measures designed to protect and restore their

populations.  For example, under the ESA and its implementing regulations it is illegal

for anyone to "take" an endangered or threatened animal. 16 U.S.C. § 1538(a)(1); 50

C.F.R. §§ 17.21, 17.31.  "The term 'take' means to harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16

U.S.C. § 1532(19).  "Harm" includes significant habitat modification or degradation that

results in death or injury to listed species "by significantly impairing essential behavioral

patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.  "Harass" is

defined as intentional or negligent actions that create a likelihood of injury to listed

species "to such an extent as to significantly disrupt normal behavioral patterns which

include, but are not limited to, breeding, feeding or sheltering." *Id.*  Congress intended

the term "take" to be defined in the "broadest possible manner to include every

conceivable way" a person could harm or kill fish or wildlife. *See* S. Rep. No. 93-307, at

7 (1973), *as reprinted in* 1973 U.S.C.C.A.N. 2989, 2995.  "Incidental take" is defined as

take that is "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 50 C.F.R. § 17.3.

107.    The Act also requires the Service to "develop and implement . . . 'recovery plans . . . for the conservation and survival of endangered species and threatened species." 16 U.S.C. § 1533(f)(1).

108.    In addition, Section 7 of the ESA provides that each federal agency "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized . . . by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of a listed species' designated critical habitat. *Id*. § 1536(a)(2); *see* 50 C.F.R. Part 402 (regulations implementing the requirements of Section 7).

109.    To fulfill its obligations under Section 7, each federal agency must review its actions to determine whether they "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a).  An agency may first initiate "informal consultation" to determine whether an action is likely to adversely affect a listed species or its critical habitat. *Id*. § 402.13(a).  The process ends if the agency determines, "with concurrence of the Service, that the action is not likely to adversely affect listed species," *Id.*; however, formal consultation is required if the Service does not agree with the agency's finding or if informal consultation leads to the conclusion that the action "may affect listed species." *Id*. § 402.14(a).

110.    Formal consultation begins when the agency submits a written request to the Service. *Id*. § 402.14(c).  This request must include:

(1) A description of the action to be considered;

(2) A description of the specific area that may be affected by the action;

(3) A description of any listed species or critical habitat that may be affected by the action;

(4) A description of the manner in which the action may affect any listed species or critical habitat and an analysis of any cumulative effects;

(5) Relevant reports, including any environmental impact statement, environmental assessment, or biological assessment prepared; and

(6) Any other relevant available information on the action, the affected listed species, or critical habitat.

*Id*. § 402.14(c)(1)-(6).  The agency must provide the Service with the "best scientific and commercial data available or which can be obtained during the consultation for an adequate review." *Id*. § 402.14(d).

111.     The Service must analyze the effects of the proposed action on listed species and habitat, which includes the direct and indirect effects, "together with effects of other activities that are interrelated or interdependent with that action, [which] will be added to the environmental baseline." *Id.* § 402.02.

112.     "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.*

113.     Indirect effects are "caused by the proposed action and [occur] later in time, but still are reasonably certain to occur." *Id.*

114.    Interrelated actions "are part of a larger action and depend on the larger action for their justification." *Id.*

115.    Interdependent actions "have no independent utility apart from the action under consideration." *Id.*

116.    The Service must also analyze the cumulative effects of "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." *Id.*  "Action area" includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.*

117.    During the formal consultation process, the Service must review all relevant information, evaluate the status of the listed species, "evaluate the effects of the action and cumulative effects on the listed species," and formulate its biological opinion of "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species." *Id*. § 402.14(g)(1)-(4).  This evaluation must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

118.    Also, while formal consultation is underway, the agency and permittee's ability to continue to undertake activities is strictly curtailed.  The agency and permittee "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate" the ESA. *Id*. § 1536(d).  This prohibition remains "in force during the consultation process and continues until the requirements of [the ESA] are satisfied." 50 C.F.R. § 402.09.

119.    At the conclusion of the consultation process, the Service must issue a "biological opinion," which "detail[s] how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and sets forth the Service's opinion as to whether the action is "likely to jeopardize" the continued existence of a listed species. 50 C.F.R. § 402.14(h)(1)-(3).  If the Service concludes that the action is likely to jeopardize a listed species, it must suggest "reasonable and prudent alternatives" that ensure such jeopardy is not likely to occur. 16 U.S.C. § 1536(b)(3)(A).

120.    If the agency action is expected to cause "take," the Service must also include an incidental take statement (ITS) in its biological opinion. 50 C.F.R. § 402.14(i).  The ITS must, where practicable, quantify the amount of take allowed for each species, thereby creating a meaningful "trigger" to reinitiate consultation when an allowable level of take is exceeded. *Id.* § 402.14(i)(1)(i). The Service may use a rational surrogate for take in the ITS where it: (1) demonstrates that it cannot express anticipated take in numerical form; (2) articulates a causal connection between the surrogate and the anticipated take; and (3) "sets a clear standard for determining when authorized take has been exceeded." *Id.*

121.    To minimize the impact of incidental take, in an ITS the Service must include Reasonable and Prudent Measures (RPMs) that are necessary or appropriate. *Id*. § 402.14(i)(1)(ii).

122.    Even after the Service issues a biological opinion, the ultimate duty to ensure that the action will not jeopardize a listed species lies with the action agency, here the Corps. *See id.* § 402.15.  An agency cannot rely on an inadequate, incomplete, or flawed biological opinion to satisfy its duty to avoid jeopardy.

123.    An agency must reinitiate consultation with the Service if any of the following

circumstances occur:

> (a) If the amount or extent of take specified in the incidental take
> statement is exceeded;
>
> (b) If new information reveals effects of the action that may affect a listed
> species in a manner or to an extent not previously considered;
>
> (c) If the identified action is subsequently modified in a manner that
> causes an effect to the listed species or critical habitat that not considered
> in the biological opinion; or
>
> (d) If a new species is listed or critical habitat designated that may be
> affected by the identified action.

*Id*. § 402.16(a)-(d).

124.    Under the terms of Section 7(b)(4) and Section 7(o)(2), take that is incidental to

and not intended as part of an agency action, may be permitted only if such taking

complies with the terms and conditions of an ITS issued as part of a biological opinion.

16 U.S.C. § 1536(b)(4), (o)(2).

125.    Federal agencies have additional responsibilities under Section 7(a)(1) of the

ESA, including a requirement that they "utilize their authorities in furtherance of the

purposes of [the Act]" and to "carry[ ] out programs for the conservation of" listed

species. *Id.* § 1536(a)(1).  The ESA defines "conservation" to mean the use of "all

methods and procedures" that are necessary to recover a listed species to the point where

protections under the act are no longer necessary. *Id.* § 1532(3).  Thus, section 7(a)(1)

requires each federal agency to ensure that its actions are consistent with the recovery of

listed species. *See* 50 C.F.R. § 402.15(a) (explaining that it is each agency's continuing

obligation to "determine whether and in what manner to proceed with the action in light of its section 7 obligations" to protect and recover listed species).

126.    Additionally, individuals may apply to take listed species through Section 10 of the ESA. 16 U.S.C. § 1539.  The Service may not issue a take permit unless the applicant's take application specifies the impact that will result from the taking; efforts to minimize and mitigate such impact; alternatives to the taking; and other necessary or appropriate measures. 16 U.S.C. § 1539(a)(2)(A)(i)-(iv).  The Service must then self-consult under Section 7 on the issuance of the incidental take permit (ITP) and likewise ensure that the authorization is not likely to jeopardize the continued existence of any endangered or threatened species. *Id.* § 1539(a)(2)(B)(iv).

### D. ADMINISTRATIVE PROCEDURE ACT

127.    Pursuant to the APA, any person who has suffered legal wrong because of agency action or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof. 5 U.S.C. § 702.

128.    Under 5 U.S.C. § 706, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." The APA also requires a reviewing court to:

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]

. . .

> (D) without observance of procedure required by
> law . . . .

*Id.* § 706(1)-(2).

129.    "In making the foregoing determinations, the court can review the whole record

or those parts of it cited by a party, and due account shall be taken of the rule of

prejudicial error." *Id.* § 706.

