# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### Tampa Division

---

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

      Plaintiffs,

      v.

U.S. ARMY CORPS OF ENGINEERS; et al.,     Case No. 8:17-cv-00618-SDM

      Defendants,

MOSAIC FERTILIZER, LLC

      Defendant-Intervenor.

---

## DEFENDANT-INTERVENOR MOSAIC FERTILIZER, LLC'S
## OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Jamie Zysk Isani (Fla. Bar No. 728861)
jisani@hunton.com
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Telephone: (305) 810-2500

*Trial Counsel for Defendant-Intervenor
Mosaic Fertilizer, LLC*

George P. Sibley, III (Va. Bar No. 48773)
gsibley@hunton.com
Jonathan L. Caulder (Va. Bar No. 89062)
jcaulder@hunton.com
HUNTON & WILLIAMS LLP
951 E. Byrd St.
Richmond, VA 23221
Telephone: (804) 788-8200

Deidre G. Duncan (D.C. Bar No. 461548)
dduncan@hunton.com
Andrew J. Turner (D.C. Bar No. 471179)
aturner@hunton.com
Kerry L. McGrath (D.C. Bar No. 997277)
kmcgrath@hunton.com
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone: (202) 955-1500

*Counsel for Defendant-Intervenor
Mosaic Fertilizer, LLC*

# TABLE OF CONTENTS

Introduction..................................................................................................................1

Standard of Review.......................................................................................................2

Argument ......................................................................................................................2

    I.      The Corps Complied With NEPA.................................................................2

          A.      The Corps Followed NEPA's Process. ..................................................3

          B.      The Project Purpose Was Properly Defined to Allow for
                    Consideration of Reasonable Alternatives...........................................6

          C.      The Corps Properly Found the Gypstacks Outside of SPE's Scope......8

    II.     The Corps Complied with the CWA................................................................10

          A.      The Corps Reasonably Determined That the SPE Mine Is the
                    LEDPA.................................................................................................10

          B.      The Corps Used the Right Scope for Its Public Interest Review.........11

          C.      The Mitigation Required by the SPE Permit is Consistent with the
                    Compensatory Mitigation Rule and the § 404(b)(1) Guidelines. ........12

          D.      The Corps Reasonably Found Unnecessary Another Public
                    Hearing...............................................................................................15

    III.    FWS and the Corps Complied with the ESA..................................................16

          A.      The Corps Was Not Required to Consult on the AEIS.......................16

          B.      The BO's Effects Analysis Was Consistent with FWS Regulations...17

          C.      The Corps and FWS Considered the Impacts of SPE on Habitat........19

          D.      FWS's Incidental Take Statement Provides a Meaningful Trigger
                    to Reinitiate Consultation. .................................................................21

          E.      The Corps and FWS Were Not Required to Reinitiate
                    Consultation. ......................................................................................23

          F.      The Corps Appropriately Relied on FWS's BO. ...............................24

      IV.      Plaintiffs Have Not Demonstrated That the Permit Should be Vacated..........25

Conclusion ....................................................................................................................25

**Cases**

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
273 F.3d 1229 (9th Cir. 2001) ............................................................22

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) ..............................................14, 25

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ..............................................................6

*Citizens for Smart Growth v. Peters*,
716 F. Supp. 2d 1215 (S.D. Fla. 2010) ............................................8

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.*,
669 F.3d 1203 (11th Cir. 2012) ..........................................................6

*City of Alexandria, Va. v. Slater*,
198 F.3d 862 (D.C. Cir. 1999) ..............................................................6

*City of Oxford, Ga. v. FAA*,
428 F.3d 1346 (11th Cir. 2005) ....................................................2, 3

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ..................................................... 16-17

*D'Olive Bay Restoration & Pres. Comm., Inc. v. U.S. Army Corps of Eng'rs*,
513 F. Supp. 2d 1261 (S.D. Ala. 2007).........................................8, 9

*Defs. of Wildlife v. U.S. Dep't of Navy*,
733 F.3d 1106 (11th Cir. 2013) ..........................................................3

*Druid Hills Civic Ass'n v. Fed. Highway Admin.*,
772 F.2d 700 (11th Cir. 1985) ..............................................................6

*Fla. Key Deer v. Paulison*,
522 F.3d 1133 (11th Cir. 2008) ........................................................16

*Fla Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*,
374 F. Supp. 2d 1116 (S.D. Fla. 2005) ............................................9

*Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
401 F. Supp. 2d 1298 (S.D. Fla. 2005) ..................................8, 9, 12

*Fund for Animals, Inc. v. Rice*,
  85 F.3d 535 (11th Cir. 1996) ................................................................ *passim*

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ...................................................................................5, 9

*Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*,
  120 F. Supp. 2d 1005 (M.D. Fla. 2000) ...................................................23

*Mahon v. U.S. Dep't of Agric.*,
  485 F.3d 1247 (11th Cir. 2007) ................................................................11

*Manatee Cty. v. Gorsuch*,
  554 F. Supp. 778 (M.D. Fla. 1982) ............................................................5

*Mayo Found. v. Surface Transp. Bd.*,
  472 F.3d 545 (8th Cir. 2006) .....................................................................6

*Miccosukee Tribe of Indians of Fla. v. United States*,
  566 F.3d 1257 (11th Cir. 2009) ................................................................22

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*,
  265 F.3d 1028 (9th Cir. 2001) ..................................................................19

*Pamlico-Tar River Found. v. U.S. Army Corps of Eng'rs*,
  329 F. Supp. 2d 600 (E.D.N.C. 2004).........................................................7

*Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*,
  87 F.3d 1242 (11th Cir. 1996) ................................................................8, 9

*Save the Bay v. U.S. Corps of Eng'rs*,
  610 F.2d 322 (5th Cir. 1980) .....................................................................8

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  2013 WL 12203239 (M.D. Fla. 2013) .......................................................15

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  295 F.3d 1209 (11th Cir. 2002) ...........................................................2, 3, 5

*Sierra Club v. Van Antwerp*,
  526 F.3d 1353 (11th Cir. 2008) ...........................................................3, 11

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*,
  433 F.3d 852 (D.C. Cir. 2006) ...................................................................9

**Statutes**

5 U.S.C. § 706 ..............................................................................................2

Endangered Species Act, 16 U.S.C. §§ 1531, *et. seq.* .............................. *passim*

16 U.S.C. § 1536(a)(2) ................................................................................24

Clean Water Act, 33 U.S.C. §§ 1251, *et. seq.*.......................................... *passim*

National Environmental Policy Act, §§ 42 U.S.C. 4321, *et. seq.* .................. *passim*

