IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

_____

|  |  |  |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; MANASOTA-88, INC; PEOPLE FOR PROTECTING PEACE RIVER; and SUNCOAST WATERKEEPER, | ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civ. No. 8:17-cv-00618-SDM-MAP |
| U.S. ARMY CORPS OF ENGINEERS; LT. GEN. TODD T. SEMONITE, in his official capacity as Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers; COL. JASON A. KIRK, in his official capacity as District Commander of the U.S. Army Corps of Engineers; U.S. DEPARTMENT OF THE INTERIOR; RYAN ZINKE, in his official capacity as Secretary of the U.S. Department of the Interior; U.S. FISH AND WILDLIFE SERVICE; and JIM KURTH, in his official capacity as Acting Director of U.S. Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Federal Defendants,* | ) ) | |
| and | ) ) | |
| MOSAIC FERTILIZER, LLC, | ) ) | |
| *Intervenor.* | ) ) | |

_____

**FEDERAL DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
DISPOSITIVE MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................1

I.     FACTUAL BACKGROUND...............................................................................1

II.    LEGAL BACKGROUND ...................................................................................2

       A.    *National Environmental Policy Act* .........................................................2

       B.    *Clean Water Act*....................................................................................3

       C.    *Endangered Species Act* .......................................................................4

STANDARD OF REVIEW .............................................................................................4

ARGUMENT .................................................................................................................5

I.     The Corps Complied with the
National Environmental Policy Act..................................................................5

       A.    *The Corps acted properly in preparing an areawide EIS* ........................5

       B.    *Nothing required the Corps to prepare—in addition to the
AEIS, EA, and ROD—either a FONSI or
an additional site-specific EIS* ..............................................................6

       C.    *Defendants took the requisite hard look
at environmental consequences* ............................................................8

       D.    *The Corps was not required to analyze the
effects of gypsum stacks* .....................................................................10

       E.    *The Corps' statement of purpose and need was appropriate* .................11

II.    The Corps Has Sufficiently Articulated A Rational
Basis For Permitting the South Pasture Extension Mine
Under the CWA ...........................................................................................13

       A.    *The Corps reasonably concluded that Mosaic had clearly
demonstrated a lack of practicable alternatives*....................................13

       B.    *The Corps Adequately Analyzed The Public Interest Factors* ...............14

C.  *The Corps Adequately Determined That the Selected
Compensatory Mitigation Option is Environmentally Preferable* ........................ 15

D.  *The Corps Reasonably Exercised Its Discretion
Not to Hold a Public Hearing* ................................................................. 17

III.  The Corps and FWS Complied with the Endangered Species Act .................... 18

A.  *The Corps and FWS considered the impacts of
planned phosphate mining* ..................................................................... 19

B.  *The ITS included meaningful triggers to reinitiate ESA consultation* ................. 22

C.  *The Reinitiation of ESA consultation at this time is unnecessary* ......................... 24

D.  *The Corps reasonably relied on the FWS's biological opinion* ........................... 25

CONCLUSION .................................................................................................. 25

# INTRODUCTION

On November 15, 2016, after a comprehensive and transparent permit-review process that spanned over six years, the Jacksonville District of the U.S. Army Corps of Engineers (Corps) issued a Clean Water Act Section 404 permit to Mosaic Fertilizer, LLC (Mosaic), for a 20-year authorization to discharge dredged or fill material into jurisdictional wetlands in connection with Mosaic's proposed South Pasture Extension phosphate mine. The Corps and the U.S. Fish and Wildlife Service (FWS) did more than the law required them to do before issuing the Permit, and a Biological Opinion and Incidental Take Statement, respectively. Given this, and the exceedingly deferential standard for judicial review of final agency action, this Court should deny Plaintiffs' Dispositive Motion for Summary Judgment and enter summary judgment in favor of the Federal Defendants.[1]

# BACKGROUND

## I.    FACTUAL BACKGROUND

In 2010 and 2011, two phosphate mining companies in central and southwest Florida, Mosaic and CF Industries, Inc., applied for four Department of the Army permits under Section 404 of the Clean Water Act (CWA) in connection with the creation and expansion of phosphate mines and attendant facilities. AR 250103.[2] The Corps determined that, when viewed collectively, the separate proposed phosphate mining related projects had similarities that provided a basis for evaluating their environmental consequences in a single Areawide

---

[1] Plaintiffs purport to be moving for summary judgment on all Counts in their First Amended Complaint, *see* Pls. Br. at 1; however, Plaintiffs' summary judgment brief does not include arguments in support of all claims. For example, Plaintiffs do not raise any arguments in support of their Fourth Claim For Relief, ECF No. 52 ¶ 289 (alleged ESA violations concerning the Florida panther, Florida scrub jay, red-cockaded woodpecker, and Florida grasshopper sparrow). To the extent that Plaintiffs' brief does not include arguments in support of all claims, those claims are deemed abandoned. *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir.1994).

[2] On March 17, 2014, Mosaic acquired all of CF Industries, Inc.'s phosphate operations and was substituted as the applicant for the South Pasture Extension project.

Environmental Impact Statement (AEIS). *Id*. In compliance with the National Environmental Policy Act (NEPA), the AEIS was sufficient in scope to support decision-making on the permit applications. AR 250103, 250286, 250318-20; *see also* AR 250104-08 and AR 250306-17 (defining the scope). The AEIS also assisted state and local decision-makers in evaluating the proposed actions and permit reviews. AR 250318. Given their expertise in environmental, water resource, and reclamation issues, the U.S. Environmental Protection Agency (EPA) and Florida Department of Environmental Protection (FDEP) participated in the NEPA process as cooperating agencies, and over 20 additional entities lent their expertise as participating agencies. AR 250327.

The AEIS provided the site-specific NEPA analysis for the South Pasture Extension (SPE) project, the only project for which a final agency action is at issue in this suit. AR 250311. In addition, the Corps exercised its discretionary authority to prepare a Supplemental Environmental Assessment (EA), AR 275350, and publish a second Public Notice for the SPE project, providing the public with an opportunity for public review and comment on the Supplemental EA, the draft Clean Water Act Section 404(b)(1) analysis, and the draft public interest review, AR 287127. *See infra* n.7. Finally, prior to issuing the permit, the Corps initiated consultation with FWS, resulting in a Biological Opinion with specified terms and conditions, FWS AR 22201-03, that were incorporated as express conditions of the permit, AR 289835-36.

## II.    LEGAL BACKGROUND

### A.    National Environmental Policy Act

Before the Corps can act on a CWA permit application, it must follow procedures established by NEPA. Importantly, NEPA does not mandate a particular substantive result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("NEPA itself does not

mandate particular results, but simply prescribes the necessary process"); *id*. ("If the adverse

environmental effects of the proposed action are adequately identified and evaluated, the agency

is not constrained by NEPA from deciding that other values outweigh the environmental costs");

*Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008).

