UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

v.                                       CASE NO. 8:17-cv-618-T-23MAP

U.S. ARMY CORPS
OF ENGINEERS, et al.,

     Defendants.

_____/


**ORDER**

In 2010, a predecessor of Mosaic Fertilizer applied to the Army Corps of

Engineers for a Clean Water Act (CWA) permit and proposed to mine phosphatic

rock on several thousand acres in Hardee County. Six years later, the Corps issued a

permit for the mine, which the parties call the "South Pasture Extension" (SPE)

mine. Suing (Doc. 1) under the National Environmental Policy Act (NEPA), the

Endangered Species Act (ESA), the CWA, and the Administrative Procedure Act

(APA), and claiming that the Corps acted arbitrarily and capriciously, the plaintiffs

request the invalidation of the SPE permit. The plaintiffs move (Doc. 61) for

summary judgment and assert a dozen arguments for invalidating the permit. Also,

Mosaic and the federal-government defendants move (Docs. 73 and 74) for summary

judgment and argue that the permitting process comports with the applicable law.[1]

## STANDARD OF REVIEW

Exceedingly deferential to an agency's decision, the judiciary invalidates a

decision only if the agency acted arbitrarily and capriciously. *Fund for Animals, Inc. v.

Rice*, 85 F.3d 535, 541–42 (11th Cir. 1996) (applying 5 U.S.C. § 706). An agency acts

arbitrarily and capriciously, for example, if the agency relies on an impermissible

factor, if the agency fails to consider an important aspect of an issue, if the

administrative record belies the agency's explanation for a decision, or if the agency's

explanation for a decision "is so implausible that [the decision] could not be ascribed

to a difference in view or [] agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.

State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43–44 (1983). The Eleventh Circuit

describes Section 706 of the APA as subjecting an agency's decision to a "rationality"

review. *Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1264

(11th Cir. 2009) (citing *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1359–60 (11th Cir.

2009)).

## DISCUSSION

### 1. Motion to supplement the administrative record

The plaintiffs move (Doc. 62) to append to the administrative record a series of

e-mails (Doc. 62-5) between Hardee County resident Brooks Armstrong and an

---

[1] A March 31, 2017 order (Doc. 33) grants Mosaic's motion to intervene as a defendant.

employee of the Corps. In the e-mails, Armstrong never mentions by name the proposed SPE mine but expresses several concerns about phosphate mining and the fertilizer industry. The plaintiffs argue for the inclusion of the e-mails in the administrative record "because it appears the agency relied on, or should have relied on," the e-mails. (Doc. 62 at 8)

Section 706 of the APA requires a district court to review the administrative record. *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("The focal point for judicial review of an administrative agency's action should be the administrative record."). Because an agency uniquely knows the content of the record the agency considered in deciding an issue, the judiciary defers to an agency's certification of the administrative record and permits supplementing the administrative record only if the plaintiff initially shows "strong [evidence] of bad faith or improper behavior" in the agency's production of the administrative record. *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1262 (11th Cir. 2007) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).[2]

In this action, the custodian of the administrative record for the Corps and for the Fish & Wildlife Service certified under oath that each agency respectively filed

---

[2] Dicta in *Preserve Endangered Areas of Cobb's History* mentions four circumstances in which the Ninth Circuit permits the district court to "go beyond the administrative record." 87 F.3d at 1246 n.2 (citing *Animal Def. Council v. Hodel*, 840 F.2d 1432 (9th Cir. 1988)). However, the result in this instance remains the same if *Animal Defense Council* states the law in the Eleventh Circuit (but no Eleventh Circuit decision so holds) because none of the circumstances that in the Ninth Circuit warrant supplementing the administrative record appear in this action.

the "complete administrative record." (Docs. 48-1 and 49-1)  Because the plaintiffs

show nothing approaching the bad faith or improper behavior necessary to

supplement the administrative record,[3] the plaintiffs' motion (Doc. 62) to supplement

the administrative record is **DENIED**.[4]

**2. The plaintiffs' motion for summary judgment**

### A. Failure to conduct a "site-specific" Environmental Impact Statement (EIS)

NEPA requires an agency to "take a hard look" at the environmental impact

of a proposed action but imposes on the agency no substantive obligation to preserve

the environment. *Robertson v. Methow Valley Citizens Council*, 409 U.S. 332, 350–51