130.    The Corps' issuance of a Section 404 permit is a final agency action reviewable

under the APA. *See* 5 U.S.C. § 704.

131.    The Corps' statement of findings and decision not to prepare an EIS under NEPA

are final agency actions reviewable under the APA. *See id.*

132.    The Corps' failure to issue a ROD for an Areawide EIS is reviewable under the

APA as unlawfully withheld. *See id.* § 706(1).

133.    The Service's issuance of a biological opinion  is a final agency action reviewable

under the APA. *See id.* § 704.

## V. FACTUAL AND PROCEDURAL BACKGROUND

134.    Phosphate mining aggressively transforms the environment, ruins the natural

hydrology of watersheds, destroys and displaces species, and irreparably changes the

character of the habitats on which species rely.  The Corps and Service are entrusted with

purposefully enforcing environmental laws to safeguard the nation's shared natural

resources and to protect the health and safety of Floridians as well as people drawn to the

state by its thriving ecotourism economy.  Compliance with these laws ensures against

preventable degradation of environmental resources and precludes avoidable adverse

effects on already imperiled endangered and threatened species and their habitats.

Plaintiffs allege that the Corps and the Service failed in these obligations when

authorizing the South Pasture Extension Mine, permit number SAJ-1993-01395, and as a

result, industrial phosphate mining now threatens to consume more than 51,000 acres in

Hardee, Manatee, and DeSoto counties.

## A. PHOSPHATE MINING IN FLORIDA

135.    Phosphate mining in Florida begins in open pit strip mines, where a phosphate

mining company—such as Mosaic here—strips all vegetation and approximately 30 feet

of existing landscape (referred to as "overburden") using dragline or dredging technology

to expose and facilitate the removal of the phosphate ore deposits below.

136.    A dragline is a one million pound extractor-crane that can remove tons of earth at

a time.  A single dragline can mine 15 acres in one month.  Meanwhile, dredging

involves mounting excavating equipment on a barge and creating a moving lake, digging

out phosphate ore at one end, and depositing sand tailings or fill at the other end.

Dredging is used when the ore is too deep to mine with a dragline.

137.    Using either the dragline or dredging technique, the mining company extracts a

mixture of phosphate pebbles, sand, and clay known as phosphate "matrix."  The mining

company then conveys the extracted matrix by pipelines to a beneficiation plant where it

forcibly separates the phosphate ore from the sand and clay.

138.    The sand is set aside for the re-contouring of mined-out lands.

139.    There is no mandate to restore mined lands to their pre-mined condition, only to

reclaim them to support some beneficial use.

140.    The clay is stored in industry-termed "clay settling areas" or "CSAs," where the water-logged clay slowly settles in a process called "dewatering."  Clay settling areas comprise 40 percent of the post-mining landscape, have dam walls between 20 to 60 feet in height, and remain irreclaimable for many years during active use.  When no additional clays are to be added, the clay settling area must undergo a protracted process of draining and clay drying, and even then are still virtually unusable.

141.    The phosphate ore is then treated with sulfuric acid to produce phosphoric acid, which is principally used in synthetic fertilizer.  This process also creates the abundant radioactive byproduct phosphogypsum.  Due to phosphogypsum's hazardous nature, the EPA requires that it be stored in mountainous "stacks" that are hundreds of acres wide and hundreds of feet tall.  Phosphogypsum contains uranium and radium-226 in concentrations well above background levels, as well as trace metals in concentrations the EPA considers to be a risk to human and environmental health.  Many established stacks also hold open-air reservoirs of acidic process water.  The presence of these stacks—in current and expanding form—will indefinitely remain an insecure part of Florida's landscape.

142.    From extraction as phosphate rock to refinement as phosphoric acid, each step of the process depends on the prior steps to produce a marketable finished product: fertilizer.  As it relates to the phosphate mining operations at issue here, each of these interrelated steps will take place within Bone Valley.

143.    The phosphate industry has an indisputable history of environmental violations and incidents connected to its phosphate operations, including during the mining,

reclamation, and fertilizer stages of production.  For example, on September 30, 2015, Mosaic and the EPA reached a $2 billion settlement agreement regarding Mosaic's unlawful disposal and commingling of hazardous wastes, including sulfuric acid, diammonium phosphate, monammonium phosphate fertilizer, and fluorocilic acid, with its phosphogypsum waste.

144.     On September 15, 2016, news broke that a sinkhole had opened up in a phosphogypsum stack at Mosaic's New Wales plant that allowed at least 215 million gallons of industrial process water to pour into the Floridan aquifer, which supplies drinking water for nearly 10 million people.

145.     The New Wales, Riverview, and Bartow fertilizer plants and phosphogypsum stacks are in Bone Valley and are the destination sites of the phosphoric ore and eventual radioactive phosphogypsum that will be generated from ore mined by the proposed Project.

146.     The Corps acknowledges that the phosphogypsum stacks where the waste from the fertilizer plants are stored have generally been built on unused or mined-out land at the processing site.

## B. THE AREAWIDE ENVIRONMENTAL IMPACT STATEMENT

### *Project Description*

147.     The applicant wants to mine more than 51,000 acres of wetlands, watersheds, and habitat in Bone Valley, Florida, starting now and continuing through the next several decades.

148.     On February 18, 2011, the Corps published a Notice of Intent to Prepare a Draft

Areawide Environmental Impact Statement for Phosphate Mining Affecting Waters of the

United States in the Central Florida Phosphate District (Draft AEIS) to assess the impacts

of the applicant's proposed mines.  The Draft AEIS includes the South Pasture Extension

Mine, Desoto Mine, Ona Mine, and Wingate Mine, and states that a "record of decision

based on the AEIS is planned for release in early 2013."  The Corps hosted two public

meetings on the Draft AEIS in June 2012, four years before the specific details of the

South Pasture Extension Mine or any of the preferred alternative mines were released to

the public.

149.     There are nine watersheds in Bone Valley, including the Hillsborough River,

Withlacoochee River, Alafia River, Tampa Bay, Little Manatee River, Manatee River,

Myakka River, Peace River, and Sarasota Bay.

150.     The South Pasture Extension Mine would be a 7,513-acre expansion of the

existing South Pasture Mine in Hardee County, in the Peace River watershed.  The Desoto

Mine would be a new 18,287-acre phosphate mine in northwestern DeSoto County, also in

the Peace River watershed.  The Ona Mine would be a new 22,320-acre phosphate mine in

western Hardee County, in the Peace and Myakka river watersheds.  The Wingate East

Mine would be a 3,635-acre expansion of the existing Wingate Creek Mine in eastern

Manatee County, also in the Peace and Myakka river watersheds.  The Myakka River is

designated by the state legislature as a Wild and Scenic River.





151.    The Corps describes the permit applicant, Mosaic, as a company that mines phosphate ore and manufactures phosphoric acid, and that owns facilities that mine and process phosphate rock and produce phosphate fertilizers.

152.    On May 3, 2013, the Corps published a notice of availability for the Final Areawide Environmental Impact Statement (Final AEIS) on Phosphate Mining in the Central Florida Phosphate District.

153.    According to the Final AEIS, rather than produce an ROD on the AEIS as promised in the Draft AEIS, the Corps will prepare individual, project-specific RODs and Statements of Findings for each of the four projects that were the focus of the AEIS.

*Phosphogypsum*

154.    Phosphogypsum stacks are located in the study area, and their number and extent are a direct result of past and future phosphate mining.  The proposed mines will increase the need for such facilities and add to the recently observed impacts and costs of stack maintenance and closures.

155.    The Corps ignored multiple requests from the public to evaluate the indirect impacts the fertilizer plants and phosphogypsum stacks will have on the region, and it maintains that the four phosphate mines have independent utility from the existing fertilizer plants in Bone Valley.

156.    Upon information and belief, the U.S. is the leading importer of phosphate rock in the world and does not export phosphate rock.

157.    In concluding that mineral processing plants have independent utility, and therefore declining to evaluate their indirect effects, the Corps relies in part on the

applicant's representation that the mineral processing plants would be able to continue operations independent of any future mines by purchasing rock from other sources, or that it could ship phosphate ore to other areas for processing into fertilizer.