42 U.S.C. § 4332(C) ....................................................................................3

**Other Authorities**

33 C.F.R. pt. 325, App. B ............................................................................6

33 C.F.R. pt. 325, App. B § 7(b) ............................................................8, 12

33 C.F.R. pt. 325, App. B § 9(c)(4) ...........................................................6

33 C.F.R. § 325.1(b) ...................................................................................6

33 C.F.R. § 327.4(a) ..................................................................................15

40 C.F.R. pt. 230 ......................................................................................10

40 C.F.R. § 230.10(a) ...............................................................................10

40 C.F.R. § 230.93(a)(2) ..........................................................................14

40 C.F.R. § 230.93(f) ................................................................................13

40 C.F.R. § 1502.1 ......................................................................................3

40 C.F.R. § 1502.9(c) .................................................................................3

40 C.F.R. § 1505.2 ......................................................................................3

40 C.F.R. § 1508.25 ....................................................................................3

50 C.F.R. § 402.02 ................................................................................ *passim*

50 C.F.R. § 402.14(i)(1)(i) ........................................................................21

50 C.F.R. § 402.16(b) ...............................................................................24

50 C.F.R. § 402.16(c)..................................................................................................23

73 Fed. Reg. 19,594 (Apr. 10, 2008) ........................................................................14

# GLOSSARY

| | |
|---|---|
| AEIS: | Areawide Environmental Impact Statement |
| BO: | Biological Opinion |
| CBD: | Center for Biological Diversity |
| CFPD: | Central Florida Phosphate District |
| CMP: | Compensatory Mitigation Plan |
| CWA: | Clean Water Act |
| EA: | Environmental Assessment |
| EIS: | Environmental Impact Statement |
| EPA: | Environmental Protection Agency |
| ERP: | Environmental Resource Permit |
| ESA: | Endangered Species Act |
| FWC: | Florida Fish and Wildlife Conservation Commission |
| FWS: | Fish and Wildlife Service |
| ITS: | Incidental Take Statement |
| LEDPA: | Least Environmentally Damaging Practical Alternative |
| MMT: | Million Metric Tons |
| NEPA: | National Environmental Policy Act |
| NMFS: | National Marine Fisheries Service |
| ROD: | Record of Decision |
| SPE: | South Pasture Mine Extension |
| UMAM: | Uniform Mitigation Assessment Mthodology |
| WHMP: | Wildlife Habitat Management Plan |

**Introduction**

Defendant-Intervenor Mosaic Fertilizer, LLC (Mosaic) needs to expand its South Pasture mine to include 7,513 adjacent acres known as the South Pasture Extension (SPE). Because mining SPE will unavoidably impact features that the federal government considers "waters of the United States," Mosaic's predecessor, CF Industries, applied to the U.S. Army Corps of Engineers (the Corps) for a Clean Water Act (CWA) section 404 permit in 2010. Years of review by multiple State and federal agencies with extensive public involvement ensued. Throughout that process, Mosaic responded to numerous queries from these agencies and adjusted its plans accordingly. Finally, in November 2016, after the development of a comprehensive Areawide Environmental Impact Statement (AEIS) that analyzed site-specific impacts from SPE and three other projects, an Environmental Assessment (EA) that considered post-AEIS changes to SPE, coordination with and approval from the U.S. Environmental Protection Agency (EPA), and consultation with the U.S. Fish and Wildlife Service (FWS) under the Endangered Species Act (ESA) culminating in a Biological Opinion (BO) addressing SPE, the Corps issued the section 404 permit for SPE.

Mosaic has relied on that permit. It has retained local workers and, on top of its substantial investment in the permitting process, has devoted resources to the infrastructure needed to mine SPE. Mosaic also has undertaken numerous actions required under the permit's Compensatory Mitigation Plan (CMP), such as recording conservation easements on more than 1000 acres of land and funding financial assurances. The project is underway.

Plaintiffs want this Court to vacate that permit and halt Mosaic's project. They claim the Corps followed the wrong process, did not consider enough alternatives, did not require

enough mitigation, and did not consult enough with FWS. Plaintiffs are wrong. They serial-ly misstate the law that governed the process and mischaracterize the key documents and analyses that process yielded. The substantial agency record—the product of years of study—readily refutes Plaintiffs' claims. The Court should deny Plaintiffs' Motion.

<u>**Standard of Review**</u>

Courts review an agency's final decision to determine whether it is arbitrary and ca-pricious. 5 U.S.C. § 706. This standard of review is "exceedingly deferential." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996).

<u>**Argument**</u>

**I.      The Corps Complied With NEPA.**

The National Environmental Policy Act (NEPA) requires federal agencies to assess the environmental effects of proposed federal actions, such as a CWA section 404 permit, and consider reasonable alternatives. *City of Oxford, Ga. v. FAA*, 428 F.3d 1346, 1353 (11th Cir. 2005). NEPA imposes no substantive requirements, but rather establishes a process to foster informed decisionmaking and public participation. *Id.*

In reviewing an agency's NEPA decision, the Court must "ensure that the agency has taken a 'hard look' at the environmental consequences of the proposed action." *Fund for An-imals*, 85 F.3d at 546 (citations omitted). An agency satisfies this "hard look" requirement if it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action in-cluding a 'rational connection between the facts found and the choice made.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002) (citation omitted). "[The] agency need not have reached the same conclusion that the reviewing court would reach; the

agency must merely have reached a conclusion that rests on a rational basis." *City of Oxford*, 428 F.3d at 1352. The Corps satisfied the "hard look" requirement in this case.

### A.    The Corps Followed NEPA's Process.

Three aspects of the NEPA process are relevant here. First, an agency must prepare an EIS if a proposed action constitutes a "major federal action" with "significant" environmental impacts. 42 U.S.C. § 4332(C). The EIS, which may consider multiple related or similar projects, 40 C.F.R. § 1508.25, must "provide full and fair discussion of significant environmental impacts," and is to "be used by Federal officials in conjunction with other relevant material to plan actions and make decisions." 40 C.F.R. § 1502.1.

Second, where an agency receives additional project information after the EIS but before action is taken, the agency must assess whether that information reveals significant impacts "on the quality of the human environment *not previously considered*." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (emphasis added). If so, a supplemental EIS may be necessary to evaluate those impacts. 40 C.F.R. § 1502.9(c). But where revisions to a project "fall within the scope of the original NEPA analysis," the agency is not required to "redo the entire environmental analysis." *Van Antwerp*, 526 F.3d at 1360; *see also, e.g., Sierra Club*, 295 F.3d at 1217, 1221 (Corps complied with NEPA by evaluating project modifications in an EA that showed that the changes reduced wetland impacts and concluding that no supplement was necessary).