    B.    <u>Clean Water Act</u>

The CWA prohibits the unauthorized discharge of pollutants, including dredged or fill

material, into navigable waters. 33 U.S.C. § 1311(a). The CWA defines "navigable waters" as

"the waters of the United States," *id*. § 1362(7), which include certain wetlands.  33 C.F.R. §

328.3(a)–(b) (2014). Section 404 of the CWA authorizes the Corps to issue individual permits on

a case-by-case basis after a resource-intensive review that involves extensive site-specific

documentation and review, opportunity for public comment, and a public interest review. *See* 33

U.S.C. § 1344; 33 C.F.R. Pts. 323, 325.

The "404(b)(1) Guidelines," codified at 40 C.F.R. Pt. 230, specify that the Corps must

ensure that the proposed fill will not cause significantly adverse effects on human health or

welfare, aquatic life, and aquatic ecosystems. *Id.* 230.10(c)(1)-(3). To comply with this

requirement, the Corps must make a written determination of the effects of a proposed activity

"on the physical, chemical, and biological components of the aquatic environment." *Id.* 230.11.

The "public interest review" evaluates "the probable impacts, including cumulative impacts, of

the proposed activity" on the public interest. 33 C.F.R. § 320.4(a)(1).

The purpose of compensatory mitigation, required under federal regulations at 33 C.F.R.

Pt. 332 and 40 C.F.R. §§ 230.91-230.98, is to offset unavoidable impacts to waters of the United

States authorized through the issuance of permits pursuant to section 404 of the CWA. 33 C.F.R.

§ 332.1(a); 40 C.F.R. § 230.91(a). "Compensatory mitigation," is defined as "the restoration (re-

establishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization have been achieved." 33 C.F.R. § 332.2; 40 C.F.R. § 230.92.

C.    Endangered Species Act

Section 7(a)(2) of the Endangered Species Act (ESA) provides that Federal agencies must ensure, in consultation with FWS and/or the National Marine Fisheries Service, that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species. . . ." 16 U.S.C. § 1536(a)(2). To achieve the objective, as relevant here, the ESA required the Corps to consult with FWS on any Corps' action that "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a). If the Corps and FWS determine that the action not only may affect, but is likely to adversely affect, listed species, the consultation process culminates in the issuance of a "biological opinion," which advises whether jeopardy is likely to occur for any listed species. *Id.* § 402.14(h).

**STANDARD OF REVIEW**

Plaintiffs bring their suit pursuant to the Administrative Procedure Act (APA), which provides for limited judicial review of the administrative record under a highly deferential standard. *See Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) (discussing the administrative record as the focal point for judicial review of final agency action). To satisfy its burden on summary judgment under the APA, Plaintiffs must point to factual failings in the administrative record indicating that the Corps' decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706 (2)(A).

Under the "arbitrary and capricious" standard, the scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Fund for Animals v. Rice*, 85 F.3d 535, 542 (11th Cir. 1996). The court's role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions." *Manasota-88, Inc. v. Thomas*, 799 F.2d 687, 691 (11th Cir. 1986) (*quoting Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 98 (1983)). A reviewing court should be particularly deferential to the agency decisions when it implicates substantial agency expertise. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377–78 (1989).

## ARGUMENT

I.    **The Corps Complied with the National Environmental Policy Act.**

A.    <u>The Corps acted properly in preparing an areawide EIS.</u>

Given their similarity and geographic proximity, the four Central Florida phosphate mining applications were particularly suited to an AEIS.  AR 250103, 250286. The actions were scoped together because they "are similar in geographic coverage, the periods of proposed activity, alternatives, and impacts." AR 250314. Emphatically, the situation did not call for a "programmatic" EIS.  *Id.*; *see also* AR 250318. In reviewing the permit applications, the Corps was not "implement[ing] a specific policy or plan," nor was it "implement[ing] a specific statutory program or executive directive." *See* 40 C.F.R. § 1508.18 (CEQ regulations discussing programmatic EISs)  It was, instead, analyzing four specific and discreet mining proposals that possessed sufficient commonalities to make coordinated NEPA analysis the most practical

approach.[3]

Federal guidance on NEPA implementation supports this approach, which provides that "[t]he preparation of an area-wide or overview EIS may be particularly useful when similar actions, viewed with other reasonably foreseeable or proposed agency actions, share common timing or geography." CEQ NEPA Guidance, 46 Fed. Reg. 18,025, 18,033 (March 23, 1981). The guidance continues, "when a variety of energy projects may be located in a single watershed ... the overview or area-wide EIS would serve as a valuable and necessary analysis of the affected environment and the potential cumulative impacts of the reasonably foreseeable actions under that program or within that geographical area." *Id.*

B. Nothing required the Corps to prepare—in addition to the AEIS, EA, and ROD—
either a FONSI or an additional site-specific EIS.

The AEIS and Supplemental EA constitute the site-specific NEPA analysis for the SPE project. Because these NEPA documents comprehensively considered the potential environmental impacts of the SPE project and because Plaintiffs have failed to identify any impacts that were not fully disclosed and analyzed, no further NEPA review is required. Plaintiffs somewhat confusingly argue—Pls.' Br. at 6-8—that the Corps violated NEPA's procedural requirements by not including either a finding of no significant impact (FONSI), or a site-specific EIS. But the argument champions form over substance. The Corps *did* perform a site-specific EIS, albeit in relation to four sites rather than just one. AR 250319.

The issue is whether the Corps took the requisite "hard look" at the environmental

---

[3] CEQ regulations specifically endorse using a single EIS to analyze "similar" actions, 40 C.F.R. 1508.28(a), defining "similar" actions as those that "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequenc[es] together, such as common timing or geography." 40 C.F.R. 1508.25(a)(3). *See also Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, question number 24.b., "When is an area-wide or overview EIS appropriate?" 46 Fed. Reg. 18026, 18033 (Mar. 23, 1981).

impacts of the SPE. Because the government has prepared both an AEIS and Supplemental EA, the Court should "examine both the site-specific EA and the area-wide EIS to determine 'whether [the government] has, at some level, adequately considered the environmental effects of its proposed actions.'" *Nat'l Wildlife Fed'n et al.*, 140 IBLA 85, 95 (1997), quoting *Southern Utah Wilderness Alliance*, 123 IBLA 302, 309 (1992).

There is no basis for Plaintiffs' assertion that an AEIS, which considered the site-specific impacts of four similar projects, must be followed by another site-specific EIS (or FONSI). *See* Pls.' Br. at 6-7. In *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, cited by Plaintiffs, the Court upheld BLM's decision declining to perform supplemental EISs covering multiple potential offshore lease sales. 684 F.3d 1242, 1251-53 (11th Cir. 2012). *Defs. of Wildlife v. Salazar* did not involve an areawide EIS, but instead involved "a program, plan, or policy environmental impact statement" – or a "programmatic EIS." 877 F. Supp. 2d 1271, 1297 (M.D. Fla. 2012). And the court's discussion is premised on the idea that the programmatic EIS did not consider the impacts of individual projects to be undertaken pursuant to the underlying program. *Id*. Here, project-specific impacts were exhaustively studied in the AEIS.