(1989) ("NEPA merely prohibits uninformed — rather than unwise — agency

action.").  Under NEPA, a federal action (which includes the issuance of a CWA

permit) that "significant[ly]" impacts the environment requires an Environmental

Impact Statement (EIS).  An agency may prepare an environmental assessment to

determine whether a proposed action warrants an EIS.  If the environmental

assessment finds no "significant" impact on the environment, the agency need not

prepare an EIS. *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1214–16

(11th Cir. 2002) (explaining the NEPA procedure).  The parties agree that the SPE

---

[3] Even if the plaintiffs showed a glaring omission in the administrative record submitted to the district court, *Overton Park* explains the remedy for an inadequate administrative record: "The court may require the administrative officials who participated in the decision to give testimony explaining their action."  401 U.S. at 420.

[4] In any event, the e-mails fail to alter the conclusion that the Corps and the Fish & Wildlife Service complied with the applicable law.

mine, which affects 7,513 acres in Hardee County (including more than a thousand acres of wetlands), significantly impacts the environment and requires an EIS.

The plaintiffs contend that the Corps failed to prepare a "site-specific" EIS, but the administrative record shows that the Corps prepared a 700-page EIS, which discusses at length the environmental impact of the proposed SPE mine.[5]  Although the EIS discusses four proposed mines (the SPE, Ona, Wingate, and DeSoto mines), 40 C.F.R. § 1508.25 permits an agency to discuss several proposals in a single EIS if the proposals are "similar" or "closely related."  The Corps concluded that the four mines "have similarities that provide a basis for evaluating [the four mines'] direct, indirect, and cumulative environmental impacts in a single Areawide Environmental Impact Statement" (AR_0250103), and the plaintiffs submit no challenge to that conclusion.[6]

## B. Unlawfully narrow "need statement"

Before approving a proposal, an agency must consider reasonable alternatives; the suitability of an alternative depends on the project's purpose, which the agency defines.  The Corps defined the SPE mine's purpose as providing 3.37 million metric tons of phosphatic rock annually for the South Pasture beneficiation plant. According to the plaintiffs, the Corps' identification of 3.37 million metric tons as the project's

---

[5] (AR_0250285–0251005)

[6] Also, the plaintiffs argue that the Corps issued the Record of Decision (ROD) before the EIS, but the Corps approved the ROD on November 10, 2016 (AR_0287182), three years after the April 2013 EIS and five months after a supplemental assessment in which the Corps concluded that updated information from Mosaic about the proposed SPE mine warranted no new EIS.

purpose preordained the rejection of any alternative "that did not guarantee the extraction of that exact amount of phosphate." (Doc. 61 at 26)

The plaintiffs show nothing arbitrary and capricious about the Corps' definition of the project's need. The South Pasture mine supplies the nearby South Pasture beneficiation plant with phosphatic rock for the moment, and Mosaic plans to supply the plant with phosphatic rock from the SPE mine after exhausting the South Pasture mine. Because the South Pasture beneficiation plant can process 3.5 million metric tons annually, Mosaic aspired to mine that amount. The Corps initially reduced the SPE mine's need to 3.43 million metric tons, the South Pasture mine's average output from 2010 through 2014. (AR_0275355) The Corps eventually settled on 3.37 million metric tons annually, which the Corps identified as the "most conservative value for the project-specific need." (AR_0275355) In other words, the administrative record shows that the Corps rationally defined the project's need as the amount of phosphatic rock necessary to supply the South Pasture beneficiation plant.

### C. Failure to consider phosphogypsum stacks

Fertilizer producers in Florida often store the weakly radioactive by-product of fertilizer production in phosphogypsum stacks, which both the EPA and the State of Florida regulate. The plaintiffs argue that the Corps failed to consider the effects of the phosphogypsum stacks on the environment and on public health. (Doc. 61 at 23) The defendants respond persuasively (Doc. 65 at 8–9 and Doc. 65 at 10–11) that the

Corps' jurisdiction excludes consideration of phosphogypsum stacks in this instance, that a phosphogypsum stack is "independent" from the proposed SPE mine,[7] and that the Corps considered the effects of the by-product where required. Again, the plaintiffs fail to identify anything arbitrary and capricious about the Corps' treatment of the phosphogypsum stacks.