158.    However, in evaluating the possibility of the applicant using imported phosphate rock in the Final AEIS's alternatives analysis, the Corps concludes that importing phosphate rock to Florida for processing would be prohibitively expensive and operationally difficult, and therefore not a viable option. Thus, the creation of phosphogypsum in Florida is the unavoidable, predictable, and necessary result of phosphate mining in Florida because the fertilizer plants only exist to process the phosphate ore that is mined and the applicant makes clear that the phosphate ore is only to be processed at those nearby fertilizer plants.

159.    Despite earlier claims that phosphate mining has independent utility from fertilizer production, in the Final AEIS's economic analysis, the Corps repeatedly considers the effects of the entire phosphate industry in Florida, not merely the effects of mining—the implication being that the mines alone would have a lesser, if any, positive effect on the economy.  Specifically, the Corps extensively cites the benefits of fertilizer production, not phosphate ore production.

160.    Similarly, in the Final AEIS's section on Stated Purpose and Need, the Corps presents the benefits of the project exclusively in terms of the ability to produce fertilizers and the resulting effects on agriculture.

161.    The only time that the applicant or the Corps considers the mining of phosphate rock in isolation, as opposed to also considering its ultimate use in fertilizers, is in their

evaluation of environmental effects.

*Project Purpose & Alternatives Analysis*

162.    The Corps describes the basic project purpose and need as to "mine phosphate ore" and the overall project purpose as to "extract phosphate ore from the mineral reserves in [Bone Valley] and to construct the associated infrastructure required to extract and process the phosphate ore at separation/beneficiation facilities, recognizing that the ore extracted must be within a practicable distance of a new or existing beneficiation plant."

163.    The Corps evaluates eight alternatives: the applicant's preferred alternatives (the four proposed mines), the Pine Level/Keys Tract alternative (which is the future mine expansion site of the Desoto mine), the Pioneer Tract alternative (which is the future mine expansion site of the Ona mine), Site A-2, and Site W-2.

164.    The Corps does not perform a quantitative analysis on impacts to surface waters for Site A-2 or Site W-2.

165.    The Corps rejects alternatives that avoid the use of phosphate fertilizer, determining that there are no feasible alternatives to the use of phosphate as a fertilizer, and that any proposals that would alter the current phosphate use process are "beyond the scope" of the Final AEIS and not considered.

166.    Likewise, the Corps rejects alternatives that involve importing rock from outside of Bone Valley, citing alleged logistical and cost impediments, yet concedes that the applicant has imported phosphate rock from outside of the phosphate district, including from Morocco and Peru.

167.    The Corps concludes that effects of three of the four projects on surface water resources would be significant without mitigation and not significant with mitigation.

168.    The Corps disregards functional alternatives that would avoid or minimize impacts to waters of the United States through operational or technological changes or project substitutes.  These alternatives include the potential to substitute dredging methods in place of dragline excavation, replacing phosphate ore with other fertilizer alternatives, or importing phosphate ore from outside of Bone Valley.

169.    The Corps does not include "infill parcels" in its Final AEIS review because it does not consider these land parcels to be similar actions to the proposed mines.  Like the mines in question, infill parcels are typically land parcels acquired and subsequently mined because of their proximity to an existing or planned future mine and beneficiation plant.

### Environmental Impacts

170.    The Corps asserts that the four proposed mines would not directly or indirectly have a significant effect on air quality, noise, climate change or sea level rise, floodplains, aesthetics, transportation, recreation, waste management, or land use.

171.    The Final AEIS identifies 17 federally listed species that have the potential to occur in the study area, including the Florida bonamia (*Bonamia grandiflora*), Florida goldenaster (*Chrysopsis floridana*), perforate reindeer lichen (*Cladonia perforata*), beautiful pawpaw (*Deeringothamnus pulchellus*), smalltooth sawfish (*Pristis pectinata*), American alligator (*Alligator mississippiensis*), eastern indigo snake (*Drymarchon couperi*), bluetail mole skink (*Eumeces egregius lividus*), sand skink (*Neoseps reynoldsi*),

Florida grasshopper sparrow (*Ammodramus savannarum floridanus*), Florida scrub jay (*Aphelocoma coerulescens*), wood stork (*Mycteria americana*), red-cockaded woodpecker (*Picoides borealis*), Audubon's crested caracara (*Polyborus plancus audubonii*), snail kite (*Rostrhamus sociabilis plumbeus*), Florida panther (*Puma concolor coryi*), and Florida manatee (*Trichechus manatus*).

172.    In addition to federally listed species, the gopher tortoise (*Gopherus Polyphemus*), a candidate for listing under the ESA, is commonly found in the study area, as are bald eagles (*Haliaeetus leucocephalus*), which are protected under the federal Bald and Golden Eagle Protection Act. Additionally, several state listed species have consistently been observed in the study area, including southeastern kestrel (*Falco sparverius paulus*), Florida sandhill crane (*Grus Canadensis pratensis*), gopher frog (*Rana (Lithobates) capito*), burrowing owl (*Athene cunicularia*), little blue heron (*Egretta caerulea*), snowy egret (*Egretta thula*), tricolored heron (*Egretta tricolor*), white ibis (*Eudocimus albus*), Florida mouse (*Podomys floridanus*), and Sherman's fox squirrel (*Sciurus niger shermani*).

173.    The Corps claims that species will relocate themselves.  Likewise, the Corps claims that species displaced by land clearing will somehow re-occupy mined areas after they are reclaimed.

174.    The Corps fails to acknowledge the fact that in some instances disturbed mined lands would border other existing or proposed mines; that some of the proposed projects are scheduled to be mined at the exact same time as each other, amplifying the harm and

leaving nowhere for species to relocate to; and that in all four projects, the time from mining to reclamation spans decades.

## C. THE SOUTH PASTURE EXTENSION MINE ENVIRONMENTAL ASSESSMENT

175.    The South Pasture Extension Mine is located in the Peace River watershed, which encompasses land that filters water into the Peace River and its tributaries.  The State of Florida has designated the Peace River watershed a "Priority Watershed," in part due to impacts to surface waters resulting from phosphate mining.  The EPA also considers the Peace River watershed to be a Priority Watershed, and it recognizes the Charlotte Harbor estuary, for which the Peace River is the primary source of freshwater, as an Aquatic Resource of National Importance.

176.    The South Pasture Extension Mine would expand the existing South Pasture Mine southward, giving the applicant 20 years to mine 7,513 acres in Hardee County, hydraulically transport the matrix to the existing South Pasture Mine beneficiation plant, and return sand and clay residuals to the tract.  The applicant claims that upon completion of mining operations, which would be decades from now, all lands disturbed by mining will be reclaimed.



177.    The project site contains 5,550.5 acres of uplands and 2,555.6 acres of wetlands. The uplands include forests, pastureland, and rangeland.  The wetlands include forested wetlands, herbaceous wetlands, intermittent streams, and surface waters.  The South Pasture Extension Mine site is bordered on the north by historic and ongoing mining, and on the west and south by the Ona Mine site, which the applicant proposes to mine actively during the same time frame.

178.    The Corps issued a public notice for the South Pasture Extension Mine application on June 1, 2012, the same day that it published a notice of availability for the Draft AEIS, evaluating environmental impacts for four proposed phosphate mines, including the South Pasture Extension Mine.  Based on surveys from 1998 to 2007, the Corps identifies in the public notice the following federally listed species as occurring in the South Pasture Extension Mine: eastern indigo snake, wood stork, and Audubon's crested caracara.  However, Corps states in the AEIS that Florida panthers and red-cockaded woodpeckers have been observed on the adjacent Ona Mine site.

179.    In alignment with the other three proposed mining projects, the Corps maintains in the AEIS that mobile wildlife species will "relocate to undisturbed areas" during land clearing for the South Pasture Extension Mine without further explanation of how that would occur.  The Corps also apparently fails to acknowledge the fact that disturbed, previously mined lands flank the northern border of the narrow strip of land that makes up the South Pasture Extension Mine or that the proposed Ona Mine makes up its entire western and southern boundary, with the two mines scheduled to be active at the exact same time.