Third, after completing its process, the agency prepares a record of decision (ROD) to "document[ ] the agency's final decision on [the] proposed action." *Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1116 (11th Cir. 2013); s*ee also* 40 C.F.R. § 1505.2.

The Corps followed that process here. Between 2010 and 2011, the Corps received section 404 permit applications for four central Florida phosphate mines, including SPE. It concluded that these mines would be major actions and thus prepared the AEIS, which evaluated the environmental impacts all four mines in a single document. AR_0250103.

The AEIS provided detailed, site-specific analysis of the degree and significance of direct and indirect impacts of each of the four projects on affected resources. AR_0250605-820. For each such category, the Corps analyzed the impacts specifically attributable to SPE.[1] The Corps then analyzed the cumulative impacts of the proposed mines when added to other past, present, and reasonably foreseeable future actions. AR_0250821-910.

After the AEIS, Mosaic reduced the SPE mine plan's impacts. So Mosaic submitted revised SPE application materials. The Corps reviewed this additional information, received public comments, and then issued a supplemental EA, which concluded that, in light of this additional information, project impacts were minimized, reduced, or unchanged since the AEIS. *See* AR_0275351-352 (explaining that Mosaic had "minimized wetland impacts by 27.83 acres," "reduc[ed]" stream impacts by "1,180 linear feet," and left unchanged the impacts to intermittent streams, forested wetlands, and herbaceous wetlands). The Corps thus did not require a supplemental EIS. Ultimately, the Corps issued a ROD documenting its decision to issue the section 404 permit for SPE. AR_0287119-183.

Plaintiffs' critiques of this process lack merit. They wrongly claim the AEIS was a "general EIS" that did not address project-specific impacts. Pl. Br. at 8. But the AEIS *was* a

---

[1] AR_0250639-646 (surface water); AR_0250683-684 (ground water); AR_0250712 (water quality); AR_0250717-718 (ecological); AR_0250728-730 (wetlands); AR_0250748-750 (wildlife habitat); AR_0250768-771 (listed species); AR_0250785-786 (economic); AR_0250794 (environmental justice); AR_0250796 (radiation); AR_0250803-804 (cultural resources and historic properties); AR_0250808-809 (surficial geology and soils); AR_0250811-820 (charts of direct and indirect effects).

project-specific EIS. The Corps said so explicitly: "[The AEIS] constitutes the project-specific NEPA analysis for the four similar permit applications." AR_0250318.[2] And the AEIS discusses project-specific impacts for SPE at length. *See* supra n.1. So Plaintiffs are simply wrong when they argue that "the EA was the public's first opportunity to review the site-specific impacts of the SPE Mine." Pl. Br. at 3. They are similarly wrong to suggest that the EA was somehow deficient because it relied on the project-specific analysis in the AEIS. Pl. Br. at 8, 10. *Manatee Cty. v. Gorsuch*, 554 F. Supp. 778, 788 (M.D. Fla. 1982) ("NEPA does not require a site specific environmental impact statement if a broad-based study has been completed which includes the site at issue.") (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410–12 (1976)). In the EA, the Corps referenced the AEIS on issues already considered and evaluated additional information, all in compliance with NEPA. The Corps did not re-visit its sound site-specific review of SPE, because it identified no new significant impacts. AR_0275351-352. Plaintiffs do not challenge that conclusion, a tacit concession that under-mines any claim that a supplemental EIS was required. *Sierra Club*, 295 F.3d at 1217, 1221.

Plaintiffs are also wrong to suggest that the Corps' process was "circular" and thus avoided consideration of certain impacts to wetlands and streams. Pl. Br. at 10. Plaintiffs baldly assert that that the AEIS "defers its analysis to its site-specific NEPA review." *Id.* (citing AR_0250730). But the AEIS says nothing of the sort. In fact, the page of the AEIS that Plaintiffs cite is the culmination of the section of the AEIS that quantifies the direct and indirect impacts of SPE on wetlands and streams, and that analysis was then used to develop the CMP to offset those impacts. AR_0250911-969. In the EA, the Corps considered im-

---

[2] The AEIS is thus different from some types of broad-based, or "programmatic" EIS documents that analyze broad programs, but do not focus on specific projects. *See, e.g.,* AR_0001405.

pacts to wetlands and streams associated with Mosaic's revised plan and concluded that those

impacts were minimized, reduced, or unchanged from those cataloged in the AEIS.

AR_0275351-352.  That is not "circular" analysis; it is the "hard look" NEPA requires.

> **B.**    **The Project Purpose Was Properly Defined to Allow for Consideration of Reasonable Alternatives.**

NEPA requires an agency to evaluate a reasonable range of alternatives that are

"technically and economically practical or feasible," and that "meet the purpose and need of

the proposed action."  33 C.F.R. § 325.1(b); 33 C.F.R. pt. 325, App. B; *Druid Hills Civic*

*Ass'n v. Fed. Highway Admin.*, 772 F.2d 700, 713 (11th Cir. 1985) ("Consideration need on-

ly be given to reasonable alternatives.").   An agency is not required, however, to consider

alternatives that would frustrate the very purpose of the project.  *Mayo Found. v. Surface*

*Transp. Bd.*, 472 F.3d 545, 550 (8th Cir. 2006).

Plaintiffs wrongly suggest that it was improper for the Corps to consider Mosaic's

business objectives in assessing the project purpose and need, and that this unduly limited the

evaluation of alternatives.  Pl. Br. at 14-15.  Not so.  The Corps must define the purpose and

need for a project "from both the applicant's and the public's perspective." 33 C.F.R. pt. 325,

App. B § 9(c)(4).  The Corps thus "should take into account the needs and goals of the parties

involved in the application."  *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669

F.3d 1203, 1212 (11th Cir. 2012) (internal quotations omitted); *Citizens Against Burlington,*

*Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) ("Congress did not expect agencies to de-

termine for the applicant what the goals of the applicant's proposal should be.").  The Corps'

definition of purpose and need is owed "considerable deference."  *See City of Alexandria,*

*Va. v. Slater*, 198 F.3d 862, 864–68 (D.C. Cir. 1999) (concluding did not violate NEPA by

failing to include a ten-lane bridge as a "reasonable alternative" where the project's traffic needs required a twelve-lane bridge).

The Corps here properly defined a broad project purpose: "to extract phosphate ore from the mineral reserves in the CFPD and to construct the associated infrastructure required to extract and process the phosphate ore at separation/beneficiation facilities, recognizing that the ore extracted must be within a practicable distance of a new or existing beneficiation plant." AR_0250306; AR_0287123. *Accord, e.g., Pamlico-Tar River Found. v. U.S. Army Corps of Eng'rs*, 329 F. Supp. 2d 600, 614 (E.D.N.C. 2004) (rejecting argument that Corps' project purpose and need statement was too narrow where the purpose was to mine the phosphate resources owned by the applicant).