More generally, the notion that NEPA imposes a procedural straitjacket is wrong. Indeed, "[t]he genius of NEPA has been that it is an extremely flexible vehicle."[4] As the Supreme Court emphasized in *Kleppe v. Sierra Club*, determining the scope of a NEPA review

> requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility. *Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies. Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.*

---

[4] Jon C. Cooper, *Broad Programmatic, Policy and Planning Assessments under the National Environmental Policy Act and Similar Devices: A Quiet Revolution in an Approach to Environmental Considerations*, 11 Pace Envtl. L. Rev. 89, 118 (1993).

427 U.S. 390, 412 (emphasis added) (citations omitted). Here, the Corps properly exercised its discretion in reviewing the applications in a single AEIS, followed by project-specific RODs.

      C.      <u>Defendants took the requisite hard look at environmental consequences.</u>

Plaintiffs' conclusory criticisms of the adequacy of the environmental analyses reflected in the AEIS are unsustainable. Pls.' Br. at 8-11. Contrary to Plaintiffs' assertion, the AEIS, sufficiently addresses surface water quality impacts, including water circulation, fluctuation, and salinity; suspended particulate/turbidity; and contaminant availability. As noted in the ROD, "[w]ater circulation, fluctuation, and salinity" are assessed in Section 4.2.5 of the AEIS. AR 287145; *see also*, AR 252638-40, 252712, 252738, 252752, and 252755 (analyzing water circulation); AR 252622, 252693, 252702, and 252729 (analyzing water fluctuation); and AR 252714, 252897 (analyzing water salinity).

Additionally, Appendices D, F, and G to the AEIS extensively analyze surface water quality and hydrologic impacts and ground water impacts. *See* AEIS Appendix D at AR 252536-252600 (analyzing surface water quality impacts); AEIS Appendix F at AR 252618-252706 (analyzing ground water impacts); and AEIS Appendix G at AR 252707-252939 (surface water hydrologic impacts). All three Appendices were prepared, under the Corps' supervision (*see* AR 82545-54), by CH2M HILL. AR 25237, 252619, 272708. Specifically concerning water quality issues such as particulates and contaminants, these are extensively analyzed in Section 4.4 of the AEIS—AR 250686-250714—and throughout Appendices F & G—AR 252618-252939. In addition, "[d]ischarges from the mine will need to comply with both a [CWA] Section 401 water quality certification (FDEP Environmental Resource Permit) and a [CWA] Section 402 NPDES permit (also issued by FDEP)." AR 287151.

Plaintiffs also complain that the "Corps did not conduct an analysis on the effect of

mining of 409 acres within the Payne Creek subwatershed." Pls.' Br. at 9 n.6. The watershed in question is 125 square miles in size, or 80,000 acres. AR 250639. The mine footprint within the watershed is 409 acres, which is one half of one percent of the whole. *Id.* Thus, the Corps rationally concluded that "it is not expected that mining this relatively small percentage of the overall subwatershed would have a measurable additional effect on flows within the subwatershed." *Id*. The expert consultants agreed, AR 252758, and Plaintiffs give no reason to conclude otherwise.

Similarly, Plaintiffs' assertion that the Corps' analysis of surface water impacts was based upon a cursory review of the existing South Pasture Mine's well monitoring is unavailing. Pls.' Br. at 9. Rather, the Corps based its analysis on, *inter alia*: analysis of historical phosphate mining effects on surface water quality, AR 250488-492; that impacts on "adjacent wetlands and surface waters" will be protected by a "perimeter ditch and berm system," AR 287145 (ROD); *see* AR 287443; that "discharges from the mine will need to comply with both a Section 401 water quality certification and a Section 402 NPDES permit (both issued by FDEP)," AR 287145; Florida permits requiring close monitoring of a dozen of water quality parameters, s*ee* AR 250688-89;[5] detailed comparative analyses of surface water impacts at several other, similar, Florida phosphate mines, s*ee* AR 250687-250706 (AEIS Sections 4.4.2.1 – 4.4.2.2); and the CH2M Hill analysis of surface water impacts. AR 252618-252939. This is hardly "cursory."

Finally, Plaintiffs' argument that the Corps failed to consider potential impacts to wetlands and streams from the SPE project, Pls.' Br. at 10, is squarely refuted by the record. *See* AR 287153-176, AR 287146, AR 287409-9756.

---

[5] "While the analytical parameters called for in the various permits reviewed were not always consistent, they often included most of the following: pH, Specific Conductance, Temperature, Turbidity, Dissolved oxygen, Total suspended solids, Fixed suspended solids, Total phosphorus, Total nitrogen, Fluoride, Sulfate, Chlorophyll a, Total radium, Gross alpha." *Id*.

D.     The Corps was not required to analyze the effects of gypsum stacks.

The SPE project is proposed wholly within the Peace River watershed, AR 250639, where there are no active phosphogypsum stacks, AR 250403. The Corps determined that fertilizer processing, which produces phosphogypsum as a byproduct, was not within the scope of the proposed mining activities and was not a direct or indirect effect of the proposed projects.[6] AR 250107, 250314-16; AR 250601-02. The fertilizer plants operate independent of the proposed mines. AR 250314-16. In addition, there are other uses for phosphate ore than fertilizer. AR 250297. Corps regulations provide that "[p]hases of a project that would be constructed even if the other phases were not built can be considered as separate single and complete projects with independent utility." 67 Fed. Reg. 2094 (Jan. 15, 2002). Here, the Corps concluded that central Florida phosphate mining, and fertilizer processing, fit this definition, and "[t]he Court must defer to the Corps' interpretation of its own regulations" regarding independent utility. *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1318 (S.D. Fla. 2005), citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-45 (1984).

Plaintiffs have the burden to demonstrate that the independent utility finding is incorrect. *Black Warrior Riverkeeper, Inc. v. Ala. Dep't of Transp.*, No. 2:11-CV-267-WKW, 2016 WL 233672, at *15 (M.D. Ala. Jan. 19, 2016). In support of their argument, Plaintiffs rely on

---

[6] Where relevant, fertilizer plants and the associated phosphogypsum stacks were considered within the Corps' cumulative impacts analysis. AR 250316. For instance, the groundwater resources cumulative impact analysis (beginning at AR 250867) was conducted on a regional level and captured the effects of non-mining activities, such as from the fertilizer processing facilities. *See generally* AEIS App. F, starting at AR 252618. For surface water resources, the cumulative impacts analysis considered the watersheds of the evaluated actions (Myakka River and Peace River watersheds) and receiving waters (Charlotte Harbor), including any past non-mining activities such as fertilizer processing. *See, e.g.* AR 252583, 250887. Importantly, however, there are no active fertilizer plants or phosphogypsum stacks within this area and Plaintiffs have failed to identify any reasonably foreseeable impact that was not considered.