**D. Failure to select a "least environmentally damaging practicable alternative"**

40 C.F.R. § 230.10 prohibits an agency's permitting a discharge of dredged or fill materials if a practicable alternative causes less harm to the environment. Under 40 C.F.R. § 230.10(a)(2), the practicability of an alternative depends partially on the "cost, existing technology, and logistics" of the alternative. The plaintiffs challenge as arbitrary and capricious the Corps' exclusion of an alternative that contemplated mining phosphatic rock more than ten miles from the South Pasture beneficiation plant. According to the plaintiffs, the exclusion of an alternative more than ten miles from the beneficiation plant "predetermined the results of the LEDPA analysis and precluded analysis of alternatives involving imported rock." (Doc. 61 at 28)

In the EIS, the Corps cogently explained the impracticability of a phosphatic-rock mine more than ten miles from the South Pasture beneficiation plant. (AR_250403–08) To move phosphatic rock from a mine to a beneficiation

---

[7] Although significantly less costly to mine phosphatic rock locally than to import phosphate mined outside Florida, a fertilizer plant can use imported phosphate to produce fertilizer. Because Mosaic's fertilizer plants will produce the by-product even if the SPE mine supplies no phosphate (that is, a fertilizer plant will use imported phosphate), the Corps' conclusion that the by-product is "independent" from the proposed SPE mine is rational.

plant, the miner mixes the rock with water, which creates a dense "slurry" laden with natural clays and other materials indigenous to the earth, and the miner pumps the slurry through a pipeline. The miner must position a million-dollar pump about every mile along the pipeline to prevent the slurry from "settling to the bottom and choking the pipeline." (AR_250404–05) The cost of equipment, maintenance, and power for the pipeline increases exponentially as the length of the pipeline increases. Citing the "costs and logistics" of transporting phosphatic rock from a distant mine to the South Pasture beneficiation plant, Mosaic explained to the Corps (and the Corps verified) that a mine more than ten miles from the plant would prove commercially impracticable. The plaintiffs identify nothing arbitrary and capricious about the Corps' exclusion of a phosphatic-rock mine more than ten miles from the beneficiation plant.

Also, the plaintiffs claim that the Corps failed to investigate the practicability of importing phosphatic rock to supply the South Pasture beneficiation plant. (Doc. 61 at 28–29) Because of the "significant logistical and cost impediments" to importing phosphatic rock from outside central Florida, the Corps considered and rejected as impracticable the importation of phosphatic rock from either another region of the United States or from abroad. (AR_250391–93) The Corps found that "all phosphate rock currently mined in the U.S. is being utilized" (AR_250393), and the Corps concluded that importing phosphatic rock from Africa or South America decisively and prohibitively increases the cost of producing fertilizer and other

phosphoric products.  That conclusion appears at least rational (and perhaps

obvious).  Again, the plaintiffs identify nothing arbitrary and capricious about the

Corps' conclusion that the costs of, and the risks attendant to, importing rock from

abroad renders importation impracticable in this instance.

### E. Failure to consider the reasonably foreseeable detriments of fertilizer

33 C.F.R. § 320.4(a)(1) requires the Corps to weigh the reasonably foreseeable

benefits of a proposal against the reasonably foreseeable detriments in deciding

whether to issue a CWA permit.  Citing three pages of the administrative record

(287152, 287153, and 250785), the plaintiffs claim that the Corps considered the

reasonably foreseeable benefits of fertilizer but failed to consider the reasonably

foreseeable detriments.[8]  (Doc. 61 at 30)  None of the pages supports the plaintiffs'

claims.  Although the pages mention the economic benefits of the SPE mine, nothing

on those pages appears to weigh the benefits of the fertilizer industry generally.  As

Mosaic observes, "the SPE mine — and not the fertilizer industry as a whole — was

the basis of the project benefits that the Corps identified."  (Doc. 65 at 12)