180.    The Corps also maintains in the AEIS that "[w]ildlife species that are displaced by land clearing are expected to re-occupy mined areas after they are reclaimed" despite the anticipated 23-year lag time between mining and reclamation,  and a paucity of evidence suggesting that reclamation will restore habitat for the affected wildlife or that wildlife will return in the same abundance and diversity following mining.

181.    The Corps also believes that "[s]ome slow-moving wildlife species may not be able to relocate to undisturbed areas and, therefore, may be injured or killed during land clearing," but it then discounts such mortality by summarily concluding that "any losses would have a negligible effect on regional wildlife populations."

182.    On June 16, 2016, the Corps released a Supplemental Environmental Assessment, draft public interest review, and draft Clean Water Act Section 404(b)(1) Guidelines analysis for the South Pasture Extension Mine (collectively "Supplemental EA").  On November 14, 2016, the Corps issued a 404 permit for the South Pasture Extension Mine, SAJ-1993-01395, authorizing impacts to 1,198.17 acres of wetlands, 3.75 acres of streams, 16.58 acres of surface waters, and 32,161 linear feet of streams.  The permit calls for the creation of 1,259.58 acres of on-site wetlands and 44.7 acres of off-site forested wetlands; the preservation of 396.23 acres of on-site wetlands; the enhancement of 123.52 acres of on-site wetlands; establishment of 18,402 linear feet of on-site streams; and preservation of 55,501 linear feet of on-site streams.

183.    The Corps does not analyze in the AEIS the effects of phosphate mining in 409 acres within the Payne Creek subwatershed, stating that it is already the most heavily mined subwatershed in the Lower Peace River watershed and that it is a relatively small

percentage of the overall subwatershed.

## D. THE RECORD OF DECISION AND STATEMENT OF FINDINGS FOR THE SOUTH PASTURE EXTENSION MINE

184.    On November 9, 2016, the Corps issued a Record of Decision and Statement of Findings on the South Pasture Extension Mine's Supplemental EA (ROD).

185.    The ROD defines the basic project purpose in nearly identical terms as the Final AEIS: "to extract phosphate ore."

186.    The ROD defines the overall project purpose in identical terms as the Final AEIS: to "extract phosphate ore from the mineral reserves in the [phosphate district] and to construct the associated infrastructure required to extract and process the phosphate ore at separation/beneficiation facilities, recognizing that the ore extracted must be within a practicable distance of a new or existing beneficiation plant."

187.    In defining the applicant's overall need for the South Pasture Extension Mine, the Corps quotes the Final AEIS, which describes the applicant's plans to expand mining operations onto the South Pasture Extension Mine and Wingate East Mine sites, and develop the Ona and Desoto Mines to replace existing mines.

188.    In the section of the ROD on the project-specific need, the Corps quotes the applicant's statement that "[t]imely development of the South Pasture Extension to continue the operation of the South Pasture Plant is necessary for the applicant to continue supplying its customers in the United States and over 40 countries with phosphate fertilizers and feed supplements for another 20 years."

189.    As in the Final AEIS, the project-specific need in the ROD is almost entirely

described as the public's alleged need for phosphate-based fertilizer.

190.    The Corps claims that it independently reviewed and verified the information in the applicant's statements of need; however, the ROD appears to show only that the Corps reviewed the applicant's 2012 Form 10-K to determine the average annual production of the South Pasture Beneficiation Plant.  The ROD does not demonstrate that the Corps independently reviewed the purported need for phosphate rock or fertilizer, nor that the Corps exercised independent judgment in accepting the applicant's statements of need.

191.    The Corps confirms that the South Pasture Extension Mine is not a "water dependent" project under 40 C.F.R. § 230.10(a)(3), meaning that the applicant must rebut the presumption that practicable alternatives to the project that do not involve wetlands are available.

192.    The ROD briefly describes the following alternatives: the no action alternative (no mining), the no action alternative (mining of uplands only), the preferred alternative, the Ona mine alternative, Wingate East mine alternative, and Pioneer tract alternative.

193.    The Corps excludes consideration of any alternatives or project locations that lie outside of a ten-mile radius of the South Pasture Beneficiation Plant because the applicant claims that ten miles is the maximum acceptable distance for transporting phosphate rock to a beneficiation plant.  The Corps also does not consider any alternatives that involve the construction of a new beneficiation plant, despite the overall project purpose of extracting phosphate ore within a practicable distance of a "*new* or existing beneficiation plant."

194.     The Corps dismisses the no action alternative (no mining) because it would not produce any phosphate rock.

195.     The Corps dismisses the no action alternative (mining of uplands only) because it would only produce 2.9 million metric tons (MMT) of phosphate rock, not the project-specific need of 33.7 MMT.  The ROD does not demonstrate that the Corps independently verified the accuracy of the 2.9 MMT figure.

196.     Despite finding that the Ona Mine alternative meets the overall project purpose and project specific need, the Corps dismisses the Ona Mine alternative as not complying with the applicant's mining development sequence, which proposes that the Ona Mine replace the production from the Four Corners Mine after the applicant depletes that mine's reserves.

197.     The Corps dismisses the Wingate East Mine alternative as not complying with the applicant's mining development sequence, which proposes that the Wingate East Mine will replace the production from the Wingate Mine after the applicant depletes it.

198.     The Corps dismisses the Pioneer Tract Mine alternative because the potential wetland acreage impact would be greater than the preferred alternative.

199.     The Corps also dismisses on-site/minimization alternatives for the South Pasture Extension Mine, including: (1) the upland mining with water crossings of waters of the United States alternative; (2) the Uniform Mitigation Assessment Methodology (UMAM) based avoidance alternative; (3) the preferred plus additional avoidance alternative; and 4) the maximum framework avoidance alternative.

200.     The Corps dismisses the upland mining with water crossings of waters of the

United States because it would produce 10.7 MMT of phosphate rock over a three-year period, not the Corps-adopted, project-specific need of 33.7 MMT over a ten-year period. The ROD does not demonstrate that the Corps independently verified the accuracy of the 10.7 MMT figure.

201.    The Corps dismisses the UMAM-based avoidance alternative because it adopts the applicant's assertion that the clay-settling-area configuration would not comply with state and local requirements. The ROD does not demonstrate that the Corps independently verified the accuracy of applicant's statement.

202.    The Corps dismisses the applicant's "preferred plus additional avoidance" alternative because it would produce 32.2 MMT of phosphate rock, which is slightly less than the project-specific need of 33.7 MMT.  The ROD does not demonstrate that the Corps independently verified the accuracy of the 32.2 MMT figure.

203.    The Corps dismisses the maximum framework avoidance alternative because it would produce 25.8 MMT of phosphate rock, not the project-specific need of 33.7 MMT.

204.    After dismissing all alternatives as not practicable, the Corps maintains that the applicant's preferred alternative is the least environmentally damaging practicable alternative (LEDPA).

205.    With respect to its Section 404(b)(1) analysis of potential impacts, the Corps relies on its Final AEIS to evaluate impacts on physical substrate; water circulation, fluctuation, and salinity; suspended particulate/turbidity; contaminant availability; aquatic ecosystems; disposal sites; special aquatic sites; and human use characteristics.

206.    However, in its Final AEIS, the Corps defers its Section 404(b)(1) analysis for the

individual applications to the project-specific RODs and statements of findings.

207.     The Corps relies on the Final AEIS in conducting its public interest review, which requires the Corps to weigh the cumulative and indirect impacts associated with the project.

208.     In the ROD, the Corps concedes that it did not consider the direct or indirect impacts of phosphogypsum stacks but claims that the "cumulative impacts" of phosphogypsum stacks were considered in the Final AEIS.  However, the cumulative impacts analysis in the Final AEIS does not contain an analysis of the impacts of phosphogypsum stacks.

209.     In the public interest review, the Corps concludes that impacts to wetlands would be "neutral as a result of mitigative action."  However, the ROD establishes that the South Pasture Extension Mine will impact 1198.17 acres of wetlands.

210.     The Corps also concludes in the public interest review that despite the environmental damage caused by the South Pasture Extension Mine, the project would have "minor" environmental benefits due to "long-term" benefits of reclamation. Similarly, the Corps concludes that the South Pasture Extension Mine would have a "minor" conservation benefit.