In the EA, the Corps properly assessed this overall project purpose in light of Mosaic's need to extend South Pasture mining operations to ensure a long-term supply of phosphate rock to maintain production levels and meet the fertilizer demand of Mosaic's customers. The Corps did not merely adopt Mosaic's position. To begin, based on years of discussions with the Corps and efforts to avoid and minimize impacts, Mosaic agreed to limit its production at SPE to levels it needs to *maintain*, rather than grow, current production levels. AR_0280873. Mosaic stated that need as 35 MMT of phosphate rock, but the Corps exercised its independent judgment and reduced Mosaic's need to 34.3 MMT of phosphate rock, and then reduced it again to 33.7 MMT of rock. AR_0275355; AR_0275354-355. In the end, the Preferred Alternative allows Mosaic to maintain production levels while sacrificing the ability to mine 14.5% of the site reserves to avoid 98.5% of the streams and 39.5% of the wetlands that warrant avoidance under the AEIS Mitigation Framework. AR_0280830-856.

Importantly, the Corps' evaluation of the purpose and need allowed consideration of a wide range of reasonable alternatives, including numerous "no action," offsite, and onsite alternatives.  The Corps found that some did not achieve the project purpose and need (*e.g.*, the "Preferred Plus"[3] alternative), and that others were "more environmentally damaging" than the SPE Mine (*e.g.*, UMAM-Based Avoidance).  AR_0275357-368.

### C.    The Corps Properly Found the Gypstacks Outside of SPE's Scope.

Contrary to Plaintiffs' contentions, Pl. Br. at 11-14, the Corps properly concluded that the "gypstacks" associated with fertilizer plants are outside of SPE's scope and thus did not require consideration as part of the direct and indirect impacts analysis.  The Corps *did* consider impacts from gypstacks as part of its cumulative impacts analysis where appropriate.

When scoping a project for NEPA analysis, the Corps generally is confined by the scope of its regulatory jurisdiction.[4]  While in some circumstances, the Corps' involvement in a phase of a larger project may allow the Corps to extend its view beyond its regulatory jurisdiction, 33 C.F.R. pt. 325, App. B § 7(b)(2), the Corps is not required to include independent projects merely because they are related.[5]  Here, the fertilizer plants are independent projects beyond the Corps' purview.  They have operated for years independently of the mines, and they will continue to operate regardless of SPE, because those plants process rock

---

[3] The "Preferred Plus" on-site alternative is very similar to Mosaic's Preferred Alternative, but would avoid two additional isolated, low-quality areas.  Critically, it would not meet project need, because it would yield only 32.2 MMT of rock, which falls 1.5 MMT shy of the "most conservative" need selected by the Corps, so the Corps properly rejected it.  *Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d 1215, 1235 (S.D. Fla. 2010).  *See also* AR_0280874-AR_0280876 (additional reasons provided by Mosaic for eliminating the "Preferred Plus" alternative).

[4] 33 C.F.R. pt. 325, App. B § 7(b)(1); *see also  D'Olive Bay Restoration & Pres. Comm., Inc. v. U.S. Army Corps of Eng'rs*, 513 F. Supp. 2d 1261, 1295 (S.D. Ala. 2007) (citing *Save the Bay v. U.S. Corps of Eng'rs*, 610 F.2d 322, 327 (5th Cir. 1980)).

[5] *See Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1247 (11th Cir. 1996) (*PEACH*); *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1317 (S.D. Fla. 2005).

sourced from other mines in Florida and rock that is imported. AR_0250107; AR_0250315-316; AR_0287128.  And the gypstacks at those plants are regulated primarily by EPA and the State and are therefore outside of the Corps' mandate with respect to the SPE project. AR_0250602; AR_0250315; AR_0287128.  The Corps thus properly concluded that impacts from gypstacks could be excluded from SPE's direct and indirect effects analysis.[6]

The Corps did consider impacts from gypstacks, where appropriate, as part of its cumulative impacts analysis.  AR_0287128.  When evaluating cumulative impacts, the agency need only consider the "effect of the current project along with any other past, present, or likely future actions *in the same geographic area*" as the project under review.[7]  Gypstacks were generally too remote to require consideration.  *See, e.g.,* AR_0252583 (gypstacks not relevant to water quality effects analysis).  But where a gypstack fell within the relevant area, its impacts were considered.  *See, e.g.,* AR_0250849 (considering effects of existing non-mining industrial uses, which would include gypstacks, on surface water hydrology); AR_0250867 (considering cumulative impacts associated with groundwater users, including non-mining uses, in areas where Mosaic withdraws groundwater to use at chemical plants).

---

[6] *See PEACH*, 87 F.3d  at 1247 (approving decision to exclude highway segment that would operate independently); *D'Olive Bay*, 513 F. Supp. 2d at 1295 (independent projects that "will be primarily if not exclusively within the expertise and permitting jurisdiction of federal and state agencies other than the Corps" were properly deemed beyond scope of reviewed project); *compare Fla. Wildlife*, 401 F. Supp. 2d at 1318 (reviewed action was merely phase of larger project on adjacent property).

[7] *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (emphasis added).   The analysis of the extent and effect of cumulative impacts, "and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976); *see also Fla Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1148 (S.D. Fla. 2005) ("Obviously, there must be reasonable perimeters around what may be considered cumulative and secondary impacts."); *D'Olive Bay*, 513 F. Supp. 2d at 1292–93 (cumulative impacts analysis should include "the impacts that are expected *in that area*" and other actions "that have or are expected to have impacts *in the same area*" (emphasis added)).

## II.   The Corps Complied with the CWA.

To issue a CWA section 404 permit, the Corps must ensure, among other things, that the activity complies with guidelines promulgated by EPA under CWA section 404(b)(1), and conforms with the public interest. 40 C.F.R. pt. 230 (the 404(b)(1) Guidelines).

### A.   The Corps Reasonably Determined That the SPE Mine Is the LEDPA.

Under the 404(b)(1) Guidelines, the Corps is to select the least environmentally damaging practicable alternative (LEDPA). 40 C.F.R. § 230.10(a). Plaintiffs' complaints about the Corps' LEDPA analysis largely track their NEPA critiques and fail for similar reasons. The Corps' LEDPA analysis is almost identical to that required by NEPA, so the alternatives analysis discussed above satisfies the 404(b)(1) Guidelines as well. *See* 40 C.F.R. § 230.10(a)(4) ("analysis of alternatives required for NEPA environmental documents … will in most cases provide the information for the evaluation of alternatives under [404(b)(1)] guidelines"); Standard Operating Procedures for the U.S. Army Corps of Engineers Regulatory Program, p. 20 (Jul. 1, 2009) ("Districts should not conduct or document separate alternatives analyses for NEPA and the 404(b)(1) Guidelines"). The Corps' exhaustive consideration of alternatives documented in the AEIS, the EA, and the ROD demonstrated that SPE was the LEDPA.