Mosaic's intent to supply phosphate rock to their phosphate production facilities. Pls.' Br. at 14. But Mosaic's intentions do not refute the independent utility of production facilities. That mining and ore processing are tied to each other does not mean that they lack independent utility. *Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 400 (9th Cir.1989) ("although each [of two projects] would benefit from the other's presence," they are still independent where "each could exist without the other.").[7] The Corps independently reviewed and verified a previously-prepared EIS that scrutinized this very issue – the economic independence of phosphate mining and processing – and found that they are in fact independent. Additionally, the Corps noted that "several" fertilizer processing facilities in Florida and the Gulf States in fact rely on foreign ore sources. AR 250315-16. The Corps also considered that FDEP and EPA directly regulate the fertilizer plants and phosphogypsum stacks. AR 287128.

And any suggestion that the Corps ignored the issue completely is wrong. Pls.' Br. at 14. The Corps reviewed the history of surface-water-contaminating phosphogypsum spills, AR 250492, and the techniques used for phosphate processing, and noted that FDEP closely regulates phosphogypsum stacks. AR 250314-15. Thus, the Corps rationally concluded that fertilizer processing was not within the scope of the proposed mining activities. AR 250316.

E.    The Corps' statement of purpose and need was appropriate.

Mosaic's stated purpose for the permit application was to mine sufficient quantities of phosphate ore to keep its existing South Pasture beneficiation plant at or near capacity.

---

[7] Indeed, Plaintiffs also obfuscate the record by arguing that the Corps' findings support the interdependence of mining and fertilizer production. Plaintiffs support that contention by citing to (among other things) the fact that the Corps considered the "practicable pumping distance" in its alternatives analysis. However, the practicable pumping distance is the reasonable distance for pumping phosphate from the mine to the beneficiation plant (not the fertilizer plant). The beneficiation plant is where the phosphate rock is physically separated from the sand and clay. *See generally* AR 250398 – 408 (describing the transport of ore to the beneficiation plant). The phosphate rock is then shipped elsewhere for processing. Because the separated phosphate rock is shipped off for any number of potential further processing options, the AEIS refers to the shipment as the "Point of Severance." AR 250400 (Fig. 3-1).

AR 287125. The Corps independently evaluated this statement of need by reviewing several years of production data for the South Pasture plant, as reflected in annual reports and other SEC filings. *Id*. Based on that review the Corps concluded that the stated need (3.37 million short tons annually) "is the most conservative value for the project-specific need." *Id*. Because the action under consideration is a permit, and because the applicant is the one to know its needs, it would be irrational to ask the Corps for a more searching second-guessing. The "Corps cannot ignore a sponsor's 'genuine and legitimate' conclusion regarding the importance of a proposed project." *Fla. Clean Water Network, Inc. v. Grosskruger* (*FCWN*), 587 F. Supp. 2d 1236, 1244 (M.D. Fla. 2008) (*FCWN*), citing *Sylvester v. U.S. Army Corps of Eng'rs,* 882 F.2d 407, 409 (9th Cir. 1989). And while the Corps must "exercise independent judgment in defining the purpose and need for the project from the applicant's and public's perspective," 33 C.F.R. Part 325, App. B(9)(b)(4), "it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." *FCWN*, 587 F. Supp. 2d at 1243, citing *La. Wildlife Fed'n, Inc. v. York,* 761 F.2d 1044, 1048 (5th Cir. 1985)

While it is true that the "Preferred Plus Additional Avoidance" alternative was found, to be "[o]verall, . . . less environmentally damaging," it was also found to be impracticable. AR 287141-42. First, this itself shows that the Corps took a "hard look" at the alternative, which is all NEPA requires. Second, although the alternative would produce five-percent less phosphate than the proposed project, it is Mosaic's business to determine the economical practicability of its proposed project. "In evaluating alternatives to a proposed project, an alternative may be deemed to be practicable even if it does not meet all of a project's components provided that any component it fails to meet is deemed to be 'incidental' to the project's basic purpose." *FCWN*, 587 F. Supp. 2d at 1244, citing *Sylvester,* 882 F.2d at 409. Keeping the South Pasture plant at

capacity is not "incidental" to the overall project purpose; it is the core of that purpose.

Finally, the Corps' statement of purpose and need is entitled to deference. "The statement of a project's purpose and need is left to the agency's expertise and discretion, and we defer to the agency if the statement is reasonable." *Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d 1215, 1223 (S.D. Fla. 2010) (quoting *All. for Legal Action v. FAA*, 69 F. App'x 617, 622 (4th Cir. 2003) (per curiam)), *aff'd*, 669 F.3d 1203 (11th Cir. 2012).

## II. The Corps Has Sufficiently Articulated A Rational Basis For Permitting the South Pasture Extension Mine Under the CWA.

### A. The Corps reasonably concluded that Mosaic had clearly demonstrated a lack of practicable alternatives.

Plaintiffs argue that the Corps failed to rebut the presumption that less environmentally damaging alternatives are available. "The burden of showing a lack of practicable alternatives[, however,] lies with the project applicant . . . not with the Corps," *Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1154 (S.D. Fla. 2005); and the Corps' analysis "does not require a specific level of detail to rebut the presumption, but only record evidence the agency took a hard look at the proposals and reached a meaningful conclusion based on the evidence," *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1168 (10th Cir. 2012). Consequently, "the court's inquiry is not whether the Corps has clearly demonstrated a lack of practicable alternatives, but whether its decision that [the applicant] had done so was a clear error of judgment." *Fla. Keys*, 374 F. Supp. 2d at 1154, *quoting All. for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F.Supp.2d 534, 543 (M.D.N.C. 2004) (alteration in the original).

Plaintiffs contend that the Corps improperly excluded less environmentally damaging practicable alternatives (LEDPA) by accepting ten miles as the furthest practicable distance for

pumping phosphate ore from a mine to a beneficiation plant. Pls.' Br. at 17. The Corps, however, independently verified publications from the Florida Industrial and Phosphate Research Institute, and considered information provided by Mosaic, in concluding that costs, technological limitations, and logistics associated with transporting phosphate ore beyond that distance is impracticable. AR 250404-08. Thus, the Corps rationally eliminated from further consideration alternatives outside of the ten-mile radius.

Plaintiffs also argue that the Corps failed to consider alternatives involving importing phosphate rock. Pls.' Br. at 17-18. But alternatives involving the importation of rock were eliminated from further consideration after being independently analyzed during the scoping process. AR 250391-93. The Corps reasonably determined that costs, technological limitations, and logistics associated with both mining and importing rock for processing simultaneously rendered the importation of phosphate rock impracticable at the scale necessary to meet the project's need. AR 250392-93. Therefore, the Corps determined that shifting solely to importation of rock is neither practical nor meets the project's purpose and need. AR 250393. Because all phosphate rock currently mined in the U.S. is already being utilized, phosphate rock would have to be imported from foreign sources. AR 250392. The primary foreign producer is Morocco, with lesser supplies from Jordan, Syria, and Peru. *Id.* Political instability in these countries could result in short-term or long-term phosphate supply problems, resulting in fertilizer and food shortages and/or substantial increases in price. *Id.* Thus, the Corps rationally eliminated from further consideration alternatives involving the importation of rock.