### F. Failure to comply with the "Compensatory Mitigation Rule"

The plaintiffs claim several violations of the Compensatory Mitigation Rule,

40 C.F.R. § 230.93, which requires an applicant to mitigate the unavoidable effects of

---

[8] Rule 56(c)(1) requires that a movant cite "particular parts of materials in the record" to support an argument. Also, Section 706 requires the judiciary to review either the entire record or "those parts of [the administrative record] cited by a party." In this instance, the size of this administrative record —more than 316,000 pages—precludes the judiciary's reviewing the entire record.

a proposed action through "restoration, enhancement, establishment, and in certain circumstances preservation" of wetlands.  Sometimes called the "no-net-loss rule," Section 230.93(f)(1) requires an applicant to offset each acre of affected wetlands by restoring, enhancing, establishing, or preserving an acre of wetlands.

The plaintiffs argue that the Corps erred by failing to "require a one-to-one ratio of mitigation through wetland[s] preservation." (Doc. 61 at 19–20)  But the plaintiffs misconceive and misstate the rule, which provides that restoration "should generally be the first option considered" by the Corps but imposes no inflexible duty on an applicant to "restore" or to "preserve" an acre of wetlands in mitigation.  As explained above, 40 C.F.R. § 230.93(a)(2) permits mitigation through "restoration, enhancement, establishment, and in certain circumstances preservation."  The plaintiffs acknowledge that the CWA permit requires Mosaic to offset 1,198.17 acres of affected wetlands through the establishment, preservation, or restoration of 2,526.3 acres of wetlands.  (Doc. 61 at n.15)  By requiring the mitigation of more than twice the acreage affected by the proposed SPE mine,[9] the permit amply satisfies the "no-net-loss" requirement.

Also, the plaintiffs argue that the Corps failed to consider the "uncertainties and risks" inherent in wetlands restoration.  But Chapter Five of the EIS describes the state of scientific knowledge about wetlands reclamation and observes that advances in wetlands-reclamation practices have rendered recent restoration efforts

---

[9] AR_287415.

more successful than earlier efforts.  And *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 102–03 (1983), states that a scientific prediction "at the frontiers of science" commands more deference than another finding of fact by the agency. Additionally, the plaintiffs argue that the Corps "failed to take into account the applicant's record of non-compliance with its existing mitigation at the adjacent South Pasture Mine." (Doc. 61 at 21)  Although a handful of documents suggest Mosaic's infrequent non-compliance with mitigation required by another permit,[10] other documents show that Mosaic more often than not successfully mitigated wetlands impacts.[11]  In sum, the Corps' decision to issue the CWA permit appears rational and consequently merits deference.

### G. Failure to hold a public hearing

The plaintiffs argue that the Corps arbitrarily and capriciously denied several requests for a public hearing.  (Doc. 61 at 33)  As *Fund for Animals* explains, 33 C.F.R. § 327.4 affords the Corps discretion in deciding whether to hold a hearing. 85 F.3d at 545.  If the Corps concludes that a public hearing would add neither new information nor a new perspective to the decision-making process, the Corps may deny the request for a hearing.

The Corps held several public hearings on the proposed SPE mine and accepted public comments on several occasions.  Concluding that another public

---

[10] For example, AR_263031–32.

[11] For example, AR_290799–866.

- 11 -

hearing would merely re-hash issues resolved by the EIS, an addendum to the EIS,

and the supplemental environmental assessment, the Corps denied the requests for a

public hearing.  (AR_287128–29)  The plaintiffs' motion for summary judgment

identifies no new information or perspective that warranted another hearing.  *See*

*Fund for Animals*, 85 F.3d at 546 (finding nothing arbitrary about the Corps' denial of

a request for public hearing where the administrative record included "voluminous

information" from wildlife organizations and where the plaintiffs failed to identify

any new information that warranted another public hearing).

### H. Violations of the Endangered Species Act

Under the ESA, a federal agency must consult with the Secretary of the

Interior[12] to determine whether a proposed action likely will jeopardize an

endangered or threatened species or the species' habitat.  To determine whether a

proposed action affects an endangered species, the Fish & Wildlife Service prepares

an "environmental baseline," which comprises the "past and present impacts of all

Federal, State, or private actions and other human activities in the area" and the

"anticipated impacts of all proposed Federal projects in the action area which are

contemporaneous with the consultation in process."  50 C.F.R. § 402.02.