211.     The Corps relies on the Final AEIS to conclude that the project would have a minor beneficial economic impact.  The Corps does not appear to have independently verified applicant's claims regarding the alleged economic benefits of the South Pasture Extension Mine.

212.     In the public interest review, the Corps indicates that the South Pasture Extension

Mine would not have any effect on "food and fiber production."

213. The Corps relies entirely upon the Final AEIS in describing the public and private need for the project in the public interest review. The Corps also relies entirely upon the Final AEIS in concluding that impacts on water supply, water conservation, and groundwater resources would be "neutral" or "minor," and impacts on water quality would either be "minor" or "moderate." It does not consider the potential impacts on water supplies or water quality from phosphogypsum stacks, such as the phosphogypsum stack at the New Wales plant that broke open and flowed into the Floridan aquifer.

214. Additionally, the Corps relies on the June 9, 2014 biological opinion in the public interest review, which is inadequate for reasons set forth below.

215. The Corps includes as attachment B to the ROD a "compensatory mitigation plan," which the applicant prepared. Neither the ROD nor the compensatory mitigation plan contains a determination by the Corps regarding the appropriate time interval for distinguishing between temporary and permanent impacts.

216. The compensatory mitigation plan provides for preservation of 396.23 acres of wetlands, enhancement of 123.5 acres of wetlands, and establishment of 1304.28 acres of wetlands. Neither the compensatory mitigation plan nor the ROD demonstrate that the Corps considered wetland restoration as the preferred option for mitigation, as required by 40 C.F.R. § 230.94(c).

217. The compensatory mitigation plan provides for 18,402 linear feet of stream establishment. Neither the compensatory mitigation plan nor the ROD demonstrate that the Corps considered avoidance, rehabilitation, enhancement, or preservation, as required

by 40 C.F.R. § 230.94(c).

218.     The Corps denied multiple requests for a public hearing on the South Pasture

Extension Mine.

219.     The Corps did not issue a FONSI on the South Pasture Extension Mine, either

with or after the Supplemental EA.  It also did not complete a site-specific EIS on the

South Pasture Extension Mine.

**E. THE BIOLOGICAL OPINION**

220.     The Service baldly discounts the impacts of phosphate mining as temporary,

allowing the destruction of 51,000 acres of habitat for imperiled, federally protected

species, including 7,512 acres at the South Pasture Extension Mine.

221.     The Corps initiated consultation with the Service on the South Pasture Extension

Mine on July 12, 2012, and the Service received a biological assessment for the South

Pasture Extension Mine on August 1, 2012.

222.     The Corps also sent its initial Section 7 consultation letters to the Service for the

Wingate East Mine in May 2012, Desoto Mine in June 2012, and Ona Mine in August

2012.  The Service received a biological assessment on the Desoto Mine in November

2014 and a biological assessment on the Ona Mine in April 2015.

223.     The Service issued a concurrence letter in May 2012 for the Wingate East Mine,

finding that the project was not likely to adversely affect the wood stork or Audubon's

crested caracara.  Also in May 2012, the Service issued Mosaic an incidental take permit

on the Wingate East Mine for the Florida scrub-jay and the eastern indigo snake through

a separate Section 10 process.

224.    On June 9, 2014, the Service transmitted a letter to the Corps stating it was a biological opinion on the effects of the South Pasture Extension Mine on Audubon's crested caracara, eastern indigo snake, and wood stork (biological opinion).  The letter also appears to be a concurrence letter on the Corps' determination regarding the Florida panther, Florida scrub jay, and Florida grasshopper sparrow.

225.    In the letter, the Service maintains that the South Pasture Extension Mine "may affect, but [is] not likely to adversely affect" the endangered Florida panther, the threatened Florida scrub jay, and the endangered grasshopper sparrow, and that it "may affect" the threatened Audubon's crested caracara, eastern indigo snake, and wood stork.

226.    The 2014 biological opinion defines the action area as the project area, which is 7,512.8 acres, plus some off-site areas for certain species.  The 2014 biological opinion states that the project's direct impacts include impacts to 4,930 upland acres and 1,487 wetland acres, as well as impacts to 0.9 acres of temporary wetland and surface water. To mitigate these impacts, the biological opinion reports that the applicant will:

- Conduct 400 acres of on-site mitigation;

- Create 1,568 acres of wetlands;

- Restore 122 acres of wetlands;

- Provide a conservation easement on 1,094 acres within the proposed preservation area where all mining disturbance will be avoided;

- Create an additional 1,789 acre conservation easement on mitigation wetlands;

- Grant conservation easements to 435 acres of offsite wetlands and 481 acres of off-site uplands; and

- Donate $150,000 to the Wildlife Foundation of Florida to finance surveys and monitoring for Audubon's crested caracaras.

227.  The Service fails to evaluate the cumulative impact to species from all four proposed phosphate mines (the South Pasture Extension Mine, Ona Mine, Desoto Mine, and East Wingate Mine) in the biological opinion for the South Pasture Extension Mine.

228.  The Service also discounts the impacts of the South Pasture Extension Mine by relying on promises of reclamation but does not evaluate the specific ecological functions to be restored, or the types of vegetation, soils, and other microhabitat proposed to be provided through mitigation.

229.  The biological opinion also indicates that the Service failed to evaluate the purported success of reclamation techniques and broad claims that the listed species will return to reclaimed mined land.

230.  Aside from a species status and description, the biological opinion provides no other information or analysis for the Florida panther, Florida scrub jay, and Florida grasshopper sparrow.

231.  The biological opinion does not specifically analyze impacts on the eastern indigo snake, wood stork, and Audubon's crested caracara from habitat destruction caused by phosphate mining, instead dismissing habitat loss as a "temporary change" based on the applicant's promised reclamation and preservation measures.  There is no specific

discussion of the reclamation and preservation measures to be employed, and there is also no independent evaluation of whether such measures have been proven successful.

232.    One study cited in the biological opinion to support a finding that eastern indigo snakes are "likely to re-colonize" reclaimed mine sites found eastern indigo snakes at only 3 of 62 study sites, all of which were reclaimed sites.  The study contains no comparison of the species' presence on natural and reclaimed lands.

233.    The biological opinion also includes conflicting opinions about impacts to species.  For instance, with regard Audubon's crested caracara, the biological opinion states that the Service "do[es] not know if . . . [mining] disturbance will cause the *temporary or permanent* abandonment of the nesting territory on the SPE or other territories in the action area," but it later concludes without further analysis that "[d]isturbance resulting from the proposed action may . . . caus[e] birds to *temporarily* leave the area."

234.    The biological opinion defines the action area narrowly around the proposed mine site, and it contains no analysis of the impacts of phosphogypsum stacks on listed species.

235.    Large portions of the 2014 biological opinion are verbatim or near-verbatim restatements of the applicant's biological assessment, including the majority of the species-impact analyses for the eastern indigo snake, wood stork, and Audubon's crested caracara.  Likewise, large portions of the ITS in the 2014 biological opinion are verbatim or near-verbatim restatements of the applicant's biological assessment.  The characterization of habitat destruction as an insignificant, "temporary impact" is a verbatim description from the applicant's biological assessment.

236.    In the ITS of the 2014 biological opinion, the Service authorizes take in the form

of harassment of two caracara pairs (a total of four (4) caracaras) and take in the form of

injury or death due to vehicle collision of one (1) caracara.

237.    The Service also authorizes take of six (6) eastern indigo snakes over a rolling

five-year period.  This authorization appears to cover death or injury to eastern indigo

snakes.  Although the 2014 biological opinion acknowledges that take of the eastern

indigo snake would occur in the form of harassment, it does not specifically quantify how

much take would be allowed.

238.    The Service also authorizes take in the form of injury or death to one (1) wood

stork from vehicular collision over the course of the mining activities.  Although the

Service acknowledges impacts to wood stork foraging habitat that could equate to harm

or harassment, it does not set a cap on take in the form of harassment because "the

loss/reduction of foraging value to the wood storks associated with these systems will be

temporary."

239.    The ITS does not provide specific monitoring requirements in relation to its

quantification of allowable take for the eastern indigo snake.  Instead it states, "The lack

of practical methods of survey, in conjunction with wide-ranging activity and use of a

variety of habitat types, makes it *difficult* to determine the exact number of indigo snakes

that will be impacted by the proposed action."  The biological opinion offers no

procedure for monitoring or recording eastern indigo snake harassment caused by mining

activities other than "annual counts."  The Service concedes that the "extent of multiple

harassments of the same individual [snakes] cannot be determined without capturing and marking the snakes" and then fails to consider or include such measures to monitor take.

240.    The Service includes the following "reasonable and prudent measures" in the 2014 biological opinion:

- Minimize disturbance and injury that may result from vehicular traffic and other mining activities;

- Reduce habitat fragmentation after reclamation;

- Fund surveys and monitoring of caracaras; and

- Report the progress of the action and its impact on species to the Service as specified in the ITS.

241.    The Service also sets out non-discretionary terms and conditions of the permit, which include:

- A requirement that the Corps ensure the applicant abides by the permit conditions and report back to the Service;

- A mandatory speed limit of no more than 35 mile per hour at the mine site;

- Briefing of mining employees on listed species;

- Implementation of the Service's Standard Protection Measures for the Indigo Snake;

- Creation of a reclamation plan "that focuses on creating an interconnected mosaic of habitats that enable movement of fish and wildlife resources across the landscape," which will be reviewed and approved by state and federal officials before implementation;

- A donation from the applicant to Wildlife Foundation of Florida in the
  amount of $150,000 to finance surveys, monitoring, and "other associated
  activities"; and

- Reporting of dead, injured, or sick threatened or endangered species.

242.    The biological opinion appears to defer consideration of species-specific
reclamation measures when it states that a reclamation plan must be "approved by
state and federal officials before implementation," thus belying the "non-
discretionary" nature of the biological opinion's terms and conditions as they
apply to reclamation.  The biological opinion does not otherwise require species-
specific reclamation terms or conditions, despite relying on such reclamation in
making its no jeopardy finding for the eastern indigo snake, wood stork, and
Audubon's crested caracara.

### Eastern indigo snake

243.    The eastern indigo snake *(Drymarchon couperi)* is the largest, non-venomous
snake in North America, reaching lengths of up to 8.5 feet.  It is uniformly lustrous-black,
hence its name "indigo," except for a red or cream-colored patch on its chin, throat, and
sometimes cheeks.

244.    The eastern indigo snake was listed as a threatened species under the ESA on
January 31, 1978, due to habitat loss and overutilization.

245.    Eastern indigos are active, spending most of their time foraging for food and
searching for mates.  In fact, they are one of few snake species that are active during the
day and inactive at night.  Even more fascinating, there are reports of virgin or isolated

females laying fertile eggs.

246.     Because of its large home range—up to 805 acres—the eastern indigo snake continues to be especially vulnerable to habitat loss, degradation, and fragmentation.

247.     The eastern indigo snake utilizes a mixture of upland and wetland habitats during its life cycle, including flatwoods, dry prairie, tropical hardwood hammocks, edges of freshwater marshes, dunes, and agricultural fields.

248.     In south Florida, agricultural sites created in former wetland areas are occupied by eastern indigo snakes.  The introduction of agriculture and its associated canal systems has resulted in an increase in rodents and other species of snakes that are prey for eastern indigo snake.  A positive long-term prognosis for these populations is tied to the continuation of agriculture at these sites.

249.     Eastern indigo snakes seek and utilize underground refugia, as well as other animals' burrows and other holes or hollows.  The snakes have close, symbiotic relationships with the gopher tortoises, which excavate burrows the eastern indigos use for shelter.

250.     In July 2016, scientists published a peer-reviewed study revealing that the eastern indigo snake is in fact two genetically and morphologically distinct species—the eastern indigo snake (*Drymarchon couperi*) and the Gulf coast indigo snake (*Drymarchon kolpobasileus*)—each more rare than the eastern indigo snake was previously considered

to be.[2]  The study also provided range maps for the new species delineation, which

revealed that the snakes present at the South Pasture Extension Mine site fall within the

range of the Gulf coast indigo snake, not the eastern indigo snake.

***Wood stork***

251.    The wood stork (*Mycteria americana*) is a large, long-legged, prehistoric-looking

wading bird.  It has a wingspan of nearly five and a half feet and stands several feet tall.

It uses its large beak to locate fish through tactilocation in shallow water.  To feed, the

bird wades through shallow water with its beak slightly open.  When it encounters prey, it

snaps its beak shut and swallows its meal.

252.    Due to the rapid loss and alteration of wetlands, the Service first listed the wood

stork as an endangered species under the ESA on February 28, 1984.[3]

253.    Wood storks use freshwater and estuarine wetlands for nesting, feeding, and

roosting.  For feeding, wood storks need wetlands that are capable of producing abundant

fish sized between  one and  ten inches, as well as small crustaceans, amphibians,

reptiles, mammals, birds, and arthropods.  Wood storks forage in a wide variety of

wetland types, including freshwater marshes, pools, hardwood and cypress swamps,

narrow tidal creeks, shallow tidal pools, stock ponds, shallow and seasonally flooded

roadsides, agricultural ditches, and managed impoundments.  Optimal habitat consists of

shallow water between 2 and 16 inches in depth with sparse vegetation.  Because wood

---

2 Kenneth Krysko et al., *A Cryptic New Species of Indigo Snake (Genus* Drymarchon*) from the Florida Platform of the United States*, 4138 ZOOTAXA 549 (2016).
3 The Service has since downlisted the wood stork to threatened status.

storks rely on access to drying wetlands to concentrate prey, they require wetlands with a diverse range of hydroperiods, or seasonal water-level patterns.

254.    Hydroperiods play an important role in the suitability of a wetland site for wood stork foraging, and many sites will only be suitable during part of the year when the natural hydrology makes prey easily accessible.  Specifically, wood storks rely on shallow water levels within wetlands to concentrate prey items during the nesting season. These wetlands must also exist within sufficient closeness to nesting sites (approximately 10.29 to 50 kilometers).

255.    Wood stork nesting habitat includes a variety of wooded habitat types such as mangroves, cypress, and various other live or dead shrubs or trees located in standing water or on islands surrounded by broad expanses of open water.  Wood storks nest colonially with other wood storks, as well as with other wading bird species.  These colonial nesting sites are used for many years as long as the colony is undisturbed and sufficient feeding habitat remains.  Wood storks will abandon nesting sites if the standing water surrounding them is drained.

256.    The primary cause of wood stork population declines is loss of wetland habitat and loss of wetland function, which results in reduced prey availability.  Studies cited in the biological opinion indicate that about 35 percent of suitable wood stork foraging habitat has been lost since 1900.  Loss of foraging wetlands continues to be the primary threat to the population of wood storks at the Corkscrew Sanctuary Colony near Naples, Collier County, Florida.

257.     This habitat loss is driven by the human alteration of wetlands and manipulation

of wetland hydroperiods.  The manipulation of water to lower levels can decrease food

production for wood storks and facilitate raccoon predation.  Artificially high water

levels can slow regeneration of nesting trees.

***Audubon's crested caracara***

258.     Audubon's crested caracara (*Polyborus plancus* or *Caracara cheriway*) is a large

raptor with an impressive dark brown crest, bright orange featherless face, heavy bill, and

unusually long legs.  Unlike many other raptors, caracaras have flat talons, which enable

them to run and walk for extended periods on the ground in search of prey and carrion.

However, caracaras are also powerful fliers, reaching speeds of up to 40 miles per hour

and soaring at great heights.

259.     Due largely to habitat loss, the Service listed the Audubon's crested caracara as

threatened under the ESA on July 6, 1987.

260.     Caracaras depend on dry or wet prairie areas with scattered cabbage palms, as

well as improved or semi-improved pasture.

261.     Habitat heterogeneity, including specific land cover types and small freshwater

wetlands, is important for caracara presence and survival.  For foraging, caracaras may

prefer open grasslands and other short vegetation structures, which aid them in spotting

prey and evading predators.  Caracaras also appear to require some wetland habitat, as

nearly 65 percent of their diet consists of wetland-dependent prey.  For nesting, caracaras

prefer cabbage palm trees, though nests have also been found in live oaks, cypress,

Australian pine, saw palmetto, and black gum.  Generally, nests will be between 13 and

59 feet off the ground.  Caracaras construct new nests each season and often return to the same tree year after year.

262.     The caracara's decline is attributed primarily to habitat loss, as large areas of native prairie and pasturelands in south-central Florida were converted to citrus operations, tree farms, agriculture, and development.  This loss has continued to accelerate in recent decades and will continue to threaten the caracara as land-use conversions continue.

263.     Caracaras are also threatened by vehicle collisions on roads because they prefer easily attainable food sources like carrion from roadkills.

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Corps' Violations of the Clean Water Act and the Administrative Procedure Act)**

264.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth herein.

265.     This claim is brought against the Corps and is raised by all Plaintiffs.

266.     The Corps violated its mandatory duty under the Clean Water Act, the 404 Guidelines, and LEDPA regulations, and consequently abused its discretion and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2), in permitting the South Pasture Extension Mine SAJ-1993-01395 because, *inter alia*:

a. The LEDPA adopted by the Corps is inadequate under the Section 404(b)(1) Guidelines because other practicable, less-damaging alternatives are available;

b.  The Corps failed to minimize and eliminate all avoidable environmental impacts associated with the LEDPA, including the filling of waters of the United States and direct, indirect, and cumulative impacts to habitat for endangered, threatened, and rare species;

c.  The LEDPA adopted by the Corps will result in unnecessary and avoidable environmental impacts to the Peace River watershed and the surrounding areas;

d.  The LEDPA adopted by the Corps will result in impacts to endangered, threatened, or rare species, including, but not limited to, the Audubon's crested caracara, eastern indigo snake, and wood stork;

e.  The Corps' analysis in support of the LEDPA is flawed and inadequate because in narrowly drawing the project's purpose, the Corps fails to adequately consider alternatives that (a) avoid the use of phosphate fertilizer; (b) involve importing rock from outside of the phosphate district; or (c) involve mining uplands only;

f.  The Corps did not rebut the presumption set forth in 40 C.F.R. § 230.10(a)(3) that practicable alternatives that do not involve wetlands are available; and

g.  The Corps failed to independently verify the veracity of the claims and/or studies presented by the applicant regarding the feasibility of alternatives.

267.  The Corps violated its mandatory duty under the Clean Water Act and the Corps' Public Interest Review regulation (33 C.F.R. § 320.4), and consequently abused its

discretion, acted arbitrarily and capriciously, and not in accordance with law, thus

violating the APA, 5 U.S.C. § 706(2) because, *inter alia*, the Corps:

    a.  Failed to analyze, evaluate, and weigh each of the public interest factors listed in 33 C.F.R. § 320.4;

    b.  Did not adequately analyze the impacts of the project on the Peace River watershed and surrounding areas;

    c.  Did not adequately analyze the practicability of reasonable alternative locations and methods to accomplish the objective of the project, as required by 33 C.F.R. § 320.4(a)(2);

    d.  Did not adequately analyze the effects of the project on general environmental concerns and human welfare, including its impacts on air quality and human health;

    e.  Improperly considered broad economic factors and purported project benefits beyond the scope of the Corps' statutory and regulatory mandates, and beyond the scope of the analysis of impacts and alternatives;

    f.  Failed to adequately assess the cumulative impacts of all stages of fertilizer production;

    g.  Failed to adequately analyze  impacts of the project on flood control and downstream erosion resulting from changes to river and stream banks and the floodplain; and

    h.  Failed to independently verify the veracity of the claims and/or studies presented by the applicant in connection with the Public Interest Review

analysis.

268.    The Corps violated its mandatory duty under the Clean Water Act, the Corps'

implementing regulations, and the Section 404 Guidelines, and consequently abused its

discretion, acted arbitrarily and capriciously, and not in accordance with law, thus

violating the APA, 5 U.S.C. § 706(2), in issuing the permit number SAJ-1993-01395 by:

   a.   Failing to ensure that the project would not cause or contribute to

        significant degradation of waters of the United States, including the Peace

        River watershed and its tributaries, through adverse impacts to human

        health or welfare, water supplies, fish, and wildlife;

   b.   Failing to properly define the scope of the project purpose and need;

   c.   Failing to fully analyze and address all of the project's cumulative effects

        on fish, wildlife, water quality and productivity of the aquatic ecosystem;

   d.   Failing to fully analyze and address the secondary effects of the filling of

        the waters of the United States associated with the project;

   e.   Failing to ensure that the project will not jeopardize the continued

        existence of any federally listed species as required by 40 C.F.R.

        § 230.10(b)(3);

   f.   Failing to provide a comprehensive compensatory mitigation plan that: 1)

        contains the required elements described in 40 C.F.R. §§ 230.91-230.98;

        2) offsets the losses resulting from unavoidable impacts on waters of the

        United States, as required by 40 C.F.R. § 230.93; and 3) determines the

        appropriate time intervals between temporary and permanent impact to

waters of the United States;

g.   Failing to take adequate steps to minimize potential adverse impacts of discharge on aquatic ecosystems; and

h.   Failing to independently verify the veracity of the claims and/or studies presented by the applicant in the permit review process.

269.   As a result of these detailed failings, the Corps acted arbitrarily and capriciously, abused its discretion, and was not in accordance with law as required by Clean Water Act, the Corps' and EPA's implementing regulations, and the APA, and is subject to judicial review under the APA. 5 U.S.C. §§ 701-706, 706(2).

270.   The Corps' violations have caused and will continue to cause plaintiffs injuries as described in above.

## SECOND CLAIM FOR RELIEF

**(Corps' Violations of the National Environmental Policy Act**

**and the Administrative Procedure Act)**

271.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

272.   The Corps performed a major federal action for the purpose of NEPA by issuing Clean Water Act permit number SAJ-1993-01395. *See* 42 U.S.C. § 4332(2)(C).  This action was a final agency action under the APA, 5 U.S.C. § 704.

273.   The Corps violated NEPA and its implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2), in its actions as they relate to the South Pasture Extension Supplemental EA and ROD, the

Final AEIS, and permit number SAJ-1993-01395.

274.    Specifically, the Corps failed to adequately addresses serious environmental issues raised by the Corps' decisions to extend the permit for the South Pasture Extension Mine, including by:

    (a)    Failing to take a hard look at the significant direct, indirect, and cumulative environmental effects of its actions in permitting the South Pasture Extension, including by failing to meaningfully assess the environmental impacts of its action as it relates to other connected permit applications, both pending and reasonably foreseeable, and failing to meaningfully assess the environmental impacts of its action as it relates to ongoing and reasonably foreseeable activities in Bone Valley;

    (b)    Failing to properly identify and assess the basic and overall purpose and need for the project generally and specifically as it relates to the South Pasture Extension Mine;

    (c)    Improperly narrowing the analyses performed through the Final AEIS and, subsequently, through the South Pasture Extension Mine Supplemental EA;

    (d)    Failing to properly identify and assess reasonable alternatives to the action, and avoid, minimize, or mitigate the adverse effects of these actions on the quality of the human environment;

    (e)    Failing to take a hard look at the significant harm to threatened and endangered species and their critical habitat from the action, including by

> failing to conduct any meaningful analysis of the substantial adverse impacts that will result from the activity through reduced opportunities for viewing birds and other wildlife, including the Florida panther, wood stork, eastern indigo snake, and Audubon's crested caracara;

(f)     Failing to supplement its NEPA review with significant new information relevant to environmental concerns and bearing on the action and its impacts as it relates to the federally threatened eastern indigo snake;

(g)     Failing to prepare a site-specific environmental impact statement for the South Pasture Extension Mine permit;

(i)     Failing to encourage and facilitate public involvement in these decisions, which are of substantial environmental controversy, including, but not limited to, by failing to adequately respond to requests that the agency hold or sponsor public hearings, as requested by several interested parties—including Plaintiffs, and failing to hold or sponsor such hearings; and

(j)     Otherwise disregarding the requirements of NEPA and its implementing regulations, including, but not limited to, failing to follow procedural requirements related to the issuance of ROD and FONSI decisions.

275.    The Corps' decision to prepare and its preparation of a general, areawide EIS on phosphate mining in Bone Valley does not supersede or excuse the inadequacy of the site-specific environmental analysis that it conducted on the South Pasture Extension Mine proposal.

276.     As a result of these errors, the Corps failed to promote efforts that will prevent or eliminate damage to the environment; failed to use all practicable means to foster and promote the general welfare; failed to avoid preventable risk to the public health and safety; failed to create and maintain conditions under which humans and nature can exist in productive harmony; and failed to enhance long-term productivity in Bone Valley.

277.     The NEPA review conducted by the Corps in connection with its decision to issue permit number SAJ-1993-01395 is inadequate and flawed, and the Corps' reliance on it was and is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.

## THIRD CLAIM FOR RELIEF

### (The Service's Violations of the Endangered Species Act

### and the Administrative Procedure Act)

278.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

279.     The Service's biological opinion is arbitrary and capricious, and contrary to the consultation requirements of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14, and is thus violation of the APA, 5 U.S.C. § 706(2)(A).

280.     Specifically, the Service failed to: (1) review all relevant information; (2) properly consider the direct and indirect effects of the action; (3) adequately assess the cumulative effects on the listed species; and (4) specify the level of take that may occur with a meaningful trigger to reinitiate consultation.

281.     The Service's biological opinion is contrary to the consultation requirements of

Section 7(a)(2) of the ESA and therefore violates the APA because it:

    (a)    Improperly restricts the action area and inaccurately describes the environmental baseline;

    (b)    Improperly limits the scope of the agency action and subsequent analysis of the effects of the agency action to the fill of wetlands;

    (c)    Fails to consider all relevant information or information otherwise available;

    (d)    Fails to analyze the cumulative impacts on listed species in the action area;

    (e)    Fails to specify the level of take that may occur and provide an adequate trigger for re-initiation of consultation; and

    (f)    Relies on insufficient, unspecified, unproven, and unenforceable mitigation measures.

282.    The Service's proffered Reasonable and Prudent Measures are also inadequate to minimize the incidental take of wood storks, Audubon's crested caracara, and eastern indigo snake at the project site.

283.    The biological opinion's Reasonable and Prudent Measures do not contain mitigation measures with specific defined conservation goals, action measures, or an implementation schedule to ensure that wood stork, Audubon's crested caracara, and eastern indigo snake conservation measures are met.

284.    The Service failed to specify the amount or extent of take that will occur or provide a surrogate ecological condition that has some connection to the taking of the species, as the ESA requires. 50 C.F.R. § 402.14(i).

285.    The Service failed to provide a meaningful trigger for the reinitiation of

consultation. *See* 16 U.S.C. § 1536 (a)(2), (b)(4), (o)(2); 50 C.F.R. § 402.14(i); Final ESA

Section 7 Consultation Handbook, 4-47, 4-48 (March 1998).

286.    The Service failed to reinitiate consultation based on new information that reveals

potential effects to the eastern indigo snake in a manner or to an extent not previously

considered, 50 C.F.R. § 402.16, specifically, that the eastern indigo snake is actually two

genetically distinct species, and the species located in the action area is the Gulf coast

indigo snake (*Drymarchon kolpobasileus*).

287.    The Service's failure to "meaningfully analyze" the risks to these species and the

key issues is arbitrary and capricious and requires the Service to reinitiate formal

consultation and prepare a new biological opinion.

## FOURTH CLAIM FOR RELIEF

### (The Service's Violation of the Endangered Species Act

### by determining not likely to adversely affect and concurrence)

288.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

289.    The Service and Corps violated Section 7(a)(2) of the ESA and implementing

regulations, and the APA, 5 U.S.C. § 706(2)(A), in finding that the South Pasture

Extension Mine is not likely to adversely affect the Florida panther, Florida scrub jay,

red-cockaded woodpecker, and Florida grasshopper sparrow.

## FIFTH CLAIM FOR RELIEF

### (The Corps' Violation of the Endangered Species Act)

290.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

291.     The Corps violated Section 7(a)(2) of the ESA and implementing regulations by failing to reinitiate consultation based on new information that the eastern indigo snake is actually two genetically distinct species, and the species located at the mine site is the newly identified Gulf coast indigo snake. 50 C.F.R. § 402.16.

292.     The Corps violated Section 7(a)(2) of the ESA by relying on the Service's flawed biological opinion to determine that its permitting decision is not likely to adversely affect the Florida panther, Florida scrub jay, red-cockaded woodpecker, and Florida grasshopper sparrow.

293.     The Corps violated Section 7(a)(2) of the ESA by relying on the Service's flawed biological opinion to determine that its permitting decision will not jeopardize the eastern indigo snake, wood stork, Audubon's crested caracara, Florida panther, Florida scrub jay, red-cockaded woodpecker, and Florida grasshopper sparrow.

294.     The Corps is also violating Section 7(d) of the ESA by permitting applicant to operate its dredge and fill activities before a valid biological opinion is prepared and implemented.

295.     Although the Corps has formally consulted with the Service, section 7(d) is in effect because the process has not been completed lawfully with the issuance of a valid biological opinion.  The prohibition against the irretrievable and irreversible commitment

of resources in Section 7(d) applies to the issuance of the Corps permit and the ongoing
filling of wetlands pending completion of a valid consultation, and adoption and
implementation of a biological opinion.

296.    The Corps is in further violation of the ESA for failing to initiate and conclude
Section 7 consultation in the AEIS process.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter Judgment for Plaintiffs and
provide the following relief:

(1)     Declare that the Corps' decisions to issue a Clean Water Act permit for the
South Pasture Extension Mine, permit number SAJ-1993-01395, violated
the Clean Water Act, NEPA, the ESA, and the APA;

(2)     Declare that the Service's biological opinion is arbitrary, capricious, and
contrary to the consultation requirements of ESA section 7(a)(2),
16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14, and in violation of the APA,
5 U.S.C. § 706(2)(A);

(3)     Declare that the Corps' reliance on the Service's biological opinion is
arbitrary and capricious and violates section 7(a)(2) of the ESA;

(4)     Declare that the NEPA review conducted by the Corps in approving Clean
Water Act permit number SAJ-1993-01395 is arbitrary, capricious, and in
violation of the law;

(5)     Order the Corps to rescind Clean Water Act permit number SAJ-1993-
01395;

(6)     Order the Service to withdraw the biological opinion, rescind its incidental

take statement, reinitiate consultation with the Corps in accordance with

the ESA and APA, and prepare a biological opinion that complies with the

mandates of the ESA;

(7)     Preliminarily and permanently enjoin the Corps from authorizing any

further action under the permit until the Corps fully complies with the

requirements of the Clean Water Act, NEPA, the ESA, and the APA,

including providing an opportunity for public hearing;

(8)     Award plaintiffs their costs and reasonable attorneys' fees pursuant to the

Equal Access to Justice Act, 28 U.S.C. § 2412, Fed. R. Civ. P. 54(d), and

the ESA, 16 U.S.C. § 1540(g)(4); and

(9)     Award plaintiffs any other relief that is just and proper.

**DATED:**  June 2, 2017

Respectfully submitted,

*/s/ Jaclyn Lopez*
JACLYN LOPEZ, Trial Counsel
FL Bar No. 96445
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190
Fax: (520) 623-9797
jlopez@biologicaldiversity.org

*/s/ Hannah M.M. Connor*
HANNAH M.M. CONNOR
FL Bar No. 125378

Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (202) 681-1676
Fax: (520) 623-9797
hconnor@biologicaldiversity.org

*/s/ Elise Pautler Bennett*
ELISE PAUTLER BENNETT
FL Bar No. 106573
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 755-6950
Fax: (520) 623-9797
ebennett@biologicaldiversity.org

*/s/ John Peter Rose*
JOHN PETER ROSE, *pro hac vice*
CA Bar No. 285819
Center for Biological Diversity
1212 Broadway, Suite #800
Oakland, CA 94612
Tel: (510) 844-7100
Fax: (510) 844-7150
jrose@biologicaldiversity.org

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of June, 2017, I electronically filed the

foregoing PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY

AND INJUNCTIVE RELIEF with the Clerk of the Court by using the CM/ECF system,

which will send a Notice of Electronic Filing to all counsel of record.


*/s/ Jaclyn Lopez*
JACLYN LOPEZ