Under the 404(b)(1) Guidelines, a "practicable" alternative is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes*." 40 C.F.R. § 230.10(a)(2) (emphasis added). As explained in Section I.B. above, the Corps properly defined the project purpose and need for the SPE project and appropriately evaluated alternatives in light of this project purpose. The

Corps reviewed a range of "no action" alternatives, offsite alternatives, and onsite alternatives and reasonably determined that these other alternatives are not the LEDPA based on multiple grounds, including that they are not practicable, do not meet the project purpose and need, and/or are not less environmentally damaging. *See* AR_0287130-134.

Plaintiffs also wrongly suggest that the LEDPA analysis is flawed because the Corps did not verify information provided by Mosaic. To begin, "[t]he Corps does not err simply because it relies on data submitted by a permit applicant . . . Indeed, an applicant will frequently be the only party with an incentive to develop such data." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1368 (11th Cir. 2008) (Kravatch, J, concurring in part and dissenting in part). But even so, the Corps did not rely solely on Mosaic's data. Instead, the Corps independently verified and provided its own conservative estimate of the amount of phosphate rock for the project need. Moreover, the Corps specifically requested information on project alternatives and sought, on multiple occasions, additional information on project alternatives before authorizing the project. *See, e.g.,* AR_0262991-994; AR_0092523-630; AR_0124330-331; AR_0177007

## B. The Corps Used the Proper Scope for Its Public Interest Review.

Plaintiffs complain that the Corps "manipulated" its public interest review by using a broader scope of analysis for the benefits of SPE than for the impacts. Pl. Br. at 18-19. At the threshold, Plaintiffs waived this argument by not raising it during administrative proceedings. *Mahon v. U.S. Dep't of Agric.,* 485 F.3d 1247, 1254 (11th Cir. 2007) ("Under ordinary principles of administrative law, a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency.").

Even if not waived, Plaintiffs' argument lacks merit.  The Corps used a project-wide scope of analysis with respect to both impacts and benefits.  The Corps appropriately provided background discussion of the larger fertilizer industry in the AEIS section on Purpose and Need, AR_0250302-303, and referenced that AEIS section in the Public Interest Review's consideration of "the relative extent of the public and private need for the proposed structure or work."  *See* AR_0287153.  However, as the record materials cited by Plaintiffs demonstrate, the SPE Mine—and not the fertilizer industry as a whole—was the basis of the project benefits that the Corps identified in its Public Interest Review and its AEIS consideration of economic benefits of SPE.[8]  *See, e.g.,* AR_0287152 (long-term benefits of reclamation of native habitat and mitigation of aquatic resources on SPE); *id.* (conservation benefits of SPE, including improvement of degraded onsite wetlands and avoidance of higher quality wetlands); AR_0250785-286 (AEIS evaluation of predicted economic benefits of SPE, including scores of additional jobs and hundreds of millions in added labor income).  So the scope of analysis used for analyzing impacts and alternatives was the same scope of analysis used for analyzing the benefits of the proposal.  33 C.F.R. pt. 325, App. B § 7(b)(3).

C.    **The Mitigation Required by the SPE Permit is Consistent with the Compensatory Mitigation Rule and the § 404(b)(1) Guidelines.**

Plaintiffs conclusorily assert that the mitigation approved by the Corps is deficient, and complain that the Corps should have required more restoration and preservation.  But they fail to identify any specific inconsistencies with the Compensatory Mitigation Rule or violations of the CWA.  And indeed, they cannot, because the SPE permit requires a robust

---

[8] The case cited by Plaintiffs to support this argument—*Fla. Wildlife Fed'n*, 401 F. Supp. 2d at 1327 (Corps improperly segmented one phase of an integrated, multi-phase project on one large plot of property)—is inapposite and provides no support for Plaintiffs' claim that the Corps improperly used a wider scope of review for benefits than for impacts.

mitigation program that will maintain and improve the quality and quantity of aquatic resources within the Peace River watershed.

As designed, the mitigation for the 1,198.2 acres of wetland impacts is proposed in the form of 123.5 acres of wetland enhancement and 396 acres of wetland preservation prior to mining, together with 1,259.5 acres of onsite herbaceous and forested wetland establishment and restoration and 44.7 acres of off-site forested wetland establishment, which will occur on a rolling basis across the site as restoration follows behind mining. AR_0273865. In addition, to mitigate for the 32,161 linear feet of stream impacts, the project will include the preservation of 55,501 linear feet and the creation of 18,402 linear feet of streams, also on a rolling basis. AR_0273865-866. The CMP is thus designed to ensure that greater than acre-for-acre and type-for-type compensation will be achieved, resulting in a net increase of wetland acreage consistent with the Mitigation Rule's goal of "no net loss" of wetland acreage or function. AR_0273866. Plaintiffs admit, as they must, that the CMP provides a more than two-to-one ratio of compensation (when the Mitigation Rule requires only a one-to-one ratio, and that ratio is required only where mitigation is not based on a functional assessment like the UMAM system used for the SPE CMP). Pl. Br. at 20; 40 C.F.R. § 230.93(f).[9]

The Corps reasonably determined, and EPA confirmed, that the SPE mining plan properly applied the AEIS Mitigation Framework. That framework, developed based on the mitigation sequence required under the 404(b)(1) Guidelines, first requires impact avoidance, then impact minimization, and lastly, compensatory mitigation for the remaining unavoida-

---

[9] That the Corps approved and the court upheld a permit requiring mitigation on three-to-one ratio in *Fund for Animals* has no bearing on the site-specific determination the Corps made for SPE. As is appropriate here, the *Fund for Animals* court deferred to the Corps' determination that the permitted level of mitigation was appropriate. 85 F.3d at 544.

ble, but minimized impacts.  *See* AR_0250933-934; AR_0287155; AR_0256378.  So the Corps, in coordination with EPA, satisfied the 404(b)(1) Guidelines' requirements.

Plaintiffs say the Mitigation Rule mandates that the Corps require more restoration than other methods of mitigation, Pl. Br. at 19-20, but the Rule has no such requirement.  In fact, the Mitigation Rule allows the Corps wide discretion to require mitigation that is appropriate for a particular site.  *See* 73 Fed. Reg. 19,594, 19,598 (Apr. 10, 2008) (The Rule allows the Corps discretion "because resource types, project impacts, and compensatory mitigation practices vary widely across both projects and regions of the country").  The Rule states that restoration should "generally be the first option considered," 40 C.F.R. § 230.93(a)(2), but does not command that the Corps require a certain level of restoration as compared to other mitigation methods like establishment, enhancement, and preservation.  Indeed, the Corps considered, and the SPE permit requires, mitigation through a number of different methods.  The CMP requires over 1,259.58 acres of wetlands establishment (which effectively "restores" the altered landscape in the post-mining condition, *see* AR_0250925), 396.23 acres of preservation, and 123.52 acres of enhancement/restoration.  AR_0289830-856.  In its discretion and technical expertise, the Corps reasonably determined that this mitigation plan is the most "environmentally preferable" approach.  AR_0287157; *see Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1289 (11th Cir. 2015) (Corps receives deference on technical issues involving compensatory mitigation).

Finally, Plaintiffs point to concerns regarding the success of reclamation.  But Mosaic has decades of experience with successful reclamation and enhancement efforts.  *See* AR_0290799-866; *see* Section III.  Florida requires that reclaimed wetlands and surface wa-

ters be restored on an acre-for-acre and type-by-type basis, AR_0250961, and Mosaic's CMP

contains extensive measures that will ensure the success of Mosaic's reclamation and mitiga-

tion efforts. AR_0289840. Mosaic's demonstrated record of compliance, including at the

neighboring South Pasture Mine add weight to these assurances. *See* AR_0267750.

      **D.**      **The Corps Reasonably Found Another Public Hearing Was Unnecessary.**

      The Corps has the "discretion to hold hearings on permit applications on an 'as need-

ed' basis." *Fund for Animals*, 85 F.3d at 545 (citing 33 C.F.R. § 327.4(a)). "If the Corps de-

termines that it has the information necessary to reach a decision and that there is 'no valid

interest to be served by a hearing,' the Corps has the discretion not to hold one." *Id.* (finding

Corps reasonably denied request for public hearing where two public hearings had been con-

ducted under state process and "voluminous written information" was submitted to the Corps

such that a hearing was unlikely to generate new information).

      The Corps held multiple public meetings during the AEIS process. AR_0287128.

And the public was given numerous opportunities to provide input on the SPE permit, be-

yond what the regulations required, including an opportunity to comment on the EA.

AR_0275348-349. The Corps thus identified no valid interest to be served by a hearing "be-

cause the issues raised by the requestor were addressed in the EIS, Addendum, supplemental

environmental assessment, or this ROD." AR_0287128-129. Tellingly, Plaintiffs fail to

identify information that would have been presented at another public hearing that was not

given to the Corps previously. *See Fund for Animals*, 85 F.3d at 545; *Sierra Club v. U.S.*

*Army Corps of Eng'rs*, 2013 WL 12203239, at *6 (M.D. Fla. 2013).

### III.   FWS and the Corps Complied with the ESA.

Plaintiffs' ESA claims build on the false premise that phosphate mining transforms a natural landscape into less valuable habitat.  But CBD ignores that 65 percent of the site was long ago cleared and ditched for agricultural use, that mining will proceed slowly over approximately 14 years from one 300-acre section to another, that reclamation of each mined section will occur on a rolling basis, and that proven mitigation measures and reclamation plans, made binding by the permit, will ensure that previously disturbed areas will be transformed to habitat that is equivalent or better than what exists now. AR_0250963; AR_0289835.  Accordingly, FWS recognized throughout the BO that the "reclamation, and enhancement and preservation of wetlands … are specifically intended to enhance the continued existence of [] species by improving habitat conditions on-site."  AR_0263515, AR_0263519, AR_0263523.  And Mosaic will avoid mining the highest quality habitat and will implement a holistic Wildlife Habitat Management Plan (WHMP) that focuses on the specific needs of the listed species known to occur on the site.  Plaintiffs challenge the work by the Corps and FWS under the ESA on this project without acknowledging these critical facts, and that flawed premise undermines the bulk of their arguments.

### A.   The Corps Was Not Required to Consult on the AEIS.

Contrary to Plaintiffs' claim, the Corps was not required to consult with FWS on the AEIS, because the AEIS is not itself a federal agency action triggering the requirement to consult under ESA section 7(a)(2).  *See* 50 C.F.R. § 402.02.  Plaintiffs claim that a "programmatic level" action requires its own consultation.  Pl. Br. at 24 (citing *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1141-44 (11th Cir. 2008) and *Cottonwood Envtl. Law Ctr. v. U.S.*

*Forest Serv.*, 789 F.3d 1075, 1077 (9th Cir. 2015)). As noted above, the AEIS is not a general programmatic EIS. AR_0250318. But even if it was, the cases Plaintiffs cite do not state that preparation of a NEPA document is itself a federal action subject to consultation. Rather, they merely affirm the unremarkable principle that an agency action, including a programmatic action, may be subject to consultation.

**B.      The BO's Effects Analysis Was Consistent with FWS Regulations.**

Plaintiffs' claims regarding FWS's effects analysis misstate key concepts and requirements from FWS's regulations and policies. Under FWS regulations, "effects of the action" refers to "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02. The environmental baseline "includes the past and present impacts of all Federal, State, or private actions and other human activities *in the action area*, the anticipated impacts of all proposed Federal projects *in the action area*, *that have already undergone formal or early section 7 consultation*, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.* (emphases added).

Plaintiffs' claim that the environmental baseline should have included other mines in the region "because the [FWS] and Corps were engaged in contemporaneous consultation on them" misunderstands the "environmental baseline" concept. Pl. Br. at 25. First, the baseline pertains only to the status of the species, its habitat, and ecosystem, *within the action area*. The Corps is engaged in contemporaneous consultation for many projects across central Florida, however, only those *within the action area* should be incorporated into the baseline.

50 C.F.R. § 402.02. Second, in analyzing "effects of the action" the baseline should include only those federal projects that "have already undergone" consultation; the analysis does not include actions undergoing consultation. *Id*. Nevertheless, FWS was well aware of and accounted for other mine projects in the area during consultation. AR_0292539-40.

FWS's cumulative effects analysis was also consistent with the regulations. The analysis is limited to the effects of future, non-federal activities, other than the action under consultation and future federal activities that will be subject to their own consultation. 50 C.F.R. § 402.02. Thus, future federal actions, such as the approval of additional phosphate mining projects, were not considered because they are federal activities that will undergo separate consultation (at which point the SPE mine will be part of the baseline). AR_0263524. In addition to full NEPA reviews, the Corps' permit decisions for each of the other three proposed mines will receive a full ESA review that will account for all actions for which consultation was previously completed (such as SPE).

The Corps and FWS appropriately determined that the "effects of the action" do not include impacts from remote fertilizer processing plants, because those plants are not interdependent or interrelated. 50 C.F.R. § 402.02. The operation of fertilizer plants is not a federal agency "action" under ESA regulations and is not within the Corps' purview here. Even if the fertilizer plant operation was a federal agency "action" (which it is not), it would not be interrelated with the phosphate mine operations governed by the Corps permit because fertilizer processing plant operation could continue independently of the proposed mine. Nor is fertilizer processing plant operation "interrelated" to the permitted SPE mine because it is not a component of a larger overall "action." AR_0250314-316, AR_0287128.

### C. The Corps and FWS Considered the Impacts of SPE on Habitat.

Plaintiffs make the surprising claim that the agencies failed to take a hard look at "habitat destruction." Pl. Br. at 25-26. Yet the impact of mining activities on species habitat was at the heart of the consultation. For example, FWS's effects analyses directly addressed and quantified habitat destruction for the caracara ("habitat loss [is] temporary because 3,182.2 [acres] of pasture (net increase of 624.9) will be reclaimed), indigo snake ("The mine will represent a temporary change to about 4,928.7 [acres] of the project landscape for indigo snakes."), and wood stork ("The project will result in the temporary loss of about 2011.4 [acres] of wetlands on-site"). AR_0263514, AR_0263519-520. FWS concluded that, while there may be some temporary habitat loss, the long-term impacts are expected to be minor, due to Mosaic's conservation measures and reclamation plans.

Plaintiffs cite *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1037-38 (9th Cir. 2001), as an example of an agency's failure to consider short-term habitat degradation. In that case, however, the court criticized the agency for providing "no scientific evidence in the record" for the proposed "passive restoration." 265 F.3d at 1037-38. Here, in contrast, FWS thoroughly documented Florida's history of successful reclamation efforts in the record, and following extraction, Mosaic must actively reclaim the land. The extensive analysis of the direct, indirect, and cumulative impacts on species' habitat in FWS's 45-page BO fulfills the agency's ESA requirements.

Plaintiffs next attempt to discredit the mitigation measures themselves as approximate, unproven, unspecified, or unenforceable. To accept this argument, the Court would have to ignore "decades of similar experience" with mitigation by Mosaic and the agencies

and the highly specific mitigation conditions of Mosaic's permit.  AR_0263523.  Mosaic's plans to restore habitat to its original structure and function have been validated by years of reclamation activity at similar mines. AR_0263523.  Included as an attachment to the 404 permit is a scientific document analyzing nearly 30 years of successful reclamation and enhancement efforts.  *See* AR_0290798-866.  Also, over 130,000 acres of phosphate-mined land have been successfully reclaimed under Florida's stringent reclamation requirements.  *See* AR_0250960-966.  And the practices Mosaic is implementing today are the product of improvements over the already-successful practices used in the past.  AR_0250967.

In addition, the mitigation, preservation and reclamation requirements are enforceable conditions of the 404 permit and the State-issued Environmental Resource Permit (ERP).  To ensure that reclamation activities are successful and enhance habitat for listed species, under the terms of the 404 permit (Special Condition 15), the permittee is required to implement the CMP, including the reclamation activities set forth in the Wetlands and Stream Work Plans, and the Reclamation Plan and the WHMP, as required under the terms and conditions of the BO and the State's ERP.  *See* AR_0289835; AR_0289966.  The WHMP also specifies additional measures to be taken to protect both state and federal listed species, such as avoidance of mining in the immediate vicinity of caracara nests while the birds are nesting. AR_0224877.  And as required by the permit, Mosaic has granted on-site permanent conservation easements for the preservation areas and must grant a permanent conservation easement to preserve reclaimed land and natural resources upon successful completion of mitigation.  AR_0289846-848.  With these conditions, the FWS and the Corps can ensure that Mosaic will create and preserve viable habitat for the listed species.

The only evidence Plaintiffs cite to support their concerns with the mitigation is a study conducted from 2004-2007.  Plaintiffs contend that the study shows that indigo snakes were found at only 3 of 62 reclaimed sites, Pl. Br. at 26, but this statement is a misleading characterization of the study for several reasons: (1) this study did not assess whether snakes were documented at the sites *before* mining; (2) indigo snakes are difficult to detect and quantify, AR_0263527, which explains why more were not identified; (3) the study resulted in a series of recommendations that have since been incorporated into the BO and Mosaic's WHMP; and (4) the study concluded that "[r]eclaimed sites, especially those reclaimed fairly recently with relatively deep sands, provide adequate habitat to support the gopher tortoise," whose habitat the indigo snake utilizes as refugia.  AR_0057697.  As such, this study provides no basis for Plaintiffs to insinuate that reclamation does not successfully restore snake habitat.  Moreover, the ESA's jeopardy standard does not require FWS to determine whether or not a species will return to a site, but rather whether or not the action would "reduce appreciably the likelihood of both the survival and recovery of a listed species."  50 C.F.R § 402.02.  Given that the eastern indigo snake has been documented on reclaimed land and a significant amount of snake habitat will be avoided, preserved, or restored, FWS correctly concluded survival and recovery efforts would not be appreciably diminished.

> **D.** **FWS's Incidental Take Statement Provides a Meaningful Trigger to Reinitiate Consultation.**

Contrary to Plaintiffs' assertions, FWS appropriately specified the level of take in the BO's Incidental Take Statement (ITS) and set a clear standard for determining when reinitiation of consultation is required.  *See* 50 C.F.R. § 402.14(i)(1)(i).  Where neither the nature of the take nor the facts allow quantification of instances of take, FWS is authorized to

describe the nature of the impacts expected as long as FWS provides the required "articulated, rational connection" between the stated trigger and the anticipated incidental taking of the subject species.[10]  The BO does just that.  For the woodstork, FWS "anticipates the harm (injured or killed) of one wood stork from vehicular collision over the course of the mining activities," but does not anticipate any appreciable take in the form of lost nest productivity.  AR_0263528.  For the caracara, the ITS "anticipates the harm (injury or death) of one caracara from vehicular collision."  *Id.*  And for the indigo snake: "no more than six (6) indigo snakes can be taken over a rolling 5-year period."  AR_0263527.  These specific levels of take trigger reinitiation and allow the agencies to effectively gauge the level of compliance.

Quantifying take in the form of *harassment* for the indigo snake and the wood stork, which Plaintiffs contend was required (Pl. Br. at 28), would be impracticable.  Harassment may result from light, noise, or vibration associated with construction or mining activities that annoy species to such an extent that it disrupts normal behavioral patterns.  FWS cannot reasonably quantify such instances of harassment, nor can Mosaic monitor and detect all subtle behavioral changes by species in the area.  Thus, because it is impractical to express take numerically, FWS explained that the direct measure of harassment of the indigo snake will be "the annual counts of indigo snakes recorded on the site and reported during annual monitoring events."  AR_0263528.  Similarly, based on observations revealing two caracara pairs currently nesting on or in buffer zone of the project site, FWS provides that "up to four adults

---

[10] *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1250 (9th Cir. 2001); *see also Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1275 (11th Cir. 2009) (numerical standard not required if "impractical"); ESA Section 7 Consultation Handbook  (Mar. 1998) at 4-50 ("In some situations, the species itself or the effect on the species may be difficult to detect.  However, some detectable measure of effect should be provided . . . [I]f a sufficient causal link is demonstrated . . ., then this can establish a measure of the impact … and provide the yardstick for reinitiation.").

could be incidentally taken by the project in the form of harassment." AR_0263527. With no wood storks known to have nested within the project area, FWS did not anticipate any take in the form of harassment for the wood stork. [11]

Plaintiffs further claim that the monitoring provisions are ineffective, but FWS established responsive monitoring and reporting provisions to determine when and if take has been exceeded. First, the BO mandates that the identification of a dead, injured, or sick threatened or endangered species must be reported to FWS and the Florida Fish and Wildlife Conservation Commission (FWC). AR_0263530. Mosaic must also fund surveys and monitoring of resident caracaras to help understand the effects of mining activities on caracaras. AR_0263529. Upon seeing a live indigo snake Mosaic must "immediately notify" FWS and halt activities "until such time that [FWS provides] further guidance as to when activities may resume." AR_0290083. Mosaic is also required to report any detected dead or injured indigo snake to FWS and FWC within one business day of occurrence. AR_0263527-528.

### E.    The Corps and FWS Were Not Required to Reinitiate Consultation.

Plaintiffs' theory that the Corps and FWS were required to reinitiate consultation is not supported by the facts or law. The limited modifications to the project, which further avoided and minimized impacts to the environment, did not change the project "in a manner that cause[d] an effect to the listed species or critical habitat" that was not considered during the consultation. 50 C.F.R. § 402.16(c); *Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 120 F. Supp. 2d 1005, 1026 (M.D. Fla. 2000) ("not every modification of or uncertainty

---

[11] While the BO found that the project may disrupt the wood stork's foraging habitat and disrupt the prey base, FWS concluded that mitigation for prey base loss will result in the same or better opportunities for wading birds post reclamation. AR_0263521.

in a complex and lengthy project requires the agency to stop and reinitiate consultation.")
(internal citations omitted). Moreover, new information regarding fertilizer plants would not
trigger the requirement to reinitiate consultation for SPE because, as explained above, ferti-
lizer processing plant operation is not part of the action subject to consultation here.

Plaintiffs argue the Corps and FWS must reinitiate consultation because a new study
purports to identify a new species of indigo snake. First, under the ESA, the Corps may con-
sult only on currently listed species, and FWS may consider only currently listed species in
its biological opinions. 16 U.S.C. § 1536(a)(2). No new species has been listed since the BO
was prepared. In fact, if the snakes documented at SPE belong to this new unlisted species,
then no Section 7 consultation would have been required. Second, the information about the
indigo snake presented by CBD does not reveal effects "in a manner or to an extent not pre-
viously considered" such that reinitiation would be required. 50 C.F.R. § 402.16(b). Exten-
sive surveying performed during the consultation process was sufficient to allow FWS to
evaluate the impacts of SPE for the Eastern indigo snake. AR_0263511. The new infor-
mation regarding potential biological distinctions between the Eastern indigo snake and the
Gulf Coast indigo snake does not alter the potential-effects analysis. As the government con-
firmed, reinitiation of consultation is unnecessary because FWS's conclusion is unchanged:
"Long-term negative impacts are expected to be minor." AR_0263519.

F.     **The Corps Appropriately Relied on FWS's BO.**

Finally, plaintiffs contend that the Corps' reliance on the BO violates the ESA and
APA. Plaintiffs' argument relies on nothing more than a restatement of their other arguments

challenging the BO. As discussed in more detail above, the 2014 BO complies with the ESA and, thus, it was appropriate for the Corps to rely on the BO when issuing the 404 permit.

**IV.     Plaintiffs Have Not Demonstrated That the Permit Should be Vacated.**

For all of the reasons discussed above, Plaintiffs have failed to prove that the permit or the process by which the Corps decided to issue it was defective at all. But even if they cleared that hurdle, they still have not demonstrated that the permit should be vacated, as opposed to remanding the matter to the Corps for further consideration without vacatur. *See Black Warrior Riverkeeper*, 781 F.3d at 1290-91. The selection of remedy requires balancing the equities, which would require the Court to account for the substantial disruption to Mosaic's operation, the resultant impact on jobs and the local economy. *Id.* These factors are substantial. SPE has allowed Mosaic to retain its South Pasture workforce; halting the project would undermine job security for those local workers. Plaintiffs fail to explain why the benefit of vacating the SPE permit would outweigh these substantial real-world impacts.

<u>Conclusion</u>

The Court should deny Plaintiffs' Summary Judgment motion in its entirety.

July 14, 2017

                                        <u>       /s/  George P. Sibley, III     </u>

Jamie Zysk Isani (Fla. Bar No. 728861)
jisani@hunton.com
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Telephone: (305) 810-2500

*Trial Counsel for Defendant-Intervenor Mosaic
Fertilizer, LLC*

George P. Sibley, III (Va. Bar No. 48773)*
gsibley@hunton.com
Jonathan L. Caulder (Va. Bar No. 89062)*
jcaulder@hunton.com
HUNTON & WILLIAMS LLP
951 E. Byrd St.
Richmond, VA 23221
Telephone: (804) 788-8200

Deidre G. Duncan (D.C. Bar No. 461548)*
dduncan@hunton.com
Andrew J. Turner (D.C. Bar No. 471179)*
aturner@hunton.com
Kerry L. McGrath (D.C. Bar No. 997277)*
kmcgrath@hunton.com
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone: (202) 955-1500

*Counsel for Defendant-Intervenor
Mosaic Fertilizer, LLC*

*Admitted pro hac vice

## CERTIFICATE OF SERVICE

I hereby certifying that on the 14th day of July, 2017, I electronically filed the forego-ing Defendant-Intervenor Mosaic Fertilizer, LLC's Opposition to Plaintiffs' Summary Judg-ment Motion with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

_____/s/George P. Sibley, III_____
George P. Sibley, III