B.     The Corps Adequately Analyzed The Public Interest Factors.

Plaintiffs assert that the Corps manipulated the results of the public interest review by considering the public need and economic benefits of phosphate fertilizer production but failing

to consider the negative impacts of fertilizer production facilities. Pls.' Br. at 18-19. While the practicability of importing phosphate rock to processing facilities is low, as discussed above, mineral processing plants are not necessarily dependent on the mines. *See* AR 250315 (relying on an economic analysis in a 1997 Phosphate Final EIS). Phosphate production facilities could continue to operate using rock from other sources and mines could ship beneficiated phosphate ore to other areas. AR 250314; AR 250316. Thus, the Corps rationally determined that phosphate mines have independent utility from fertilizer plants, such that the mines are a single and complete project. *See Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1247 (11th Cir. 1996) (explaining that independent utility justifies the consideration of the environmental effects of that project alone). Moreover, although the impacts of fertilizer production facilities were not included as a direct or indirect effect, they were considered within the cumulative impacts analysis. AR 250822-25.

      C.    <u>The Corps Adequately Determined That the Selected Compensatory Mitigation Option is Environmentally Preferable.</u>

Contrary to Plaintiffs' argument—Pls.' Br. at 19—compensatory mitigation projects do not "require" that restoration be prioritized over establishment, but only that "[r]estoration should generally be the first option considered." 33 C.F.R. § 332.3(a)(2). The regulations also allow the Corps to determine what constitutes the most appropriate and practicable compensatory mitigation based on project-specific circumstances. 33 C.F.R. § 332.3(a)(1). While the regulations establish a preference for accomplishing mitigation through the purchase of credits from mitigation banks, 33 C.F.R. § 332.3(b), the Corps reasonably determined that departure from this preference is environmentally preferable in this case.

First, the Corps determined that because neither of the two available mitigation banks are within the Horse Creek subwatershed, neither provides compensation within the subwatershed

where the impacts occur. AR 287155; *see also* 33 C.F.R. § 332.3(a)(1) (requiring the Corps to consider the location of the compensation site relative to the impact site and their significance within the watershed). Second, the mitigation plan addresses several priority problems identified for the Peace River watershed based on a watershed approach pursuant to 33 C.F.R. § 332.3(c). AR 287156. Third, Florida state law requires Mosaic to restore mined wetlands and streams on site on an acre-for-acre, type-for-type, foot-for-foot basis, a considerable expense that cannot be avoided by purchasing mitigation bank credits. *See* Fla. Stat. § 378.207(1); § 373.414(6)(b) (2013); *see also* 33 C.F.R. § 332.3(a)(1) (requiring the Corps to consider the costs of the compensatory mitigation project). Fourth, the Corps independently verified that the specific locations and types of onsite and offsite wetland and surface water mitigation areas was based on extensive monitoring, data collection, and analyses demonstrating that the chosen locations would support the planned mitigation, and that the mitigation would be successful and self-sustaining. AR 287158-60; *see also* 33 C.F.R. § 332.3(a)(1) (requiring the Corps to consider the likelihood for ecological success and sustainability). Accordingly, the Corps rationally determined that Mosaic's compensatory mitigation plan meets the hierarchy preference expressed in 33 C.F.R. § 332.3. *See* AR 287154-176.

Plaintiffs also allege that the selected compensatory mitigation plan violates the 2008 Mitigation Rule's (33 C.F.R. Parts 325 and 332) goal of "no net loss" of wetland acreage or function, 33 C.F.R. § 332.3(f)(1). Pls.' Br. at 20. The Mitigation Rule recognizes, "where appropriate functional or condition assessment methods or other suitable metrics are available, these methods should be used where practicable to determine how much compensatory mitigation is required." 33 C.F.R. 332.3(f). The Uniform Mitigation Assessment Method (UMAM) is the functional assessment applied to measure wetland mitigation sufficiency. AR

250918. FDEP's Habitat Assessment Procedure (HAP) is the functional assessment method applied to measure stream mitigation sufficiency. AR 250920.

In using the UMAM and the HAP to evaluate proposed compensatory mitigation for phosphate mine projects, Mosaic applied the relevant factors to the functional analysis to address temporal loss and risk. AR 287426-27; *see generally*, AR 289680-756 (Temporal Lag Tables); AR 287428-34; AR 287440-444. The Corps independently reviewed and verified Mosaic's functional assessments. AR 287160. The UMAM analysis demonstrates a functional loss of -520.17 units, with a total of 520.82 units of functional gain, leaving a surplus functional lift of 0.65 units. AR 287415. The HAP analysis demonstrates a functional loss of 13,361.14 units of stream function, with a total of 13,440.6 units of functional gain, leaving a surplus of 79.46 units. AR 287444.

Mosaic's mitigation plan results in a greater acreage of wetlands—AR 287416—and a greater linear footage of streams—AR 287416—onsite than currently exists. *See generally* AR 290088-222 (Compensatory Mitigation Plan). Additionally, the UMAM and HAP analyses demonstrate a net gain in wetland and stream function. From either perspective, Mosaic's mitigation plan meets the "no net loss" objective. Accordingly, the Corps rationally determined that Mosaic's compensatory mitigation plan is the environmentally preferable option.

D.    The Corps Reasonably Exercised Its Discretion Not to Hold a Public Hearing.

There is no basis for Plaintiffs' claim that denial of their requests for an additional public hearing deprived the public of meaningful participation.[8] Pl's. Br. at 22-23. Where the Corps determines that "the issues raised are insubstantial or there is otherwise no valid interest to be

---

[8] Opportunities for public input were provided in advance of scoping (including two public workshops), during the scoping period (including two public meetings and a 45-day comment period), on the first Public Notice and Draft AEIS (including two public meetings and a 60-day comment period), on the AEIS Addendum, and on the second Public Notice and Supplemental EA (30-day comment period). *See* AR 250323-28, 275348-49; 256376-77.

served by a hearing[,]" it has the discretion not to hold one. 33 C.F.R. § 327.4(b). The Eleventh

Circuit has interpreted that regulation to "provide the Corps discretion to hold hearings on permit

applications on an 'as needed' basis." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 545 (11th Cir.

1996), *citing* 33 C.F.R. § 327.4. Here, the Corps reasonably exercised its discretion not to hold a

public hearing after it determined that the issues raised in the requests for a public hearing were

either "insubstantial," or that no new information would be obtained at a public hearing that

would assist in the decision making process. AR 287128-29. The Corps further explained how

Plaintiffs' concerns were already addressed in the existing record. *E.g.,* AR 289805-07. These

factual findings, rooted in the Corps' factual expertise, must be given deference. *See Envtl. Coal.*

*of Broward Cty., Inc. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987).

## III.    The Corps and FWS Complied with the Endangered Species Act

In its biological opinion dated June 9, 2014, FWS concluded that the SPE project is not

likely to jeopardize the continued existence of the Audubon's crested caracara, the eastern indigo

snake, or the wood stork, all of which FWS have listed as threatened species pursuant to Section

4 of the ESA, 16 U.S.C. § 1533.[9] FWS AR 22200-01. FWS expressly provided for the

"incidental take" of Audubon's crested caracara, eastern indigo snakes, and wood storks, subject

to specified terms and conditions. FWS AR 22201-03. FWS' biological opinion was based on the

best available scientific information concerning each species. The Corps reasonably decided to

rely on FWS' scientific expertise by incorporating the biological opinion's requirements as

express conditions of the SPE permit. AR 289835-36.

---

[9] FWS also concurred with the Corps' determination that the project is "not likely to adversely affect" the endangered Florida panther, the threatened Florida scrub-jay, or the endangered Florida grasshopper sparrow. FWS AR 222161.

The Corps and FWS properly considered potential effects of habitat modification on ESA-listed species throughout the 20-year permit period.[10] *See* FWS AR 22163. Although FWS was aware of the proposed Desoto, Ona and Wingate East mines through its role as a participating agency in the AEIS, *see* AR 250327, it was unnecessary for FWS to include the effects of the proposed Desoto, Ona and Wingate East mines as part of its consultation for the SPE project. These three projects are at varying stages of planning, and the Corps has not yet issued CWA permits for the projects.

It was unnecessary for the FWS to analyze the proposed Desoto, Ona, and Wingate East projects as part of the "environmental baseline" for the biological opinion.[11] Desoto and Ona had not "already undergone formal or early section 7 consultation" at the time of the SPE consultation and thus were not part of the baseline under 50 C.F.R. § 402.02.[12] Although consultation for Wingate East was complete when FWS issued its biological opinion for the SPE project, the action areas of the relevant species for Wingate East did not overlap with the

_____

[10] For example, FWS acknowledged that disturbance from the project may result in the permanent abandonment of some Audubon's crested caracara nesting territory. FWS AR 22189. FWS also recognized that the temporal lag between habitats actively being cleared and not yet reclaimed will negatively affect indigo snake breeding, feeding and sheltering in areas lacking vegetative cover, prey, and structure. FWS AR 22194. As to potential effects on wood storks, FWS considered a long-term simulation to assess hydrologic impacts for the action area. FWS AR 22197. FWS adequately accounted for potential long-term effects on the species of concern considering the 20-year permit period.

[11] As defined in FWS' regulations, "[t]he environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. "Action area" means "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.*

[12] As provided in FWS' regulations, "[f]ormal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director [of FWS] in accordance with § 402.12." 50 C.F.R. § 402.14(c)(6). The Corps submitted its biological assessments for Desoto and Ona in November 2014 and April 2015, respectively. FWS AR 22250; AR 292732-861; AR 292865-3144. Thus, the Corps had not yet initiated formal consultation for DeSoto and Ona mines at the time FWS issued its biological opinion for the SPE project on June 9, 2014. FWS AR 22161.

corresponding action areas for the SPE project. FWS AR 22251; *see also* AR 292567-69.[13]

Because Wingate East is proposed outside the relevant action areas, it was not part of the

environmental baseline for purposes of the biological opinion on the SPE project.[14] Fertilizer

processing and the creation of phosphogypsum stacks at existing fertilizer plants were not part of

the Corps action subject to ESA consultation on the SPE, because these operations are not within

the scope of the proposed action that was the subject of the Corps' permitting authority here.

FWS AR 22252; 50 C.F.R. § 402.03 ("Section 7 and the requirements of this part apply to all

actions in which there is discretionary Federal involvement or control.").

Additionally, it was unnecessary for the FWS to consider effects of the proposed Desoto,

Ona and Wingate East mines in its analysis as part of its consultation on the SPE project. Subject

to further environmental reviews that may or may not result in the issuance of permits by the

Corps, these projects are not "reasonably certain to occur." *See* 50 C.F.R. § 402.02. If the Corps

issues permits for these mines, those federal actions would first be subjected to their own ESA

consultations if and when they occur. *See* 51 Fed. Reg. 19,926, 19,933 (June 3, 1986), *cited in*

*Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1269 (11th Cir. 2009). To

the extent that species occur within the same action areas, the SPE project would be included in

the environmental baseline for purposes of ESA consultation on these future federal actions.

Plaintiffs incorrectly suggest that the Corps and FWS were obligated to undertake a

"programmatic level" ESA consultation concerning the AEIS.[15] Pls.' Br. at 24. The AEIS is not

---

[13] FWS evaluated the Wingate East mine in May 2012 under ESA Section 10, 16 U.S.C. § 1539(a)(1)(B), as part of the Wingate East Habitat Conservation Plan. FWS AR 22250; AR 293145-295.

[14] By contrast, the agency activities in *Defs. of Wildlife v. Babbitt* were deemed to be within the same action area based on the movement of the species at issue. 130 F. Supp. 2d 121, 129 (D.D.C. 2001) ("Pronghorn move across this relatively discreet area of land entirely under federal management without regard to which federal agency is responsible for administering a particular area.").

[15] The agency actions in *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1144 (11th Cir. 2008) and *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1082 (9th Cir. 2015) required ESA consultation pursuant to 50 C.F.R.

an agency action triggering ESA consultation because it does not authorize any actions that "may affect" ESA-listed species or critical habitat. 50 C.F.R. § 402.14(a); FWS AR 22249-50.

The record before the Court demonstrates that the Corps and FWS based their decisions on the "best scientific and commercial data available," as required under Section 7 of the ESA, 16 U.S.C. § 1536(a)(2). For example, FWS' biological opinion is supported by record information concerning the permittee's history of successful mitigation and reclamation. FWS AR 22254-55, AR 292570, AR 292638. Thus, FWS reasonably considered the beneficial effects of planned mitigation. *See Fund for Animals*, 85 F.3d at 545 (noting that the challenged Corps permit, while facilitating development within species habitat, would otherwise further other conservation benefits through a mitigation plan that provided for creation, restoration, and enhancement of adjacent wetland areas).[16]

Lastly, FWS reasonably concluded that areas mined within the action area will be reclaimed to suitable indigo snake habitat. FWS AR 22199. This determination was supported in part by Durbin 2008, a comprehensive assessment of wildlife utilization of phosphate-mined lands in Florida. FWS 6425.[17] Under the circumstances, the court should defer to FWS' decision

---

§ 402.14(a) because they involved agency actions that "may affect" ESA-listed species or designated critical habitat. Moreover, this Court recently observed that "[r]esource management plans generally do not constitute 'agency action' requiring ESA consultation under Section 7." *Nat. Res. Def. Council v. Nat'l Park Serv.*, No. 2:16-cv-585, --- F. Supp. 3d---, 2017 WL1438238, at *34 (M.D. Fla. Apr. 24, 2017).

[16] *See also Nat. Res. Def. Council v. Nat'l Park Serv.*, 2017 WL at 1438238 at *31 ("An agency's expert determinations such as the appropriate mitigation measures to protect endangered species are owed exceeding deference."); *Fla. Keys Citizens Coal.*, 374 F. Supp. 2d at 1161 ("FWS and the NMFS also properly considered the beneficial results from Project mitigation in assessing the extent of any potential adverse affects on marine life and its habitat."). Plaintiffs' citation to *Fla. Key Deer v. Brown*, 364 F. Supp. 2d 1345, 1355-56 (S.D. Fla. 2005) is inapposite. The court ruled that certain measures adopted as "reasonable and prudent alternatives" for the Federal Emergency Management Agency to avoid jeopardy to the Florida key deer were not reasonably certain to occur because these measures were being implemented by third parties who were not directly subject to enforcement by FEMA. *Id., aff'd*, 522 F.3d 1133 (11th Cir. 2008).

[17] This study observed that the number of reptile species at former mining sites increased with time since reclamation and specifically documented the presence of eastern indigo snakes at reclaimed mining sites. FWS AR 6419, 6448-6449. Although Plaintiffs criticize the study because it lacks site-specific information concerning the occurrence of eastern indigo snakes prior to mining, *see* Pls.' Br. at 26, Plaintiffs fail to cite any other research that they believe FWS should have considered in addition to Durbin 2008.

to rely on the cited study. "The general view is that the agency decides which data and studies are the 'best available' because that decision is itself a scientific determination deserving deference." *Miccosukee Tribe*, 566 F.3d at 1265 (citing *Marsh*, 490 U.S. at 377–78).[18]

> B.    The ITS included meaningful triggers to reinitiate ESA consultation.

After ESA consultation is completed, the action agency may need to reinitiate consultation under certain circumstances, including if the amount or extent of taking specified in the incidental take statement is exceeded.[19] 50 C.F.R. § 402.16. Thus, an incidental take statement must incorporate a trigger for reinitiating consultation when necessary. *Miccosukee Tribe*, 566 F.3d at 1275. Here, FWS specified the number of individual caracaras, wood storks, and eastern indigo snakes that would potentially be injured or killed by the permitted action. FWS AR 22201-22203.[20] FWS also concluded that each of these species would be subject to incidental take by harassment.[21] The ITS incorporated appropriate triggers for reinitiation of consultation if necessary. FWS AR 22201-03.

---

[18] Plaintiffs' citation to *Fla. Key Deer*, 364 F. Supp. 2d at 1353 is again off point. The court concluded that the biological opinion at issue entirely failed to consider the effects of the challenged agency action as modified by implementation of 'reasonable and prudent alternatives" recommended in a previous biological opinion. *Id.* Here, by contrast, the biological opinion fully analyzes the effects of the challenged agency action.

[19] Section 9 of the ESA prohibits the "taking" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). FWS has extended the same prohibition to threatened species by regulation, except where it issues a special rule for the species under ESA Section 4(d), 16 U.S.C. § 1533(d). 50 C.F.R. § 17.31. "Take" as defined by the ESA means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in such conduct. *Id.* § 1532(19). The ESA's prohibition on taking species applies to all "persons,"– including individuals, corporations, and Federal or state agencies–upon the final listing of a species. 16 U.S.C. § 1532(13). However, takings incidental to Federal actions can be exempted as part of the consultation process in an incidental take statement attached to the final biological opinion. *Id.* § 1536(b)(4). An ITS identifies the impact of such taking and specifies reasonable and prudent measures "necessary or appropriate to minimize such impact" and terms and conditions to implement those measures. *Id.* § 1536(b)(4)(ii); 50 C.F.R. § 402.14(i)(1)(i-v).

[20] FWS determined that the project could result in the injury or death of one caracara from vehicular collision. FWS AR 22202. FWS concluded that the project could cause the injury or death of one wood stork from vehicular collision over the course of the mining activities. FWS AR 22203. FWS also concluded that the project may result in injury or death to up to six eastern indigo snakes over a rolling five-year period. FWS AR 22203.

[21] FWS determined that the project could result in the harassment of up to four adult caracaras. FWS 22202. In addition, this harassment could result in a loss or reduction of reproductive success for the harassed individuals. *Id.* FWS also determined that the project could result in harassment of all eastern indigo snakes inhabiting the project site prior to and during construction. FWS 22203. FWS determined that the project will result in temporary loss/reduction of foraging value to an unspecified number of wood storks. FWS 22203.

The ITS incorporates reporting and monitoring requirements so that the Corps and FWS may reinitiate consultation if the project results in incidental take of any species that exceeds the numbers predicted. FWS AR 22204-05. However, FWS is not required to provide an exact number of species that may be incidentally taken by the proposed activity due to harassment, where, as here, take cannot be quantified numerically. *See, e.g., Miccosukee Tribe*, 566 F.3d at 1275 ("We apply instead the rule that specific population data is required unless it is impractical.") (citation omitted); 50 C.F.R. § 402.14(*i*)(i). FWS estimated the number of caracaras that would potentially be harassed based on an estimate of the number of individuals with nesting territories overlapping the project area, *see* FWS AR 22202, but FWS explained why it is otherwise difficult to quantify the extent of incidental take for eastern indigo snakes and wood storks.[22] Under the circumstances, it was impractical for FWS to describe the number of eastern indigo snakes and wood storks that would potentially be harassed in numeric terms or with further specificity. *Nat. Parks Conserv. Ass'n v. U.S. Dept. of the Interior*, 835 F.3d 1377, 1388 (11th Cir. 2016) ("In this case, the NPS and FWS used habitat loss as the appropriate trigger based on the impracticality of maintaining an accurate population count of Florida panthers.").

Although it is impractical to estimate the number of eastern indigo snakes and wood storks that may potentially be harassed, the Corps permit requires the applicant to abide by the permit conditions regarding conservation measures to minimize incidental take of the caracara, indigo snake, and wood stork.[23] AR 289835. These reporting requirements will help determine

---

[22] Eastern indigo snakes are difficult to detect due to lack of practical methods of survey, wide ranging activity and use of a variety of habitat types. *Id.* Wood stork usage of the project site is limited and, as a result, harassment would be insignificant or discountable. FWS AR 22255.

[23] The biological opinion specifically requires Mosaic to provide a report to FWS on implementation and compliance with conservation measures to minimize incidental take within 1 year of the issuance date of the permit. FWS AR 22204. The Corps permit also requires Mosaic to provide annual reports to the Corps on permit

whether listed species have been harassed and when the allowable take has been exceeded.[24] FWS AR 22256. In sum, the ITS quantifies incidental take to the extent practical and provides a meaningful trigger to reinitiate consultation.

        C.      <u>Reinitiation of ESA consultation at this time is unnecessary.</u>

Reinitiation of ESA consultation may be required under certain circumstances, such as where new species are listed or the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not previously considered. 50 C.F.R. § 402.16 (c), (d). However, "not 'every modification of or uncertainty in a complex and lengthy project requires the action agency to stop and reinitiate consultation.'" *Loggerhead Turtle v. Cty. Council of Volusia Cty,* 120 F. Supp. 2d 1005, 1026 (M.D. Fla. 2000) (quoting *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987)). In responding to a notice letter submitted by Plaintiffs prior to filing this suit pursuant to 16 U.S.C. § 1540(g)(2)(A)(i), the Corps and FWS fully addressed each of the grounds Plaintiffs cite and concluded that reinitiation is unnecessary.[25] FWS AR 22249. Plaintiffs fail to demonstrate that reinitiation of ESA

---

compliance. AR 28935-36. In addition, the Corps permit requires Mosaic to provide summary reports to the Corps, FWS, and other agencies every five years. AR 289836-37.

[24] *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010), cited by Plaintiffs (Pls.' Br. at 28), is distinguishable. Although the ITS at issue in that case incorporated an express numeric cap on taking, it was not accompanied by an express monitoring and reporting requirement. *Id.* at 532. Here, by contrast, both the biological opinion and the Corps permit include express monitoring and reporting requirements. The facts here are also distinguishable from *Oceana v. Pritzker*, 75 F. Supp. 3d 469, 498-99 (D.D.C. 2014), which invalidated a requirement for assessing annual take limits only once every five years. For example, the biological opinion here requires "annual counts of indigo snakes recorded on the site and reported during annual monitoring events." FWS AR 22203.

[25] In response to Plaintiffs' assertion that there have not been any changes to the plant species included in the reclamation plan, the Corps and FWS concluded that "there have been no changes to the SPE that 'cause an effect to the listed species or critical habitat that was not considered in the biological opinion.'" FWS AR 22257. In response to Plaintiffs' assertion that the eastern indigo snake may be two rarer species, the Corps and FWS stated that the article cited by Plaintiffs "does not provide significant new information bearing on the SPE or its impacts." FWS AR 22257. Moreover, pursuant to the ESA, 16 U.S.C. § 1536(a)(2), the Corps may consult only on currently listed species and the Service may consider only currently listed species in its biological opinion. *Id.* The Corps and FWS also concluded that the development of a sinkhole beneath Mosaic's New Wales plant is outside the scope of the action under review. FWS AR 22257. Among other reasons cited, the sinkhole is located in a different watershed than the SPE project and otherwise outside the action area for the biological opinion. *Id.*

consultation is warranted under 50 C.F.R. § 402.16 at this time.

D. The Corps reasonably relied on the FWS's biological opinion.

Plaintiffs also challenge the Corps' decision to rely on the biological opinion to satisfy

the ESA's substantive requirements to avoid jeopardizing listed species. In light of the biological

opinion's conclusion that the SPE project is not likely to jeopardize any listed species, Plaintiffs

must demonstrate that: 1) the FWS' conclusions themselves are arbitrary and capricious; and 2)

the Corps unreasonably relied on these findings. *Fla. Key Deer*, 522 F.3d at 1144-45 ("[A]nother

agency's reliance on that opinion will satisfy its obligations under the [ESA] if a challenging

party can point to no 'new' information—i.e., information the [FWS] did not take into account—

which challenges the opinion's conclusions.") (*quoting Pyramid Lake Paiute Tribe of Indians v.

U.S. Dep't of the Navy,* 898 F.2d 1410, 1415 (9th Cir. 1990)). *See also, Fund for Animals*, 85

F.3d at 541, 548 (Corps may reasonably rely upon FWS's expert determinations regarding

project effects on threatened and endangered species). As explained above, the FWS' biological

opinion is fully supported by the administrative record. Plaintiffs cite no new information

necessitating reinitiation of consultation, and the Corps reasonably relied on this biological

opinion.[26]

## CONCLUSION

For the reasons stated above, Plaintiffs' Dispositive Motion for Summary Judgment

should be denied.[27]

---

[26] In *Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 26-27 (D.D.C. 2003), the action agency continued to rely on a biological opinion that had been declared unlawful and vacated by a court. Here, by contrast, the FWS' biological opinion has not been held invalid.

[27] If the Court concludes that there was some legal error, the Court should exercise its discretion to remand these matters without vacatur. *See, e.g., Black Warrior Riverkeeper v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015) ("[W]here it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process, the remedy of remand without vacatur is surely appropriate.").

Dated: July 14, 2017                    Respectfully submitted,


                                        JEFFREY H. WOOD
                                        Acting Assistant Attorney General
                                        Environment & Natural Resources Division

                                        /s/   Mark Arthur Brown
                                        MARK ARTHUR BROWN (FL Bar No. 0999504)
                                        Senior Trial Attorney
                                        Wildlife & Marine Resources Section
                                        U.S. Department of Justice
                                        Environment and Natural Resources Division
                                        P.O. Box 7611
                                        Washington, D.C. 20044-7611
                                        mark.brown@usdoj.gov
                                        Telephone: (202) 305-0204 | (202) 305-0432
                                        Facsimile: (202) 305-0275

                                        PAUL CIRINO
                                        Trial Attorney
                                        Environmental Defense Section
                                        U.S. Department of Justice
                                        Environment and Natural Resources Division
                                        P.O. Box 7611
                                        Washington, D.C. 20044-7611
                                        paul.cirino@usdoj.gov
                                        Telephone: (202) 514-1542
                                        Facsimile: (202) 514-8865

                                        DEBRA CARFORA
                                        Trial Attorney
                                        Environmental Defense Section
                                        U.S. Department of Justice
                                        Environment and Natural Resources Division
                                        P.O. Box 7611
                                        Washington, D.C. 20044-7611
                                        debra.carfora@usdoj.gov
                                        Telephone: (202) 514-2640
                                        Facsimile: (202) 514-8865

PETER KRYN DYKEMA
Senior Trial Attorney
Natural Resources Section
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, DC 20044-7611
peter.dykema@usdoj.gov
Telephone: (202) 305-0436
Facsimile: (202) 305-0506

*Counsel for Federal Defendants*

Of Counsel:

Rachel D. Gray
Assistant District Counsel
U.S. Army Corps of Engineers
701 San Marco Boulevard
Jacksonville, Florida 32207
Telephone:  (904) 232-3713
Facsimile: (904) 232-1954
rachel.d.gray@usace.army.mil

Daniel Inkelas
U.S. Army Corps of Engineers
441 G Street, NW
Washington, D.C. 20314-1000
Telephone: (202) 761-0345
Facsimile: (202) 761-1113
daniel.inkelas@usace.army.mil

Michael Stevens
Helen Speights
Attorney-Adviser
Office of the Regional Solicitor
Southeast Region
75 Ted Turner Street SW, Suite 304
Atlanta, GA  30303
Telephone:  (404) 331-5617
Facsimile:  (404) 730-2682
mike.stevens@sol.doi.gov

CERTIFICATE OF SERVICE

      I hereby certify that on July 14, 2017, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. Counsel of record currently identified on the Mailing Information list to receive e mail notices for this case are served via Notices of Electronic Filing generated by CM/ECF.

      /s/ Mark Arthur Brown
      MARK ARTHUR BROWN