---

[12] Under 50 C.F.R. § 402.02, the Secretary delegates the duty to prepare a biological opinion
to the Fish & Wildlife Service.

The plaintiffs claim several violations of the ESA.[13]  First, the plaintiffs argue

that the Fish & Wildlife Service's failure to account for the proposed DeSoto, Ona,

and Wingate East mines impermissibly taints the environmental baseline for the

proposed SPE mine.  (Doc. 61 at 36)  But 50 C.F.R. § 402.02 requires that the Fish &

Wildlife Service include in the environmental baseline only a proposed federal action

that "ha[s] already undergone formal or early section 7 consultation."  When the

Fish & Wildlife Service issued the biological opinion for the proposed SPE mine on

June 9, 2014, neither the DeSoto nor the Ona mine proposals "ha[d] already

undergone" consultation.[14]  And the Corps explains that the "action areas of the

relevant species for Wingate East did not overlap with the corresponding action areas

for the SPE project."  (Doc. 66 at 19)  The Corps and the Fish & Wildlife Service

rationally excluded the other proposed mines from the environmental baseline of the

proposed SPE mine.

Second, the plaintiffs claim that the Fish & Wildlife Service mis-characterized

the permanent destruction of some unspecified species' habitat as "temporary."

(Doc. 61 at 25–26)  But the Fish & Wildlife Service observed that Mosaic's

reclamation efforts would adequately restore the affected land (and in some instances

---

[13] The plaintiffs claim that the EIS "is a 'programmatic level' action that requires its own consultation" (Doc. 61 at 35), but as explained in Section 2A of this order, the EIS specifically discusses the proposed SPE mine.

[14] The plaintiffs claim that the failure to include the other mines in the biological opinion for the SPE mine "leaves impacts on species entirely unconsidered" (Doc. 61 at 36), but the environmental baseline for another proposed mine in the same area must include the SPE mine.

would improve the land's suitability for habitation by a threatened or endangered species).[15]  (FWS_22199, 22200, 22201)

Third, the plaintiffs argue that the Fish & Wildlife Service failed to quantify "take" for several specifies.[16]  For example, the plaintiffs claim that the ESA requires the Fish & Wildlife Service to specify the number of eastern indigo snakes and wood storks subject to harassment from the construction or operation of the SPE mine.  But the ESA requires the Fish & Wildlife Service to quantify "take" if practicable.  *See Miccosukee Tribe of Indians*, 566 F.3d at 1274–75.  The Fish & Wildlife Service identified several characteristics of the eastern indigo snake's habitat and behavior that preclude quantifying the "take" from harassment.  (AR_263527)  Also, the Fish & Wildlife Service found that the wood stork's usage of the SPE mine "is limited" and that "harassment would be insignificant or discountable."  (FWS_22255)  Again, the plaintiffs fail to show that the Fish & Wildlife Service or the Corps acted arbitrarily and capriciously.[17]

---

[15] Also, the plaintiffs claim that the Fish & Wildlife Service failed to use the "best scientific and commercial data available" (Doc. 61 at 37–38) but fail to identify any superior data on which the Fish & Wildlife Service purportedly should have relied.

[16] 16 U.S.C. § 1532 defines to "take" as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."

[17] Also, the plaintiffs argue that the Fish & Wildlife Service failed to set an adequate "trigger" and that purportedly new information required the Fish & Wildlife Service to update the biological opinion. The defendants respond (Doc. 65 at 21–24 and Doc. 66 at 22–24) persuasively and refute those arguments.

## CONCLUSION

For the reasons explained above and for the reasons in the defendants'
responses (Docs. 65 and 66) in opposition to summary judgment, the plaintiffs fail to
show arbitrary and capricious action. The plaintiffs' motion (Doc. 61) for summary
judgment is **DENIED**. The defendants' motions (Docs. 73 and 74) for summary
judgment are **GRANTED**, and the clerk is directed to enter judgment for the
defendants and against the plaintiffs. After entering judgment, the clerk must close
the case.

ORDERED in Tampa, Florida, on December 14, 2017.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE